CC TO JUDGE __ES__

____ FILED        ____ ENTERED
____ LODGED     ____ RECEIVED

JUN - 3 2005    ES

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY                                    DEPUTY

05-CV-01016-CMP

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

DOMINICK LORIGGIO, on behalf of himself
and all others similarly situated,

                    Plaintiff,

    vs.

JAMES E. ROTTSOLK, PETER J. UNGARO,
DAVID R. KIEFER, SCOTT J. POTERACKI,
KENNETH W. JOHNSON, BURTON J.
SMITH, KENNETH W. KENNEDY, JR.,
STEPHEN C. KIELY, DANIEL C. REGIS,
SALLY G. NARODICK, FRANK L.
LEDERMAN, and JOHN B. JONES, JR.,

                    Defendants,

    -and-

CRAY INC., a Washington corporation,

                    Nominal Defendant.

Case No.

# C05-1016 RSL

CLASS ACTION

VERIFIED DERIVATIVE COMPLAINT
FOR BREACH OF FIDUCIARY DUTY,
ABUSE OF CONTROL, GROSS
MISMANAGEMENT, WASTE OF
CORPORATE ASSETS, AND UNJUST
ENRICHMENT

DEMAND FOR JURY TRIAL

       Plaintiff Dominick Loriggio ("Loriggio" or "Plaintiff"), by his attorneys, submit this

Verified Derivative Complaint (the "Complaint") against the defendants named herein.

## I. NATURE OF THE ACTION

       1.    This is a shareholder derivative action brought by shareholders of Cray Inc. ("Cray"

or the "Company"), which is both incorporated in and maintains its headquarters in Washington, on

behalf of the Company against certain of its officers and directors seeking to remedy defendants'

violations of state law, including breaches of fiduciary duties, abuse of control, gross

mismanagement, waste of corporate assets and unjust enrichment that occurred between July 31,

ORIGINAL

VERIFIED DERIVATIVE COMPLAINT      - 1 -

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Avenue SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870

1    2003 and the present (the "Relevant Period"). These breaches of fiduciary duty and violations of law
2    have caused Cray to suffer damages, as alleged herein.

## II.  OVERVIEW OF THE CASE

4       2.      Cray is engaged in the design, development, marketing and support of high-
5    performance computer systems, commonly known as supercomputers. These systems provide higher
6    capability and capacity than typical mainframe computer systems and address challenging computing
7    problems for government, industry and academia. Because of the complex nature of the products
8    and services produced by Cray, the Company's contracts with its customers often contain complex
9    terms that impact our recognition and determination of revenue (including customer rights of return,
10   multiple elements and contingencies that can have a material impact on the recognition or deferral
11   of revenue) and balance sheet classification of deferred revenue.

12      3.      Throughout the Relevant Period defendants knowingly misrepresented both the
13   dynamics of Cray's business model and the Company's internal controls with regard to its financial
14   reporting process. In so doing, the individual defendants represented that  the receipt of new
15   contracts was the driving force behind its revenue growth. In fact, however, Cray's revenues were
16   largely dependent upon the speed of on-site acceptance testing, improved manufacturing processes,
17   access to key parts and components and its ability to manufacture and qualify new supercomputer
18   models. Throughout the Relevant Period, Defendants focused on the receipt of contracts to portray
19   the Company's financial prospects since Cray's internal controls were flawed and ineffective. As
20   a result, it was difficult for Cray to manage basic operational tasks, such as the development of
21   software applications, to manage customer requirements and specifications for system per contract,
22   and to accurately report and forecast the revenue which it could properly recognize. Furthermore,
23   throughout the Relevant Period, Cray was unable to secure key parts and components needed to
24   manufacture its new lines of supercomputers.

25      4.      These problems manifested themselves throughout the Relevant Period in the form
26   of unpredictable and repetitive missed quarterly revenue guidance. Over time, a huge order backlog
27   for Cray's supercomputers developed, growing as large as $127 million. In the interim period,
28   defendants took steps to conceal the Company's basic problems. Defendants did so by misleading

VERIFIED DERIVATIVE COMPLAINT          - 2 -

1  analysts about expectations for future revenue recognition in later quarters and through concealment
2  of basic performance issues, such as losses in performance of customer contracts and delays in the
3  receipt of critical parts to build computer systems, and through active misrepresentation of the
4  Company's internal controls with respect to financial reporting.

5      5.    On March 16, 2005, Cray revealed that, commensurate with its Sarbanes-Oxley
6  activities, it expected to document material weaknesses in its system of internal controls and also
7  expected to report that these controls were ineffective. Moreover, the Company reported that its own
8  auditors have expressed serious reservations, including whether or not the auditors would be able
9  to render an opinion on either the Company's own assessment or its internal controls. Shockingly,
10 these revelations came less than two weeks after the Company's filing of an SEC Form S-3, in
11 connection with the resale or conversion of $80 million in convertible debt notes issued in December
12 2004. Following the shocking news, on March 17, 2005, the price of Cray's stock fell $0.78 per
13 share, for an astonishing 25.9% loss, closing at $2.23, on volume of 14.8 million shares.

14     6.    Finally, on May 9, 2005, Cray revealed that it had failed to include an auditor's
15 opinion on management's assessment of internal control over financial reporting, required pursuant
16 to Section 404 of the Sarbanes-Oxley Act of 2002 in its Form 10K/A filed on May 3, 2005.
17 Moreover, Cray continued to report revenue results adversely impacted by faulty internal controls
18 and practices of past quarters. In response to this shocking news, the price of Cray's stock was dealt
19 a final blow, falling $0.74 per share over the three-day period ending on May 12, 2005, for an
20 astonishing 35.6% loss, closing at $1.34, on combined volume of 9.5 million shares, *destroying more*
21 *than $1 billion in market capitalization.*

22     7.    During the Relevant Period, defendants knew and concealed the fact that:

23         (a)    The Company was virtually devoid of internal controls with regard to its
24 financial reporting and forecasting;

25         (b)    The Company lacked the processes, staffing and training in its finance and
26 accounting departments to properly analyze, report and forecast properly recognizable revenue from
27 its unique and complex contracts with customers;

28

VERIFIED DERIVATIVE COMPLAINT          - 3 -

1           (c)      Due to the unique nature of the Company's business and the high degree of

2 complexity with regard to Cray's products, the speed and cost of on-site acceptance testing or

3 improved processes for building machines, in accordance with customer requirements and

4 specifications, had become increasingly unfavorable at Cray and were unlikely to get better anytime

5 soon;

6           (d)      Cray's own auditors and Audit Committee was aware the flawed and

7 ineffective nature of the Company's internal controls;

8           (e)      Delays in realization of inventory and recognition of revenue were a recurring

9 and unpredictable feature of both Cray's business model and its ineffective and flawed financial

10 reporting processes and lack of internal controls;

11           (f)      Delays in the receipt of critical parts for hardware assembly were contributing

12 to delays in the development, assembly, shipment and acceptance testing of the Company's

13 "products";

14           (g)      Cray's "products" were hardware and software component configurations that

15 could be substantially altered in accordance with customer requirements and specifications;

16           (h)      Cray was in no position to capitalize on the four-fold increase in the

17 addressable market resulting from the OctigaBay acquisition;

18           (i)      Each new customer order presented a new set of hardware and software

19 development challenges, complicated by the complexity of the contracts which could not be properly

20 and critically analyzed due to the flawed and ineffective nature of Cray's internal controls;

21           (j)      Cray was losing money or breaking even on certain of its largest customer

22 orders; and

23           (k)      The inherent unpredictability of Cray's quarterly revenue guidance had far

24 more to do with the flawed and ineffective nature of the Company's internal controls than the timing

25 of customer contract awards.

26                          **III.  JURISDICTION AND VENUE**

27       8.      This Court has jurisdiction over all claims asserted herein pursuant to 28 U.S.C.

28 §1332(a)(2), because complete diversity exists between plaintiff and each defendant, and the amount

VERIFIED DERIVATIVE COMPLAINT      - 4 -

1   in controversy exceeds $75,000. This action is not a collusive action designed to confer jurisdiction

2   on a court of the United States that it would not otherwise have.

3         9.     This Court has jurisdiction over each defendant named herein because each defendant

4   is either a corporation that conducts business in and maintains operations in this District, or is an

5   individual who has sufficient minimum contacts with Washington so as to render the exercise of

6   jurisdiction by the Washington courts permissible under traditional notions of fair play and

7   substantial justice.

8         10.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because a substantial

9   portion of the transactions and wrongs complained of herein, including Defendants' primary

10   participation in the wrongful acts detailed herein, occurred in this District. One or more of the

11   defendants either resides in or maintains executive offices in this District, and defendants have

12   received substantial compensation in this District by engaging in numerous activities and conducting

13   business here, which had an effect in this District.

## IV. PARTIES

15         11.     Plaintiff Loriggio at all relevant times owned and continues to own shares of Cray

16   common stock. Loriggio is a resident of New York.

17         12.     Nominal defendant Cray, a Washington corporation, is engaged in the design,

18   development marketing and support of high-performance computer systems, commonly known as

19   supercomputers. These systems provide higher capability and capacity than typical mainframe

20   computer systems and address challenging computing problems for government, industry and

21   academia. Cray maintains its corporate and administrative offices, where the Company's day-to-day

22   business activities are conducted at 411 First Avenue South, Suite 600, Seattle, Washington 98104.

23         13.     Defendant James E. Rottsolk ("Rottsolk") is currently, and has been a director of the

24   Company since 1987. Rottsolk was one of the Company's co-founders and serves as Chairman and

25   Chief Executive Officer. Rottsolk served as Chief Executive Officer from the inception of Cray in

26   1987 through September 2001 and from March 2002 to the present. He served as President from

27   1987 through September 2001 and from March 2002 until March 7, 2005. Rottsolk has served as

28   Chairman of the Board since December 2000 to the present. Because of Rottsolk's positions with

VERIFIED DERIVATIVE COMPLAINT      - 5 -

1   the Company, he knew material, adverse non-public information regarding Cray and the fact that the
2   Company disseminated false and misleading financial information throughout the Relevant Period.
3   Among other things, Rottsolk was aware of the fact that Cray lacked internal controls necessary to
4   accurately report the Company's financial results throughout the Relevant Period. Rottsolk was
5   aware of this information via his access to internal corporate documents, conversations and
6   connections with other corporate officers and employees, attendance at management and Board
7   meetings and committees thereof and via reports and other information provided to him in
8   connection therewith. During the Relevant Period, Rottsolk participated in the issuance of false
9   and/or misleading statements, including the preparation of false and/or misleading press releases and
10   Securities and Exchange Commission ("SEC") filings. During the Relevant Period, while in
11   possession of the undisclosed adverse information set forth herein, Rottsolk sold 75,000 shares of
12   Cray stock for proceeds of $971,906. Upon information and belief, Rottsolk is a citizen of
13   Washington.

14         14.     Defendant Burton J. Smith ("Smith") is currently, and has been a director of the
15   Company since 1988. Smith was one of the Company's co-founders and served as Chairman from
16   1988 to 1999. Because of Smith's positions with the Company, he knew material, adverse
17   non-public information regarding Cray and the fact that the Company disseminated false and
18   misleading financial information throughout the Relevant Period. Among other things, Smith was
19   aware of the fact that Cray lacked internal controls necessary to accurately report the Company's
20   financial results throughout the Relevant Period. Smith was aware of this information via his access
21   to internal corporate documents, conversations and connections with other corporate officers and
22   employees, attendance at management and Board meetings and committees thereof and via reports
23   and other information provided to him in connection therewith. During the Relevant Period, Smith
24   participated in the issuance of false and/or misleading statements, including the preparation of false
25   and/or misleading press releases and Securities and Exchange Commission ("SEC") filings. During
26   the Relevant Period, while in possession of the undisclosed adverse information set forth herein,
27   Smith sold 49,548 shares of Cray stock for proceeds of $539,052. Upon information and belief,
28   Smith is a citizen of Washington.

VERIFIED DERIVATIVE COMPLAINT       - 6 -      

1     15.     Defendant Peter J. Ungaro ("Ungaro") at relevant times was President of Cray.
2  Because of Ungaro's positions with the Company, he knew material, adverse non-public information
3  regarding Cray and the fact that the Company disseminated false and misleading financial
4  information throughout the Relevant Period. Among other things, Ungaro was aware of the fact that
5  Cray lacked internal controls necessary to accurately report the Company's financial results
6  throughout the Relevant Period. Ungaro was aware of this information via his access to internal
7  corporate documents, conversations and connections with other corporate officers and employees,
8  attendance at management and Board meetings and committees thereof and via reports and other
9  information provided to him in connection therewith. During the Relevant Period, Ungaro
10 participated in the issuance of false and/or misleading statements, including the preparation of false
11 and/or misleading press releases and Securities and Exchange Commission ("SEC") filings. Upon
12 information and belief, Ungaro is a citizen of Washington.

13    16.     Defendant David R. Kiefer ("Kiefer") at relevant times was Sr. Vice President of
14 Cray. Because of Kiefer's positions with the Company, he knew material, adverse non-public
15 information regarding Cray and the fact that the Company disseminated false and misleading
16 financial information throughout the Relevant Period. Among other things, Kiefer was aware of the
17 fact that Cray lacked internal controls necessary to accurately report the Company's financial results
18 throughout the Relevant Period. Kiefer was aware of this information via his access to internal
19 corporate documents, conversations and connections with other corporate officers and employees,
20 attendance at management and Board meetings and committees thereof and via reports and other
21 information provided to him in connection therewith. During the Relevant Period, Kiefer
22 participated in the issuance of false and/or misleading statements, including the preparation of false
23 and/or misleading press releases and Securities and Exchange Commission ("SEC") filings. During
24 the Relevant Period, while in possession of the undisclosed adverse information set forth herein,
25 Kiefer sold approximately $2.2 million worth of his Cray Stock.  Upon information and belief,
26 Kiefer is a citizen of Washington.

27    17.     Defendant Scott J. Poteracki ("Poteracki") at relevant times was Senior Vice
28 President of Finance and Chief Financial Officer of Cray. Defendant Poteracki resigned his positions

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Avenue SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870

1   at Cray effective November 9, 2004.   Because of Poteracki's positions with the Company, he knew

2   material, adverse non-public information regarding Cray and the fact that the Company disseminated

3   false and misleading financial information throughout the Relevant Period.   Among other things,

4   Poteracki was aware of the fact that Cray lacked internal controls necessary to accurately report the

5   Company's financial results throughout the Relevant Period.     Poteracki was aware of this

6   information via his access to internal corporate documents, conversations and connections with other

7   corporate officers and employees, attendance at management and Board meetings and committees

8   thereof and via reports and other information provided to him in connection therewith.   During the

9   Relevant Period,   Poteracki participated in the issuance of false and/or misleading statements,

10   including the preparation of false and/or misleading press releases and Securities and Exchange

11   Commission ("SEC") filings.   During the Relevant Period, while in possession of the undisclosed

12   adverse information set forth herein, Poteracki sold 37,679 shares of Cray stock for proceeds of

13   $473,198.   Upon information and belief, Poteracki is a citizen of California.

14          18.      Defendant Kenneth W. Johnson ("Johnson") was General Counsel, Secretary and

15   CFO of Cray.   Because of   Johnson's positions with the Company, he knew material, adverse

16   non-public information regarding Cray and the fact that the Company disseminated false and

17   misleading financial information throughout the Relevant Period.   Among other things,   Johnson

18   was aware of the fact that Cray lacked internal controls necessary to accurately report the Company's

19   financial results throughout the Relevant Period.    Johnson was aware of this information via his

20   access to internal corporate documents, conversations and connections with other corporate officers

21   and employees, attendance at management and Board meetings and committees thereof and via

22   reports and other information provided to him in connection therewith.   During the Relevant Period,

23   Johnson participated in the issuance of false and/or misleading statements, including the preparation

24   of false and/or misleading press releases and Securities and Exchange Commission ("SEC") filings.

25   During the Relevant Period, while in possession of the undisclosed adverse information set forth

26   herein, Johnson sold approximately $972,587 worth of his Cray Stock.    Upon information and

27   belief, Johnson is a citizen of Washington.

28

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Avenue SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870

19.     Defendant Kenneth W. Kennedy, Jr. ("Kennedy") is currently, and has been a director of the Company since 1989. Because of Kennedy's positions with the Company, he knew material, adverse non-public information regarding Cray and the fact that the Company disseminated false and misleading financial information throughout the Relevant Period. Among other things, Kennedy was aware of the fact that Cray lacked internal controls necessary to accurately report the Company's financial results throughout the Relevant Period. Kennedy was aware of this information via his access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Kennedy participated in the issuance of false and/or misleading statements, including the preparation of false and/or misleading press releases and Securities and Exchange Commission ("SEC") filings. During the Relevant Period, while in possession of the undisclosed adverse information set forth herein, Kennedy sold 900 shares of Cray stock for proceeds of $10,404. Upon information and belief, Kennedy is a citizen of Texas.

20.     Defendant Stephen C. Kiely ("Kiely") is currently, and has been a director of the Company since 1999. Because of Kiely's positions with the Company, he knew material, adverse non-public information regarding Cray and the fact that the Company disseminated false and misleading financial information throughout the Relevant Period. Among other things, Kiely was aware of the fact that Cray lacked internal controls necessary to accurately report the Company's financial results throughout the Relevant Period. Kiely was aware of this information via his access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Kiely participated in the issuance of false and/or misleading statements, including the preparation of false and/or misleading press releases and Securities and Exchange Commission ("SEC") filings. Upon information and belief, Kiely is a citizen of Massachusetts.

21.     Defendant Daniel C. Regis ("Regis") is currently, and has been a director of the Company since 2003. Because of Regis' positions with the Company, he knew material, adverse

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Avenue SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870

1  non-public information regarding Cray and the fact that the Company disseminated false and
2  misleading financial information throughout the Relevant Period. Among other things, Regis was
3  aware of the fact that Cray lacked internal controls necessary to accurately report the Company's
4  financial results throughout the Relevant Period. Regis was aware of this information via his access
5  to internal corporate documents, conversations and connections with other corporate officers and
6  employees, attendance at management and Board meetings and committees thereof and via reports
7  and other information provided to him in connection therewith. During the Relevant Period, Regis
8  participated in the issuance of false and/or misleading statements, including the preparation of false
9  and/or misleading press releases and Securities and Exchange Commission ("SEC") filings. During
10 the Relevant Period, while in possession of the undisclosed adverse information set forth herein,
11 Regis sold 31,999 shares of Cray stock for proceeds of $212,185.   Upon information and belief,
12 Regis is a citizen of Washington.

13     22.    Defendant Sally G. Narodick ("Narodick") is currently, and has been a director of the
14 Company since October 2004. Because of Narodick's positions with the Company, she knew
15 material, adverse non-public information regarding Cray and the fact that the Company disseminated
16 false and misleading financial information throughout the Relevant Period. Among other things,
17 Narodick was aware of the fact that Cray lacked internal controls necessary to accurately report the
18 Company's financial results throughout the Relevant Period.   Narodick was aware of this
19 information via her access to internal corporate documents, conversations and connections with other
20 corporate officers and employees, attendance at management and Board meetings and committees
21 thereof and via reports and other information provided to him in connection therewith. During the
22 Relevant Period, Narodick participated in the issuance of false and/or misleading statements,
23 including the preparation of false and/or misleading press releases and Securities and Exchange
24 Commission ("SEC") filings. Upon information and belief, Narodick is a citizen of Washington.

25     23.    Defendant Stephen C. Richards ("Richards") is currently, and has been a director of
26 the Company since October 2004. Because of Richards' positions with the Company, he knew
27 material, adverse non-public information regarding Cray and the fact that the Company disseminated
28 false and misleading financial information throughout the Relevant Period. Among other things,

VERIFIED DERIVATIVE COMPLAINT          - 10 -

1    Richards was aware of the fact that Cray lacked internal controls necessary to accurately report the
2    Company's financial results throughout the Relevant Period. Richards was aware of this information
3    via his access to internal corporate documents, conversations and connections with other corporate
4    officers and employees, attendance at management and Board meetings and committees thereof and
5    via reports and other information provided to him in connection therewith. During the Relevant
6    Period, Richards participated in the issuance of false and/or misleading statements, including the
7    preparation of false and/or misleading press releases and Securities and Exchange Commission
8    ("SEC") filings. Upon information and belief, Richards is a citizen of California.

9          24.     Defendant Frank L. Lederman ("Lederman") is currently, and has been a director of
10   the Company since May 2004. Because of Lederman's positions with the Company, he knew
11   material, adverse non-public information regarding Cray and the fact that the Company disseminated
12   false and misleading financial information throughout the Relevant Period. Among other things,
13   Lederman was aware of the fact that Cray lacked internal controls necessary to accurately report the
14   Company's financial results throughout the Relevant Period. Lederman was aware of this
15   information via his access to internal corporate documents, conversations and connections with other
16   corporate officers and employees, attendance at management and Board meetings and committees
17   thereof and via reports and other information provided to him in connection therewith. During the
18   Relevant Period, Lederman participated in the issuance of false and/or misleading statements,
19   including the preparation of false and/or misleading press releases and Securities and Exchange
20   Commission ("SEC") filings. Upon information and belief, Lederman is a citizen of Arizona.

21         25.     Defendant John B. Jones, Jr. ("Jones") is currently, and has been a director of the
22   Company since December 2004. Because of Jones' positions with the Company, he knew material,
23   adverse non-public information regarding Cray and the fact that the Company disseminated false and
24   misleading financial information throughout the Relevant Period. Among other things, Jones was
25   aware of the fact that Cray lacked internal controls necessary to accurately report the Company's
26   financial results throughout the Relevant Period. Jones was aware of this information via his access
27   to internal corporate documents, conversations and connections with other corporate officers and
28   employees, attendance at management and Board meetings and committees thereof and via reports

VERIFIED DERIVATIVE COMPLAINT          - 11 -

1   and other information provided to him in connection therewith.  During the Relevant Period, Jones
2   participated in the issuance of false and/or misleading statements, including the preparation of false
3   and/or misleading press releases and Securities and Exchange Commission ("SEC") filings.  Upon
4   information and belief, Jones is a citizen of California.

5     26. The defendants identified in ¶¶13-14 and 19-25 are referred to herein as the "Director
6   Defendants."  The defendants identified in ¶¶13 and 15-18 are referred to herein as the "Officer
7   Defendants."  The defendants identified in ¶¶13-14, 16-19 and 21 are referred to herein as the
8   "Insider Selling Defendants."  Collectively, the Director Defendants, the Officer Defendants and the
9   Selling Defendants are referred to herein as the "Individual Defendants."

10   **V. CRAY'S BOARD, AND BOARD SUBCOMMITTEES**

11     27. The Company's Annual Proxy Statement for the Company's Annual Meeting of
12   Shareholders was filed on April 14, 2005 (the "2005 Proxy").  Among other things, the 2005 Proxy
13   provides information pertaining to executive compensation, ownership of securities and
14   organizational information pertaining to the Board.  During the Company's 2004 fiscal year ("FY
15   2004"), the full Board met seven times and the Board committees held a total of 23 meetings..  Each
16   director attended at least 85% of the meetings of the Board and relevant committees, except that
17   Daniel J. Evans attended 14 of 21 total meetings of the Board and committees on which he sat and,
18   before his resignation from the Board, William A. Owens attended four of six total meetings of the
19   Board and committees on which he sat.  The current standing committees of the Board are: (i) the
20   Audit Committee; (ii) the Compensation Committee; and (iii) the Nominating Committee and
21   Corporate Governance Committee.

22     28. With respect to the Audit Committee, the Individual Defendants caused the Company
23   to disclose:

24     **A. Audit Committee**

25     The current members of the Audit Committee are defendants Regis (Chair), Richards and
26   Narodick.  During fiscal 2004, Daniel J. Evans and defendant Lederman also served on the Audit
27   Committee.  The Audit Committee had 11 meetings during 2004.  According to the 2005 Proxy:

28

VERIFIED DERIVATIVE COMPLAINT  - 12 -  **LAW OFFICES OF**
**CLIFFORD A. CANTOR, P.C.**
627 208th Avenue SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870

The Audit Committee assists the Board of Directors in fulfilling its responsibility for oversight of:

• *the quality and integrity of our accounting and financial reporting processes and the audits of our financial statements,*

• the qualifications and independence of the public auditing firm engaged to issue an audit report on our financial statements,

• **the performance of our systems of internal controls, disclosure controls and internal audit functions, and**

• **our procedures for legal and regulatory compliance, risk assessment and business conduct standards.**

Pursuant to the Audit Committee Charter, the Audit Committee is responsible to oversight of all reported financial information and for establishing and maintaining internal controls with regard to financial reporting. With regard to financial information oversight, the Audit Committee is required, *inter alia*, to:

 1. Review and discuss with management and the independent auditor:

  a. The Company's quarterly and annual financial statements, all internal control reports (or summaries), and other relevant reports or financial information submitted by the Company to any governmental body or the public, including management certifications as required by law, and relevant reports rendered by the auditors (or summaries).

  b. The critical accounting policies and practices used by the Company, all alternative treatments of financial information within generally accepted accounting principles, the ramifications of the use of such alternative disclosures and treatments and the treatments preferred by the independent auditor.

  c. Any significant judgments made in management's preparation of the financial statements and the view of each as to the appropriateness of such judgments.

  d. Earnings press releases, guidance and other information provided to analysts and rating agencies, including "pro forma" and other non-GAAP financial measures.

  e. The effect of regulatory and accounting initiatives, and of any off-balance sheet structures, on the Company's financial statements.

  f. Written communications between the auditor and management including any management representation letter, internal control recommendation letter and schedule of unadjusted differences issued, or proposed to be issued, by the auditor to the Company, and management's response.

 2. Review in advance and approve all filings with the SEC containing (or incorporating by reference) the Company's financial statements, including the Quarterly Reports on Form 10-Q and the Annual Report on Form 10-K and "Management's Discussion and Analysis of Financial Condition and Results of Operations" in such filings.

VERIFIED DERIVATIVE COMPLAINT  - 13 -

3.     Oversee the resolution of any disagreements between management and the auditors regarding financial reporting.

4.     Recommend to the Board whether the audited financial statements should be included in the Company's Annual Report on Form 10-K.

With regard to internal controls, the Audit Committee is required, *inter alia,* to:

1.     Review with the auditor and management the integrity of the Company's financial reporting processes (internal and external) and the internal control structure, including disclosure controls.

2.     Consider whether any changes to the internal controls or disclosure controls processes and procedures are appropriate in light of management's assessment and the independent auditor's report.

3.     Review the internal audit scope, audit plans and relevant process, and the results of internal audits, including the auditor's attestation report on management's assessment of internal control over financial reporting.

**B.    Compensation Committee**

29.    Defendants Lederman (Chair), Jones, Kennedy and Kiely were members of the Compensation Committee for FY 2004. The Compensation Committee met eight times in FY 2004, according to the 2005 Proxy:

The Compensation Committee assists the Board of Directors in fulfilling its responsibilities for the oversight of:

- our compensation policies, plans and benefit programs,

- the compensation of the chief executive officer and other executive officers, and

- the administration of our equity compensation plans.

**C.    Nominating and Corporate Governance Committee**

30.    Defendants Kiely (Chair), Lederman and Regis were members of the Nominating and Corporate Governance Committee for FY 2004. The Nominating and Corporate Governance Committee met eight times in FY 2004. According to the 2005 Proxy:

The Corporate Governance Committee has the responsibility to:

- ***develop and recommend to the Board a set of corporate governance principles,***

- recommend qualified individuals to the Board for nomination as directors,

- lead the Board in its annual review of the Board's performance, and

- recommend directors to the Board for appointment to Board committees.

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Avenue SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870

## VI.   DUTIES OF THE INDIVIDUAL DEFENDANTS

31.     In addition to the foregoing, by reason of their positions as officers, directors and/or fiduciaries of Cray and because of their ability to control the business and corporate affairs of Cray, the Individual Defendants owed Cray and its shareholders fiduciary obligations of trust, loyalty, good faith and due care, and were and are required to use their utmost ability to control and manage Cray in a fair, just, honest and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Cray and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

32.     Each director and officer of the Company owes to Cray and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.  In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's revenue, margins, operations, performance, management, projections and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

33.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Cray, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.  Because of their advisory, executive, managerial and directorial positions with Cray, each of the Individual Defendants had access to adverse non-public information about the financial condition, operations, and improper representations of Cray.

34.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Cray, and was at all times acting within the course and scope of such agency.

35.     To discharge their duties, the officers and directors of Cray were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of Cray were required to, among other things:

VERIFIED DERIVATIVE COMPLAINT          - 15 -

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Avenue SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813  •  Fax: (425) 868-7870

1    (i) refrain from acting upon material inside corporate information to benefit themselves;

2    (ii) ensure that the Company complied with its legal obligations and requirements, including

3    acting only within the scope of its legal authority and disseminating truthful and accurate statements

4    to the SEC and the investing public;

5    (iii) conduct the affairs of the Company in an efficient, business-like manner so as to make

6    it possible to provide the highest quality performance of its business, to avoid wasting the

7    Company's assets, and to maximize the value of the Company's stock;

8    (iv) properly and accurately guide investors and analysts as to the true financial condition of

9    the Company at any given time, including making accurate statements about the Company's financial

10   results and prospects, and ensuring that the Company maintained an adequate system of financial

11   controls such that the Company's financial reporting would be true and accurate at all times;

12   (v) remain informed as to how Cray conducted its operations, and, upon receipt of notice or

13   information of imprudent or unsound conditions or practices, to make reasonable inquiry in

14   connection therewith, and to take steps to correct such conditions or practices and make such

15   disclosures as necessary to comply with federal and state securities laws;

16   (vi) ensure that the Company was operated in a diligent, honest and prudent manner in

17   compliance with all applicable federal, state and local laws, rules and regulations; and

18   (vii) ensure that the Company maintained adequate internal controls so that the financial

19   reports and public statements issued by the Company and the Individual Defendants were based upon

20   accurate information.

21   36.    Each Individual Defendant, by virtue of his or her position as a director and/or officer,

22   owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith and the

23   exercise of due care and diligence in the management and administration of the affairs of the

24   Company, as well as in the use and preservation of its property and assets. The conduct of the

25   Individual Defendants complained of herein involves a knowing and culpable violation of their

26   obligations as directors and officers of Cray, the absence of good faith on their part, and a reckless

27   disregard for their duties to the Company and its shareholders that the Individual Defendants were

28   aware or should have been aware posed a risk of serious injury to the Company. The conduct of the

VERIFIED DERIVATIVE COMPLAINT          - 16 -          LAW OFFICES OF
                                                       CLIFFORD A. CANTOR, P.C.
                                                       627 208th Avenue SE
                                                       Sammamish, WA 98074-7033
                                                       Tel: (425) 868-7813 · Fax: (425) 868-7870

1  Individual Defendants who were also officers and/or directors of the Company during the Relevant
2  Period has been ratified by the remaining Individual Defendants who collectively comprised all of
3  Cray's Board during the Relevant Period.

4      37.    The Individual Defendants breached their duties of loyalty and good faith by allowing
5  defendants to cause or by themselves causing the Company to misrepresent the adequacy of its
6  internal controls, together with the Company's financial results and prospects, as detailed herein
7  *infra*, and by failing to prevent the Individual Defendants from taking such illegal actions. In
8  addition, as a result of defendants' illegal actions and course of conduct during the Relevant Period,
9  the Company is now the subject of a NASDAQ investigation and several class action law suits that
10 allege violations of federal securities laws. As a result of the foregoing, Cray has expended and will
11 continue to expend significant sums of money. Such expenditures include, but are not limited to:

12      (i)    Costs incurred to carry out internal investigations, including legal fees paid
13          to accountants, auditors and outside counsel; and

14      (ii)   Costs incurred in investigating and defending Cray and certain officers in
15          NASDAQ investigation and class actions, plus potentially millions of dollars in settlements
16          to satisfy an adverse judgments.

17      38.    Moreover, these actions and failures to act, have irreparably damaged Cray's
18 corporate image and goodwill. For at least the foreseeable future, Cray will suffer from what is
19 known as the "liar's discount," a term applied to the stocks of companies who have been implicated
20 in illegal behavior and have misled the investing public, such that Cray's ability to raise equity
21 capital or debt on favorable terms in the future is now impaired.

22 **VII.   CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

23      39.    In committing the wrongful acts alleged herein, the Individual Defendants have
24 pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and
25 conspired with one another in furtherance of their common plan or design. In addition to the
26 wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further
27 aided and abetted and/or assisted each other in breach of their respective duties.

28

VERIFIED DERIVATIVE COMPLAINT          - 17 -

1     40.    During all times relevant hereto, the Individual Defendants collectively and
2  individually initiated a course of conduct that was designed to and did: (i) conceal the fact that the
3  Company was improperly misrepresenting its financial results and prospects, in order to allow
4  defendants to artificially inflate the price of the Company's shares; (ii) maintain the Individual
5  Defendants' executive and directorial positions at Cray and the profits, power and prestige that the
6  Individual Defendants enjoyed as a result of these positions; and (iii) deceive the investing public,
7  including shareholders of Cray, regarding the Individual Defendants' management of Cray's
8  operations, the adequacy of its internal controls, the Company's financial health and stability, and
9  future business prospects throughout the Relevant Period. In furtherance of this plan, conspiracy and
10  course of conduct, the Individual Defendants collectively and individually took the actions set forth
11  herein.

12     41.    The Individual Defendants engaged in a conspiracy, common enterprise and/or
13  common course of conduct commencing by at least July 2003 and continuing thereafter. Certain of
14  the Individual Defendants subsequently joined in the conspiracy upon accepting a position as an
15  officer and/or director of the Company and by taking the actions alleged herein ratified the actions
16  and conduct committed in furtherance of the conspiracy prior to that time. During this time the
17  Individual Defendants caused the Company to conceal the true fact that Cray was misrepresenting
18  the expense incurred by the Company in granting lucrative stock based compensation to officers and
19  directors of the Company, together with the Company's financial results and prospects. In addition,
20  defendants also made other specific, false statements about Cray's internal controls, financial
21  performance and future business prospects, as alleged herein.

22     42.    The purpose and effect of the Individual Defendants' conspiracy, common enterprise,
23  and/or common course of conduct was, among other things, to disguise the Individual Defendants'
24  violations of law, breaches of fiduciary duty, abuse of control, gross mismanagement, waste of
25  corporate assets and unjust enrichment; to conceal adverse information concerning the Company's
26  operations, financial condition and future business prospects; and to artificially inflate the price of
27  Cray common stock so they could: (i) dispose of over $4.8 million of their personally held stock;

28

VERIFIED DERIVATIVE COMPLAINT          - 18 -

1   and (ii) protect and enhance their executive and directorial positions and the substantial
2   compensation and prestige they obtained as a result thereof.

3       43.     The Individual Defendants accomplished their conspiracy, common enterprise and/or
4   common course of conduct by causing the Company to purposefully, recklessly or negligently
5   misrepresent its financial results. Because the actions described herein occurred under the authority
6   of the Board, each of the Individual Defendants was a direct, necessary and substantial participant
7   in the conspiracy, common enterprise and/or common course of conduct complained of herein.

8       44.     Each of the Individual Defendants aided and abetted and rendered substantial
9   assistance in the wrongs complained of herein. In taking such actions to substantially assist the
10  commission of the wrongdoing complained of herein, each of the Individual Defendants acted with
11  knowledge of the primary wrongdoing, substantially assisted the accomplishment of that
12  wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## VIII.   SUBSTANTIVE ALLEGATIONS

15      45.     On July 31, 2003, the Individual Defendants caused the Company to issue a press
16  release entitled, "Cray Inc. Announces Second Quarter 2003 Financial Results - Record quarterly
17  revenue of $61.8 million and earnings of $.10 cents per diluted share." The press release stated in
18  part:

19      SEATTLE – July 31, 2003 – Global supercomputer leader Cray Inc. (Nasdaq
        NM: CRAY) today reported record financial results for the second quarter ended
        June 30, 3003. Total revenue for the quarter was $61.8 million compared to $38.6
20      million in the same quarter last year. Net income was $7.9 million or $.10 cents per
        diluted share, up from $1.2 million or $.02 cents per diluted share reported in the
21      second quarter of 2002. Second quarter results benefited from previously announced
        revenue of approximately $6 million that was deferred from first quarter 2003.

23      "The first half of 2003 came in as planned, thanks to the tremendous efforts
        of the entire Cray team as well as our customers," said Jim Rottsolk, Chairman and
24      CEO of Cray Inc. "Improved profitability in the second quarter indicates we're
        getting closer to our target business model and we are beginning to see the leverage
25      in the model as revenue increases. With the Cray X1 system now in full-production
        mode, we are focused on product delivery and successfully meeting increasingly
        challenging customer acceptance tests for the second half of the year," said Rottsolk.

27      Product margins in the second quarter improved but to higher volumes, lower
        component costs and improved yields. Service margins were negatively affected by
28      bid costs associated with Cray's successful DARPA funding award and by severance
        costs.

VERIFIED DERIVATIVE COMPLAINT          - 19 -

*"We used cash in the second quarter to retire remaining bank debt and to fund inventory and accounts receivable accompanying the growth of our business," Rottsolk said. "The effect was exaggerated due to the timing of acceptances late in the quarter, and due to our decision to assemble large systems for software testing in advance of deliveries.* The balance sheet strengthened during the second quarter, with working capital increasing by over $12 million. We expect strong positive cash flow in the second half of the year," Rottsolk said.

Second Quarter Highlights

• In April, Cray reported the first customer acceptance of a full-production version of the new Cray X1™ supercomputer system. The system was accepted by Network Computing Services, Inc., systems integrator and computing facilities manager for the Army High Performance Computing Research Center.

• In May, Cray reported $16.0 million in orders for Cray X1 equipment and related technology and services from undisclosed customers.

• In June, Cray announced that all 3,125,000 shares of its Series A Convertible Preferred Stock held by NEC Corporation had been converted and sold. With this transaction, the company has no preferred stock outstanding.

*Recently, Cray announced that it would receive $49.9 million in funding over the next three years from the Defense Advanced Research Projects Agency (DARPA) through participation in the second phase of DARPA's High Productivity Computing Systems Program. "Participating in the second phase of this program is a great win for Cray and further validation of our HPC experience and ability to innovate," said Rottsolk. "The selection process was very competitive and the Cray team deserves high marks for their hard work."*

Guidance

Full year 2003 guidance remains unchanged, with anticipated revenue of at least $220 million and profitability in the higher range of 5 to 10 percent of revenue. Cray remains confident that revenue, profitability and overall financial performance will be stronger in the second half of 2003 compared to the first half.

46.      Defendants' press release of July 31, 2003 was false and misleading, since it provided a false and misleading picture of the "predictability" of Cray's guidance and forecasts, using product inventory and realized revenue measures. Defendants sought to distinguish the need to "fund" inventory and receivables during the quarter, as an exaggeration due to growth. This explanation served to convince investors that, in spite of "growing pains," defendants had sufficient internal controls established to properly determines and report its financial results accurately.

47.      Although investors were being told that "software testing" was the culprit for this one-time exaggeration, Individual Defendants knew and concealed the fact that Cray lacked adequate internal controls and a reporting process to properly report Cray's financial results. Each new

VERIFIED DERIVATIVE COMPLAINT          - 20 -

1    customer order for Cray's custom-built systems brought its own peculiar set of challenges, despite
2    Cray's representations of "commodity" product lines and disclosure of machine sales by model
3    number, in fact each custom order was subject to unique contractual contingencies, containing
4    complex terms that impacted the Company's recognition and determination of revenue (including
5    customer rights of return, multiple elements and contingencies that can have a material impact on
6    the recognition or deferral of revenue) and balance sheet classification of deferred revenue. During
7    the Relevant Period, Cray did not evaluate and document the consideration of such terms, and did
8    not have a process for independent review of the accounting treatment and the associated revenue
9    determinations for such contracts. Thus, defendants' false and misleading statements of one-time
10   explanations and excuses as reason for delays in inventory and revenue recognition effectively
11   concealed the truth about the Company's inadequate internal controls and financial reporting process.

12        48.     During the pre-market conference call of July 31, 2003 that followed, defendants
13   further concealed the basic problem in using Cray's quarterly revenue measures as a way to predict
14   the success and prospects of the business.   Regarding 2004 guidance, defendant Rottsolk
15   commented:

16           As we reported in the press release, we are now starting to see the target business
             model kick in.  And the level of profitability in the second quarter is indicative of the
17           strong leverage our business model can produce.  You will see further evidence of
             this in the second half of the year as revenue increases.
18
                                              *   *   *
19
             You will see that our guidance has been changed from $220m, and operating income
20           in the upper range of 5% to 10%.  We are confident we can achieve these results.
             *While we are very optimistic about 2004, there is a wide range of possible outcomes
21           at this stage, tied to both government funding and capital spending in commercial
             sectors.  This makes it difficult to comment on the 2004 outlook, and therefore we
22           will not provide 2004 guidance until later in this year.*  That concludes our formal
             comments and now we would like to address any questions that you might have.
23           Thank you very much.

24        49.     Defendant Rottsolk's comments regarding the "leveraging capabilities" of Cray's
25   business model were false and misleading, given the development challenges that accompanied each
26   new customer order, the unique contractual provisions containing complex terms which substantially
27   impacted the recognition of revenue from the contracts.  This was exacerbated by the fact that Cray
28

VERIFIED DERIVATIVE COMPLAINT          - 21 -

1   also lacked sufficient processes, staffing and training within its finance and accounting departments
2   to properly conduct a critical analysis of the components of deferred revenue implicit in each of
3   these contracts. Rottsolk's comments served to focus attention on the receipt of new contracts as
4   the driving force for increased revenues, rather than factors having a direct bearing on revenue
5   recognition, such as the speed of on-site acceptance testing or improved processes for building
6   machines in accordance with customer requirements and specifications.

7        50.     Moreover, defendant Rottsolk's reasons for not providing 2004 guidance were false
8   and misleading. Although he cited customer budgetary issues, the inherent unpredictability of Cray's
9   quarterly revenue measures had far more to do with the accuracy of Cray's lack of adequate internal
10  controls that severely restricted accurate revenue guidance rather than the timing of customer
11  contract awards. Defendants knew that each new customer order presented a new set of hardware
12  and software development challenges, challenges that were at the root of that unpredictability
13  together with unique and complex contractual provisions which had a direct bearing on the ability
14  of the Company to recognize revenue generated from each new order. Furthermore, Individual
15  Defendants knew that the Company lacked the internal controls, processes, staffing and training in
16  the finance and accounting departments to accurately evaluate, report and forecast properly
17  recognized revenue from these transactions. Defendants continued with a discussion of their product
18  models and lines:

19       Alan Robinson - Delafield Hambrecht, Inc. - Analyst

20       Just on the-- first quick question on sort of a macro level and then some bookkeeping
21       questions. There's been a lot of noise recently from potential competitors in the MPP
         markets. I'm thinking about the dawning company in China and also (inaudible)
22       recently.

23       Can you give us an idea of how you think your Red Storm Technology sets you apart
         from these people, and whether their recent of these announcements make you any
24       more or less confident that the positive Red Storm getting attractions as a commercial
         product?

25       Jim Rottsolk - Cray Inc. - Chairman and CEO

26       Yeah, let me--Alan this is Jim. Let me try to tackle that. I think Red Storm and in
         any success to our commercial product from Red Storm is going to be pretty highly
27       differentiated from the types of products you are reading about. Most of which are
         fairly straightforward clusters with a fairly loose more bandwidth interconnection.
28

VERIFIED DERIVATIVE COMPLAINT     - 22 -

Red Storm, as you know, will have a very high bandwidth; very intelligent interconnect system.

This also, quite flexible can be to figure the number of ways and as well will have at we believe to be superior system software. So we think we are going to have a nicely differentiated product that will be very pleased performance competitors.

51.    The Individual Defendants' represented Red Storm as a "commercial product", possessing "superior system hardware" and highly differentiated from other types of commercial products. However, these representations were false and misleading since the "product" was simply a hardware and software component configuration, one that could be substantially altered in accordance with customer requirements and specifications.    Customer requirements and specifications translated into challenges that would manifest themselves both during the building of the machine and during on-site customer acceptance testing. Thus, the Red Storm did not possess locked-down attributes of a typical "commercial product".

52.    The Individual Defendants then faced questions about the "increasing complexity" of customer acceptance testing:

Jim McGowrie - Analyst

Thank you. There's a comment in the release thing. You are facing increasingly challenging customer acceptance tests for the second half of the year. Can you just expand on what you mean by that?

Jim Rottsolk - Cray Inc. - Chairman and CEO

Well, we are obviously feeling very confident the way things worked out in 2Q, we made a lot of progress. We didn't want - it's just a cautionary statement, we are going to be building and delivering larger systems in the third quarter and then even larger systems in the fourth quarter. And as noted these systems that comes from our site increase in size, we face all the software, everything else that is sealed which was just in size. That's just a lot of work and customers are beginning to put these systems, not just to acceptance tests but getting ready for the full production, within whatever work they do, and just more demanding, more stringent acceptance tests we picked. I think we are telling more and more confidence, Jim don't get me wrong, but just a word of caution.

Jim McGowrie - Analyst

No. I understand. And last quarter you said that Q2 you would face some backend loaded customer acceptance issues. Do you have the same level of issues in Q3 as you did in Q2?

Jim Rottsolk - Cray Inc. - Chairman and CEO

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Avenue SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870

It's less in Q3 than Q2 and again less in Q4 than in Q3. We, you know, we have to complete the software to scale these systems to larger sizes, so that's probably the facing item.

53.    Thus, defendant Rottsolk presented the on-site customer acceptance testing issue as one related to scalability, not tied to the unique customer requirements and specifications for each system.   This was false and misleading, since each customer order generated its own set of requirements and specifications, with acceptance tests related to those challenging requirements and not simply the "size" of the system. Moreover, these additional requirements and specifications resulted in complex contractual terms for which the Company lacked the internal control, processes, and staffing to properly and critically analyze, report or forecast their impact on revenue.

54.    On August 14, 2003, the Individual Defendants caused the Company to file its quarterly report on Form 10Q for 2Q 2003, in which Cray repeated the financial results set forth above. The quarterly report also stated in relevant part:

> We recognize product revenue from sales of our computer systems upon acceptance by the customer, although in limited circumstances, depending on sales contract terms, revenue may be recognized when title passes upon shipment or may be delayed until funding is certain or other contractual requirements are satisfied. We recognize product revenue from the Red Storm contract using the percentage-of-completion method. We recognize service revenue for the maintenance of our computer systems ratably over the term of each maintenance agreement. Funds from maintenance and product sales contracts that are paid in advance are recorded as deferred revenue. We recognize service revenue from our professional services activities as services are rendered.
>
> * * *
>
> We evaluated the effectiveness of the design and operation of our disclosure controls and procedures, as defined in Rules 13a-15(c) and 15d-15(e) of the Securities Exchange Act of 1934, as amended, as of the end of the period covered by this report. Our principal executive and financial officers supervised and participated in the evaluation. **Based on the evaluation, our principal executive and financial officers each concluded that, as of the date of the evaluation, our disclosure controls and procedures were effective in providing reasonable assurance that material information relating to Cray and our consolidated subsidiaries is made known to management, including during the period when we prepare our periodic SEC reports.** The design of any system of controls is based in part upon certain assumptions about the likelihood of future events, and there can be no assurance that any design will succeed in achieving its stated goals under all potential future conditions, regardless of how remote.

55.    In fact, however, the Company did not have sufficient internal controls to ensure either that revenue was properly recognized or that financial information was accurately reported.

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 209th Avenue SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870

56.   On October 30, 2003, the Individual Defendants caused the Company to issue a press release entitled, "Cray Inc. Reports Third Quarter 2003 Financial Results — Company posts record quarterly revenue of $53.8 million, $1.10 per diluted share." The press release stated in part:

SEATTLE – October 30, 2003 – Global supercomputer leader Cray Inc. (Nasdaq NM: CRAY) today reported financial results for the third quarter ended September 30, 2003.

Third quarter revenue was $63.8 million, up 52 percent from $42.1 million in the same period last year, reflecting strong customer acceptances during the quarter for the company's flagship Cray X1™ supercomputer system. Third quarter net income was $8.5 million or $.10 cents per diluted share, compared to $2.1 million or $.04 cents per diluted share for the same period in 2002. The company had strong operating cash flow of $24 million, with cash balances increasing o $69 million as of September 30, 2003.

For the nine months ended September 30, 2003, total revenue increased to $169.7 million, up 46 percent from $115.9 million reported for the first nine months in 2002. Net income for the nine months was $17.5 million or $.23 cents per diluted share, compared to net income of $4.1 million and $.08 cents per diluted share respectively.

"Excellent execution helped drive another profitable quarter, highlighted by record quarterly revenue of $63.8 million and strong margins of nearly 45 percent," commented Jim Rottsolk, Chairman and CEO of Cray Inc. *We anticipated a challenging third quarter because we were building and delivering larger Cray X1 systems for the first time, and therefore facing more difficult customer acceptances. Fortunately, we were successful on all fronts.* Again, Cray employees deserve a great deal of credit for our accomplishments, as do our customers, who worked closely with us throughout the quarter."

In October, the company announced Cray X1 supercomputer orders from The Boeing Company and the University of Warsaw. Earlier this week, Cray announced plans to expand the company's addressable market by offering a massively parallel processing (MPP) product based on the "Red Storm" supercomputer Cray is developing for Sandia National Laboratories. The new, high-bandwidth MPP product, using standard AMD Opteron™ microprocessors and the Linux operating system, is scheduled to begin shipping in 2004.

"Our positive momentum has continued into the fourth quarter with important Cray X1 orders and exciting new product plans designed to help Cray penetrate new opportunities, both domestically and internationally," Rottsolk said.

"The University of Warsaw order includes a planned upgrade to the Cray X1E and will be used to enhance weather forecasting, life sciences research and other research projects in Europe. The Boeing Company procurement was the first commercial sale of a Cray X1 system and will be installed in Boeing's Puget Sound Data Center," he said.

Third Quarter Highlights

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Avenue SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870

- Working closely with a number of our partners, we delivered several single-image systems of 128 processors or more, the largest of which is located at Oak Ridge National Laboratory.

- In July, Cray received additional funding of $50 million from DARPA for Phase II of an advanced research program (HPCS) to develop supercomputer technology capable of sustained petaflops performance by the year 1020.

- In August, Cray announced the appointment of Peter J. Ungaro as Vice President of Sales and Marketing. Ungaro was formerly vice present, worldwide deep computing sales at IBM.

- In September, cRay signed a co-funding agreement with the U.S. government under which the U.S. government will contribute $17.5 million toward the development of the successor of the Cray X1 and X1E supercomputer system, code named "Black Widow."

- Also in September, industry analysts, International Data Corporation (IDC) reported that Cray captured first, second and third place in the most powerful class of single computers in their latest supercomputer rankings.

Guidance

*"Based upon our solid results for the third quarter, we anticipate revenue for the full year 2003 will be between $230 million and $235 million. This assumes that systems scheduled for fourth quarter installation receive customer acceptance within the quarter," Rottsolk said. "Operating income should be slightly above the previously established range of five to ten percent of revenue."*

57.   Defendants' press release of October 30, 2003 was false and misleading for the following reasons. First, defendants again sought to explain the increasing delays in completing product acceptance testing, this time for the Cray X1 hardware configuration, as primarily an issue of system size. However, each system was built in accordance with customer requirements and specifications, with each set of requirements and specifications presenting their own unique set of hardware and software challenges. Although defendants explained that Cray was up to the task, these challenges were placing an increased strain on Company resources and timelines. Moreover, these ever increasing individual requirements and specifications resulted in increasingly complex contracts with provisions that impacted the Company's ability to recognize revenue from these contracts. Cray, however, lacked internal controls, processes, and staffing to properly and critically analyze such contract provisions, making both reported financial results as well as financial forecasts inaccurate and unpredictable.

VERIFIED DERIVATIVE COMPLAINT          - 26 -

58.   During Individual Defendants' conference call October 30, 2003, defendant Rottsolk provided a "report card" for the Cray X1:

Jim Rottsolk - Cray, Inc. - Chairman, President and Chief Executive Officer

Thank you, Scott, and good morning, everyone.   Before I talk about the new Red Storm product and our plans to bring it to market in 2004, I thought it would be useful to provide a brief report card on the Cray X1.

It was about this time last year we were in the middle of launching that product, which was Cray's first new supercomputer system. A lot has happened in 12 months. **To date, there have been over $180 million in orders for the Cray X1.   These include domestic and international orders, governmental and commercial orders, orders for research, defense and academia.   All of the installed systems are engaged in tackling the most challenging scientific and engineering problems.**

59.   Defendant Rottsolk's comments regarding the Cray X1 were false and misleading, since they presented the Cray X1 as a "commercial product," rather than as a hardware and software configuration ordered in accordance with customer requirements and specifications.   Those specifications and requirements would, in turn impact the time to build the system and the nature of the product acceptances tests defendants would have to perform before they could ever realize revenue from sales of the systems.   Moreover, the Company lacked the internal controls, processes and staffing in the finance and accounting departments to properly and critically analyze the complex terms of each of the contracts to assure that revenue was properly being recognized.

60.   The Individual Defendants then responded questions regarding the influence of "deferred revenue" on cash flow:

Alan Robinson - Delafield Hambrecht, Inc. - Analyst

Good morning, Scott, a couple of questions for you.   I noticed the cash provided by operations is up nicely there.   Was that most generated by deferred revenue?

Scott Poteracki - Cray, Inc. - Chief Financial Officer, VP-Finance

We had receivables come down about 5 million. **Deferred revenue was very strong, up about 13, 14 million, I think.   It was obviously – earnings were strong, which was a key contributor.**   It was mostly deferred revenue, receivables along with earnings.   In Q4, I look for inventory to really contribute to another strong cash flow quarter.

61.   Defendant Poteracki's representation of "strong earnings" during the quarter was false and misleading.   The deferred revenues accounting measure Poteracki pointed to make that claim was in fact one more unpredictable twist to Cray's revenue recognition story.   It simply was

VERIFIED DERIVATIVE COMPLAINT                    - 27 -

1   impossible to determine which of Cray's contracts would contribute to positive cash flow and
2   deferred revenue, as opposed to back-ended deals where all acceptance testing would need to be
3   completed before payments would be made.

4         62.    On November 14, 2003, the Individual Defendants caused the Company to file its
5   quarterly report on Form 10Q for 3Q 2003, in which Cray repeated the financial results set forth
6   above. The quarterly report also repeated the representations with regard to recognition of revenue
7   and internal controls set forth in paragraph 54, preceding. In fact, however, the Company did not
8   have sufficient internal controls to ensure either that revenue was properly recognized or that
9   financial information was accurately reported.

10        63.    On January 29, 2004, the Individual Defendants caused the Company to issue a press
11  release entitled, "Cray Inc. Announces 2003 Financial Results — Company reports revenue of $237.0
12  million, EPS of $.81 including non-recurring items." The press release stated in part:

13        SEATTLE — January 29, 2004 — Global supercomputer leader Cray Inc.
14  (Nasdaq NM: CRAY) today reported financial results for the fourth quarter and full
    year 2003 ended December 31, 2003.

15        Fourth quarter 2003 revenue was a record $67.2 million, up 71 percent from
    $39.2 million in the same period last year. Fourth quarter net income was $45.4
16  million, or $56 per fully diluted share compared to $1.3 million or $.02 per fully
    diluted share in the fourth quarter 2002.

17
          Non-recurring items for the fourth quarter 2003 included a write-up of a
18  deferred tax asset of $42.2 million and a restructuring charge of $4.0 million related
    primarily to severance. Non-recurring items improved earnings by $38.2 million, or
19  $.47 per fully diluted share.

20        "Fourth quarter revenue, our best yet, capped a great 2003 for Cray and the
    results were in line with our expectations," commented Jim Rottsolk, Cray Chairman
21  and CEO. "Notably during the quarter, we obtained all expected acceptances,
    including the two most powerful systems ever installed by Cray," Rottsolk said.

22
          For the twelve months ended December 31, 2003, Cray reported revenue of
23  $237.0 million compared to $155.1 million last year, an increase of 53 percent.
    Including non-recurring items, net income for 2003 was $52.9 million, or $.81 per
24  fully diluted share, up from net income of $5.4 million and fully diluted earnings per
    share of $.10 per share in the same period last year.

25
          For the full-year 2003, non-recurring items improved earnings by 38.2 million
26  or $.47 per fully diluted share.

27        "Cray delivered record financial results in 2003 and throughout the year we
    successfully delivered on our overall strategy," Rottsolk said. "In addition to
28  growing the company, we accomplished many additional objectives. We

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Avenue SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870

strengthened our capital structure with a successful public offering and the retirement of all outstanding bank debt; gained significant market share in a highly competitive environment; and demonstrated our ability to build and bring to market products customers need," he said.

Recent Highlights

• In October, Cray won an order from the Boeing Company for a Cray X1™ system to support Boeing's research and development efforts. The Boeing order represented the first commercial order for the Cray X1.

• In October, Cray received an order from Warsaw University's Interdisciplinary Center for Mathematical and Computational Modeling (ICM), Warsaw, Poland. The order included an upgrade to the successor system, the Cray X1E™.

• In October, Cray unveiled plans to deliver a new product based on the "Red Storm" 40-TeraOp (40 trillion calculations per second) supercomputer it is developing for Sandia National Laboratories. The Red Storm product is due out in 2004.

• In November, Cray reported that its Cray X1 supercomputer had the most powerful processors, according to the "World's Top 500 Supercomputers," which is published annually by the universities of Tennessee and Mannheim (Germany), and NERSC/Lawrence Berkeley National Laboratory.

• In December, Cray announced another international order for the Cray X1 system.

Outlook

*"The outlook for 2004 and 2005 for Cray is promising and we are confident in our long-term growth prospects as well as our ability to execute," said Rottsolk. "We've set a high bar for ourselves in 2004, planning to grow revenue to about $300 million while achieving operating profit in the range of eight to twelve percent of revenue. Our plan depends primarily on the timely and successful introduction of two new products, the Cray X1E and commercialized Red Storm systems, both of which we plan to launch in the second half of 2004."*

"Our outlook also relies on maintaining momentum with our current customer base, including the U.S. government." Rottsolk added, "While the fiscal 2004 U.S. federal budget process was recently completed, it remains difficult to forecast the outcome of individual budget allocations and the resulting impact on Cray."

64.     During the premarket conference call of January 29, 2004 that followed, confusion about how the Individual Defendants caused the Company to book revenue on contract completions continued:

Brandy Brandon - Eason Vance - Analyst

And then on the percentage the completion, presumably we can see a—see that in kind of deferred revenue or something like that?

VERIFIED DERIVATIVE COMPLAINT                    - 29 -

1    Scott Poteracki - Cray - CFO

2    I don't quite understand your question.

3    Brandy Brandon - Eason Vance - Analyst

4    Well, as you go ahead and you kind of percentage of completion contract basis, you
     kind accrue revenues and expenses on it at a presumed profit rate and stuff like that.
5    Is that visible in the balance sheet given the notes in the Qs and Ks, will it be?

6    Scott Poteracki - Cray - CFO

7    Well, I'll make sure it is.  There is some receivables that we have accrued–I know
     there's contracts that have not been built–but, a modest amount.  So we're pretty
8    much keeping up with our billings, relative to the revenue we've taken in Sandia.
     But it's included in accounts receivable.  I'll try to get some disclosure into the KM
9    on the makeup of those receivable.

10       65.     On March 12, 2004, the Individual Defendants caused the Company to file its annual

11   report on Form 10K with the SEC.  This annual report repeated the financial results set forth above.

12   In addition, the annual report went on to state that with respect to revenue recognition:

13       We recognize revenue when it is realized or realizable and earned.  We consider
         revenue realized or realizable and earned when it has persuasive evidence of an
14       arrangement, the product has been shipped or the services have been provided to the
         customer, the sales price is fixed or determinable and collectability is reasonably
15       assured.  In addition to the aforementioned general policy, the following are the
         specific revenue recognition policies for each major category of revenue and for
16       multiple-element arrangements.

17          *Product.*  We generally recognize revenue from product sales upon customer
         acceptance and when we have no unfulfilled obligations that affect the customer's
18       final acceptance.

19          ***Revenue from contracts that require us to design, develop, manufacture or
         modify complex information technology systems to a buyer's specifications, and to
20       provide services related to the performance of such contracts, is recognized using
         the percentage of completion method for long-term development projects.
21       Percentage of completion is measured based on the ratio of costs incurred to date
         compared to the total estimated costs.  Total estimated costs are based on several
22       factors, including estimated labor hours to complete certain tasks and the estimated
         cost of purchased components at future dates.  Estimates may need to be adjusted
23       from quarter to quarter which would impact revenue and margins on a cumulative
         basis.***

24
            *Services.*  Service revenues for the maintenance of computers are recognized
25       ratably over the term of the maintenance contract.  Funds from maintenance contracts
         that are paid in advance are recorded as deferred revenue.  High performance
26       computing service revenue is recognized as the services are rendered.

27          ***Multiple-Element Arrangements.  We enter into transactions that include
         multiple-element arrangements, which may include any combination of services,
28       hardware, and/or software.  When some elements are delivered prior to others in an***

VERIFIED DERIVATIVE COMPLAINT            - 30 -

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Avenue SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813  •  Fax: (425) 868-7870

*arrangement and all of the following criteria are met, revenue for the delivered element is recognized upon delivery and acceptance of such item. Otherwise, revenue is deferred until delivery of the last element.*

• Vendor-specific objective (VSOE) of fair value of the undelivered element.

• The functionality of the delivered elements is not dependent on the undelivered elements.

• Delivery of the delivered element represents the culmination of the earnings process.
VSOE is the price we charge to an external customer for the same element when such element is sold separately and/or management's established price list

66.    With respect to the Company's internal controls, the annual report stated:

We evaluated the effectiveness of the design and operation of our disclosure controls and procedures, as defined in Rules 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934 (the "Exchange Act") as of the end of the period covered by this report. Our principal executive and financial officers supervised and participated in the evaluation. *Based on the evaluation, our principal executive and financial officers each concluded that, as of the end of the period covered by this report, our disclosure controls and procedures were effective in providing reasonable assurance that information required to be disclosed by us in the reports we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's form and rules.* The design of any system of controls is based in part upon certain assumptions about the likelihood of future events, and there can be no assurance that any design will succeed in achieving its stated goals under all potential future conditions, regardless of how remote. *Our principal executive and financial officers have concluded that our controls and procedures are, in fact, effective at the "reasonable assurance" level.*

67.    In fact, however, the Company did not have sufficient internal controls to ensure either that revenue was properly recognized or that financial information was accurately reported. Specifically, the Company lacked the processes, staffing and training in the finance and accounting departments to accurately and critically analyze complex contracts to ascertain whether revenue was properly being recognized, rendering the financial results and forecasts reported by the Individual Defendants false and misleading.

68.    On April 2, 2004, the Individual Defendants caused the Company to issue a press release entitled, "Cray Inc. Completes OctigaBay Acquisition." The press release stated in part:

SEATTLE – (Business Wire) – April 2, 2004 - Cray Inc. (Nasdaq NM: CRAY) today announced that it has completed the acquisition of privately held OctigaBay Systems Corporation of Vancouver, British Columbia. This acquisition, coupled with Cray's previously announced decision to commercialize the Sandia Red Storm system, will extend Cray's product portfolio and multiply its addressable market by over four times, according to market analyst firm IDC.

VERIFIED DERIVATIVE COMPLAINT             - 31 -

In completing the transaction, Cray exchanged about 12.4 million shares and just under $15 million dollars for all outstanding OctigaBay shares and assumed approximately 740,000 options. The acquisition is expected to be accretive in 2005, excluding the impact of non-cash acquisition-related charges. For 2004, the continuing cost of OctigaBay-related product development efforts and the product launch will be about $2 million per quarter.

OctigaBay has been developing a high performance computing (HPC) system designed around its direct connected processor architecture, an innovative approach to massively parallel processing that directly links together processors, alleviating memory contention and interconnection bottlenecks found in cluster systems. The OctigaBay system, formerly known as the 12K, will be called the Cray XD1 product.

Early shipments of the Cray XD1 direct connect processor product are expected in the second half of 2004, with general availability in early 2005. Pricing, to be announced later this year, is expected to range from under $100,000 to about $2 million.

With the addition of OctigaBay, Cray can provide purpose-built systems at a wide range of price points that allow customers to get more work done at a lower cost than they did with mainstream HPC systems today, said Cray Chairman and CEO Jim Rottsolk.

Previewed by OctigaBay in November 2003, the Cray XD1 high performance computer has an innovative architecture that embeds both a high speed interconnect and application accelerators to remove major bottlenecks and improve performance on real-world applications. Self-monitoring, self-healing and management features give administrators a highly reliable and easy-to-use system.

69.     The press release of April 2, 2004 was false and misleading for the following reasons. First, the press release announced that the OctigaBay purchase would increase defendants' addressable market by over four times, a statement that pointed to Cray's ability to seize up such an opportunity. This was unlikely, given Cray's dependence on the strong efforts of its employees to deal with an ever increasing backlog of system build and on-site acceptance testing of its systems, slowing the Company's execution of its business. Moreover, the Company lacked the internal financial and accounting internal controls, staffing and training to properly conduct Cray's existing business. Therefore, any increase in Cray's addressable market would exacerbate the Company's already flawed finance and accounting processes, staffing and training.

70.     On April 29, 2004, the Individual Defendants caused the Company to issue issued a press release entitled, "Cray Inc. Reports First Quarter 2004 Financial Results – Company announces $43 million international procurement win." The press release stated in part:

VERIFIED DERIVATIVE COMPLAINT          - 32 -

SEATTLE – April 29, 2004 – Global supercomputer leader Cray Inc. (Nasdaq NM: CRAY) today reported financial results for the first quarter ended March 31, 2004.

The Company reported total revenue of $42.1 million for the first quarter, compared to $44.1 million in the same period last year. Operations for the period resulted in a loss of $3.8 million, or $.05 per share, compared to net income of $1.2 million, or $.02 per share, in the first quarter of 2003.

Product gross margin declined to 30.4 percent from 42.1 percent in the first quarter of 2003 due primarily to product mix. The company shipped fewer-than-anticipated Cray X1™ systems and shipped some lower-margin cluster systems. Additionally, low-margin revenue was generated from continued performance on the Red Storm and Cascade engineering projects.

Service revenue declined as expected to $13.8 million, from $16.8 million in the first quarter of 2003. Service margin, at 37.7 percent, was above target.

"Quarter one results were affected by government procurement delays and a general slow-down in the defense segment," said Jim Rottsolk, CEO of Cray Inc. "While we are making progress on the sales front and orders have begun to pick up, the weakness in revenue experienced in the first quarter will continue through the first half. *Until we introduce the Cray X1E™, Red Storm and Cray XD1™ products in the second half, the Cray X1 system remains our major source of revenue."*

*"Once these new products become available, we anticipate significant, accelerating growth. However, it is unlikely that we will make up for the first half shortfall in time to meet our 2004 plan," said Rottsolk. "We are focused on building our order pipeline, delivering new products and positioning the company for substantial growth and profitability."*

"By the end of 2004, we will have the strongest product portfolio in the industry," Rottsolk added. "With the Cray XD1 system along with our previously announced Red Storm and Cray X1 systems, we can address, the entire HPC market with high-bandwidth, purpose-built solutions."

We are pleased to announce that Korea's Public Procurement Service has selected Cray to supply the next-generation supercomputer to the Korea Meteorological Administration. This award, based on the Cray X1 product family, is worth more than $43 million and is subject to contract completion.

Separately, the Pittsburgh Supercomputing Center (PSC) has advised Cray that it is placing an advance order for the company's upcoming product based on the Sandia "Red Storm" supercomputer. This is the first disclosed customer for the new product line, which will be launched later this year.

Cray previously announced an order for a Cray X1 supercomputer system from Madison Research Corporation for the U.S. Army Space and Missile Defense Command (SMDC). The company also announced the first Cray X1 system order in the subcontinent of India from the Tata Institute of Fundamental Research.

On April 1, Cray completed the acquisition of Vancouver-based OctigaBay Systems Corporation and announced the naming of its high bandwidth product now known as the Cray XD1 system. According to IDC, this acquisition, together with

VERIFIED DERIVATIVE COMPLAINT                    - 33 -

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Avenue SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870

the Red Storm product, more than quadruples Cray's addressable market. The first Cray XD1 beta system has already shipped, with other beta systems expected to follow during the second quarter. Said Rottsolk. "The addition to the Cray Canada team is very exciting for us. The XD1 system rounds out our HPC product line and opens the door to market expansion beyond traditional HPC users."

71.   During the pre-market conference call of April 29, 2004 that followed:

Jim Rottsolk - Cray Inc. - Chairman and CEO

\*   \*   \*

To summarize, we believe Cray is at an important inflection point. We've been gaining market share in the $1 million high-end capabilities segments, and with the addition of the commercialized Red Storm product and the XD1 we will be able to address the entire $5 billion HPC market. More importantly, we're broadening our reach and increasing customer access to our standard for high-performance computers. This is obviously a very exciting time for Cray management, employees and customers. We're making decisions and investments we believe are fundamental to our ongoing success. Over the next couple of quarters we have a number of engineering and execution hurdles, as we discussed. We will do our best to keep our shareholders and customers informed. Beyond these near-term challenges the outlook for Cray is rewarding.

72.   Defendant Rottsolk's characterization of the business as at an "inflection point" was false and misleading, since it belied the truth about Cray's increased difficulties in managing the backlog of contracted orders already in the system:

Chad Bennett - MJSK - Analyst

Fair enough. Can you provide a little bit of—you indicated Q2 was again going to be weak. Just trying to gauge—you have 75 million in backlog; half of that is Red Storm, which means you have—I don't know—35 million that potentially—I don't t' know when it gets recognized. And you probably need to announce some orders this quarter. But do you think Q2 can be sequentially up from Q1?

\*   \*   \*

Jim Rottsolk - Cray Inc. - Chairman and CEO

I think backlog is going to growing. I think as usual I'm trying to encourage people not to focus on quarters. I know that is hard to do. It is particularly hard for you analysts, and it is as frustrated for us sometimes as it is, I'm sure, for you. But the long-term- I couldn't be more optimistic about Cray's business long-term than I think all of us are here at Cray are today. We think the pieces really are falling in place for substantial growth. But there are going to be quarter-to-quarter fluctuations. I think it's going be particularly dramatic this year. *I think by the time you get–if we can execute on these new product introductions, by the time you get to fourth quarter you're going to see something totally different than the first quarter or two.*

Hopefully, with the addition of more—we are really dependent upon the X1 right now. And as strong as that product is, it's at a very high average sales price in general, and

VERIFIED DERIVATIVE COMPLAINT        - 34 -

one or two shipments a quarter can make a huge difference. Once we add XD1 to the mix and maybe even some of the smaller Striders as kind of introductory systems as Pete suggested, I think we will be able smooth that revenue flow out a bit, so volatility will decrease over time. Buy right now, it is unfortunately something we have to live with.

73.     Although defendant Rottsolk expressed optimism about Cray's business, delays in the rollout of "new products" seemed to be the overall message for Cray's weak performance. When pressed, however, defendants refused to admit to any delays or the underlying causes of them:

Justin Udelhofen - Needham & Company - Analyst

Quickly on to the Red Storm product, with regards to the delay, is that primarily attributable to hardware or software slowdown? And do you see that affecting, or how do you see that affecting rather, the follow on procurement? Is it the kind of thing that will significantly hinder the follow on sales? Or how does the timing work?

Jim Rottsolk - Cray Inc. - Chairman and CEO

I don't think we actually characterize it in terms of a delay, although it's going to take place a couple of months later than we had earlier hoped. I don't think it has any impact on the ability to increase the size of that system over time or on other systems. It's strictly a timing issue.

74.     On May 10, 2004, the Individual Defendants caused the Company to file its quarterly report on Form 10Q for 1Q 2004, in which Cray repeated the financial results set forth above. The quarterly report also repeated the representations with regard to recognition of revenue set forth in the annual report and the representations with regard to the adequacies of internal controls from the Company's prior quarterly reports. In fact, however, the Company did not have sufficient internal controls, processes, staffing or training in the finance and accounting departments to ensure either that revenue was properly recognized or that financial information was accurately reported.

75.     On July 26, 2004, the Individual Defendants caused the Company to issue a press release entitled, "Cray Inc. Reports Second Quarter 2004 Financial Results – Company Announces Restructuring to Align With Product Strategy; Company will host a conference call today at 5:00 p.. EST." The press release stated in part:

SEATTLE–(BUSINESS WIRE) July 26, 2004–Global supercomputer leader Cray Inc. (Nasdaq: CRAY) today reported financial results for the second quarter ended June 30, 2004.

The company reported second quarter revenue of $21.7 million compared to $61.8 million in the same period last year. GAAP net loss for the quarter was ($54.8)

VERIFIED DERIVATIVE COMPLAINT                - 35 -