UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| IN RE CRAY INC.<br>DERIVATIVE LITIGATION<br><br>This document relates to:<br>ALL ACTIONS | Lead Case No. C 05-1016 RSL<br><br>VERIFIED AMENDED DERIVATIVE<br>COMPLAINT FOR BREACH OF FIDUCIARY<br>DUTY, ABUSE OF CONTROL, GROSS<br>MISMANAGEMENT, WASTE OF<br>CORPORATE ASSETS, AND UNJUST<br>ENRICHMENT<br><br><u>DEMAND FOR JURY TRIAL</u> |

Plaintiffs Dominick Loriggio and Vasant Butala ("Plaintiffs"), by their attorneys, submit this Verified Derivative Complaint (the "Complaint") against the defendants named herein.

## I.  NATURE OF THE ACTION

1.     This is a shareholder derivative action brought by shareholders of Cray Inc. ("Cray" or the "Company"), which is both incorporated in and maintains its headquarters in Washington, on behalf of the Company against certain of its officers and directors seeking to remedy defendants' violations of state law, including breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment that occurred between July 31, 2003 and the present (the "Relevant Period").  These breaches of fiduciary duty and violations of law have caused Cray to suffer damages, as alleged herein.

## II.  OVERVIEW OF THE CASE

2.     Cray is engaged in the design, development, marketing and support of high-performance computer systems, commonly known as supercomputers.  These systems provide higher capability and capacity than typical mainframe computer systems and address challenging

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Avenue SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870

computing problems for government, industry and academia. Because of the complex nature of the products and services produced by Cray, the Company's contracts with its customers often contain complex terms that impact its return, multiple elements and contingencies that can have a material impact on the recognition or deferral of revenue and balance sheet classification of deferred revenue.

3.     Throughout the Relevant Period defendants knowingly misrepresented both the dynamics of Cray's business model and the Company's internal controls with regard to its financial reporting process.  In so doing, the individual defendants represented that the receipt of new contracts was the driving force behind its revenue growth.  In fact, however, Cray's revenues were largely dependent upon the speed of on-site acceptance testing, improved manufacturing processes, access to key parts and components and its ability to manufacture and qualify new supercomputer models.  Throughout the Relevant Period, Defendants focused on the receipt of contracts to portray the Company's financial prospects since Cray's internal controls were flawed and ineffective.  As a result, it was difficult for Cray to manage basic operational tasks, such as the development of software applications, to manage customer requirements and specifications for systems per contract, and to accurately report and forecast the revenue which it could properly recognize.  Furthermore, throughout the Relevant Period, Cray was unable to secure key parts and components needed to manufacture its new lines of supercomputers.

4.     These problems manifested themselves throughout the Relevant Period in the form of unpredictable and repetitive missed quarterly revenue guidance.  Over time, a huge order backlog for Cray's supercomputers developed, growing as large as $127 million.  In the interim period, defendants took steps to conceal the Company's basic problems.  Defendants did so by misleading analysts about expectations for future revenue recognition in later quarters and through concealment of basic performance issues, such as losses in performance of customer contracts and delays in the receipt of critical parts to build computer systems, and through active misrepresentation of the Company's internal controls with respect to financial reporting.

5.     On March 16, 2005, Cray revealed that, commensurate with its Sarbanes-Oxley activities, it expected to document material weaknesses in its system of internal controls and also expected to report that these controls were ineffective.  Moreover, the Company reported that its

AMENDED DERIVATIVE COMPLAINT          - 2 -
(Lead Case No. C 05-1016 RSL)

own auditors have expressed serious reservations, including whether or not the auditors would be able to render an opinion on either the Company's own assessment or its internal controls. Shockingly, these revelations came less than two weeks after the Company's filing of an SEC Form S-3, in connection with the resale or conversion of $80 million in convertible debt notes issued in December 2004.  Following the shocking news, on March 17, 2005, the price of Cray's stock fell $0.78 per share, for an astonishing 25.9% loss, closing at $2.23, on volume of 14.8 million shares.

6.      Finally, on May 9, 2005, Cray revealed that it had failed to include an auditor's opinion on management's assessment of internal control over financial reporting, required pursuant to Section 404 of the Sarbanes-Oxley Act of 2002 in its Form 10K/A filed on May 3, 2005. Moreover, Cray continued to report revenue results adversely impacted by faulty internal controls and practices of past quarters.  In response to this shocking news, the price of Cray's stock was dealt a final blow, falling $0.74 per share over the three-day period ending on May 12, 2005, for an astonishing 35.6% loss, closing at $1.34, on combined volume of 9.5 million shares, ***destroying more than $1 billion in market capitalization***.   As the Company has continued to announce staggering losses, the inability of Cray systems to complete customer acceptance testing and failures in its internal controls, the trading price of Cray stock has continued to erode, closing at just $0.98 per share on October 11, 2005.

7.      During the Relevant Period, defendants knew and concealed the fact that:

(a)      The Company was virtually devoid of internal controls with regard to its financial reporting and forecasting;

(b)      The Company lacked the processes, staffing and training in its finance and accounting departments to properly analyze, report and forecast properly recognizable revenue from its unique and complex contracts with customers;

(c)      Due to the unique nature of the Company's business and the high degree of complexity with regard to Cray's products, the speed and cost of on-site acceptance testing or improved processes for building machines, in accordance with customer requirements and specifications, had become increasingly unfavorable at Cray and were unlikely to get better anytime soon;

**LAW OFFICES OF**
**CLIFFORD A. CANTOR, P.C.**
627 208th Avenue SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870

1       (d)    Cray's own auditors and Audit Committee were aware of the flawed and

2   ineffective nature of the Company's internal controls;

3       (e)    Delays in realization of inventory and recognition of revenue were a recurring

4   and unpredictable feature of both Cray's business model and its ineffective and flawed financial

5   reporting processes and lack of internal controls;

6       (f)    Delays in the receipt of critical parts for hardware assembly were contributing

7   to delays in the development, assembly, shipment and acceptance testing of the Company's

8   "products";

9       (g)    Cray's "products" were hardware and software component configurations that

10  could be substantially altered in accordance with customer requirements and specifications;

11      (h)    Cray was in no position to capitalize on the fourfold increase in the

12  addressable market resulting from the OctigaBay acquisition;

13      (i)    Each new customer order presented a new set of hardware and software

14  development challenges, complicated by the complexity of the contracts which could not be properly

15  and critically analyzed due to the flawed and ineffective nature of Cray's internal controls;

16      (j)    Cray was losing money or breaking even on certain of its largest customer

17  orders; and

18      (k)    The inherent unpredictability of Cray's quarterly revenue guidance had far

19  more to do with the flawed and ineffective nature of the Company's internal controls than the timing

20  of customer contract awards.

21  **III.   JURISDICTION AND VENUE**

22      8.    This Court has jurisdiction over all claims asserted herein pursuant to 28 U.S.C.

23  §1332(a)(2), because complete diversity exists between Plaintiffs and each defendant, and the

24  amount in controversy exceeds $75,000.  This action is not a collusive action designed to confer

25  jurisdiction on a court of the United States that it would not otherwise have.

26      9.    This Court has jurisdiction over each defendant named herein because each defendant

27  is either a corporation that conducts business in and maintains operations in this District, or is an

28  individual who has sufficient minimum contacts with Washington so as to render the exercise of

AMENDED DERIVATIVE COMPLAINT    - 4 -
(Lead Case No. C 05-1016 RSL)

**LAW OFFICES OF**
**CLIFFORD A. CANTOR, P.C.**
627 208th Avenue SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870

jurisdiction by the Washington courts permissible under traditional notions of fair play and substantial justice.

10.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein, occurred in this District.  One or more of the defendants either resides in or maintains executive offices in this District, and defendants have received substantial compensation in this District by engaging in numerous activities and conducting business here, which had an effect in this District.

## IV.  PARTIES

11.     Plaintiff Loriggio at all relevant times owned and continues to own shares of Cray common stock.  Loriggio is a resident of the State of New York.

12.     Plaintiff Butala at all relevant times owned and continues to own shares of Cray common stock.  Butala is a resident of the State of Minnesota.

13.     Nominal defendant Cray, a Washington corporation, is engaged in the design, development marketing and support of high-performance computer systems, commonly known as supercomputers.  These systems provide higher capability and capacity than typical mainframe computer systems and address challenging computing problems for government, industry and academia. Cray maintains its corporate and administrative offices, where the Company's day-to-day business activities are conducted at 411 First Avenue South, Suite 600, Seattle, Washington 98104.

14.     Defendant James E. Rottsolk ("Rottsolk") is currently, and has been a director of the Company since 1987.  Rottsolk was one of the Company's co-founders and serves as Chairman and Chief Executive Officer. Rottsolk served as Chief Executive Officer from the inception of Cray in 1987 through September 2001 and from March 2002 to the present. He served as President from 1987 through September 2001 and from March 2002 until March 7, 2005. Rottsolk has served as Chairman of the Board since December 2000 to the present.  Because of Rottsolk's positions with the Company, he knew material, adverse non-public information regarding Cray and the fact that the Company disseminated false and misleading financial information throughout the Relevant Period.  Among other things, Rottsolk was aware of the fact that Cray lacked internal controls

necessary to accurately report the Company's financial results throughout the Relevant Period. Rottsolk was aware of this information via his access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  During the Relevant Period, Rottsolk participated in the issuance of false and/or misleading statements, including the preparation of false and/or misleading press releases and Securities and Exchange Commission ("SEC") filings.  During the Relevant Period, while in possession of the undisclosed adverse information set forth herein, Rottsolk sold 75,000 shares of Cray stock for proceeds of $971,906.  Upon information and belief, Rottsolk is a citizen of the State of Washington.

15.    Defendant Burton J. Smith ("Smith") is currently, and has been a director of the Company since 1988.  Smith was one of the Company's co-founders and served as Chairman from 1988 to 1999.  Because of Smith's positions with the Company, he knew material, adverse non-public information regarding Cray and the fact that the Company disseminated false and misleading financial information throughout the Relevant Period.  Among other things, Smith was aware of the fact that Cray lacked internal controls necessary to accurately report the Company's financial results throughout the Relevant Period.  Smith was aware of this information via his access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  During the Relevant Period, Smith participated in the issuance of false and/or misleading statements, including the preparation of false and/or misleading press releases and Securities and Exchange Commission ("SEC") filings.  During the Relevant Period, while in possession of the undisclosed adverse information set forth herein, Smith sold 49,548 shares of Cray stock for proceeds of $539,052.   Upon information and belief, Smith is a citizen of the State of Washington.

16.    Defendant Peter J. Ungaro ("Ungaro") at relevant times was President of Cray. Because of Ungaro's positions with the Company, he knew material, adverse non-public information regarding Cray and the fact that the Company disseminated false and misleading financial

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Avenue SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870

information throughout the Relevant Period.  Among other things, Ungaro was aware of the fact that Cray lacked internal controls necessary to accurately report the Company's financial results throughout the Relevant Period.  Ungaro was aware of this information via his access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  During the Relevant Period, Ungaro participated in the issuance of false and/or misleading statements, including the preparation of false and/or misleading press releases and Securities and Exchange Commission ("SEC") filings.  Upon information and belief, Ungaro is a citizen of the State of Washington.

17.     Defendant David R. Kiefer ("Kiefer") at relevant times was Senior Vice President of Cray.  Because of Kiefer's positions with the Company, he knew material, adverse non-public information regarding Cray and the fact that the Company disseminated false and misleading financial information throughout the Relevant Period.  Among other things, Kiefer was aware of the fact that Cray lacked internal controls necessary to accurately report the Company's financial results throughout the Relevant Period.  Kiefer was aware of this information via his access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  During the Relevant Period, Kiefer participated in the issuance of false and/or misleading statements, including the preparation of false and/or misleading press releases and Securities and Exchange Commission ("SEC") filings.  During the Relevant Period, while in possession of the undisclosed adverse information set forth herein, Kiefer sold 183,000 shares of Cray stock for approximately $2.2 million.  Upon information and belief, Kiefer is a citizen of the State of Washington.

18.     Defendant Scott J. Poteracki ("Poteracki") at relevant times was Senior Vice President of Finance and Chief Financial Officer of Cray.  Defendant Poteracki resigned his positions at Cray effective November 9, 2004.    Because of  Poteracki's positions with the Company, he knew material, adverse non-public information regarding Cray and the fact that the Company disseminated false and misleading financial information throughout the Relevant Period.

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Avenue SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870

1   Among other things,  Poteracki was aware of the fact that Cray lacked internal controls necessary
2   to accurately report the Company's financial results throughout the Relevant Period.  Poteracki was
3   aware of this information via his access to internal corporate documents, conversations and
4   connections with other corporate officers and employees, attendance at management and Board
5   meetings and committees thereof and via reports and other information provided to him in
6   connection therewith.  During the Relevant Period,  Poteracki participated in the issuance of false
7   and/or misleading statements, including the preparation of false and/or misleading press releases and
8   Securities and Exchange Commission ("SEC") filings.  During the Relevant Period, while in
9   possession of the undisclosed adverse information set forth herein, Poteracki sold 37,679 shares of
10  Cray stock for proceeds of $473,198.   Upon information and belief, Poteracki is a citizen of the
11  State of California.

12          19.       Defendant Kenneth W. Johnson ("Johnson") was during all relevant times, General
13  Counsel, Secretary and CFO of Cray.  Because of  Johnson's positions with the Company, he knew
14  material, adverse non-public information regarding Cray and the fact that the Company disseminated
15  false and misleading financial information throughout the Relevant Period.  Among other things,
16  Johnson was aware of the fact that Cray lacked internal controls necessary to accurately report the
17  Company's financial results throughout the Relevant Period.  Johnson was aware of this information
18  via his access to internal corporate documents, conversations and connections with other corporate
19  officers and employees, attendance at management and Board meetings and committees thereof and
20  via reports and other information provided to him in connection therewith.  During the Relevant
21  Period, Johnson participated in the issuance of false and/or misleading statements, including the
22  preparation of false and/or misleading press releases and Securities and Exchange Commission
23  ("SEC") filings.  During the Relevant Period, while in possession of the undisclosed adverse
24  information set forth herein, Johnson sold approximately $1,003,624 worth of his Cray Stock.
25  Upon information and belief, Johnson is a citizen of the State of Washington.

26          20.       Defendant Kenneth W. Kennedy, Jr. ("Kennedy")  is currently, and has been a
27  director of the Company since 1989.  Because of Kennedy's positions with the Company, he knew
28  material, adverse non-public information regarding Cray and the fact that the Company disseminated

AMENDED DERIVATIVE COMPLAINT                  - 8 -
(Lead Case No. C 05-1016 RSL)

1   false and misleading financial information throughout the Relevant Period.  Among other things,

2   Kennedy was aware of the fact that Cray lacked internal controls necessary to accurately report the

3   Company's financial results throughout the Relevant Period.  Kennedy was aware of this

4   information via his access to internal corporate documents, conversations and connections with other

5   corporate officers and employees, attendance at management and Board meetings and committees

6   thereof and via reports and other information provided to him in connection therewith.  During the

7   Relevant Period, Kennedy participated in the issuance of false and/or misleading statements,

8   including the preparation of false and/or misleading press releases and Securities and Exchange

9   Commission ("SEC") filings.  During the Relevant Period, while in possession of the undisclosed

10  adverse information set forth herein, Kennedy sold 900 shares of Cray stock for proceeds of

11  $10,404.  Upon information and belief, Kennedy is a citizen of the State of Texas.

12          21.     Defendant Stephen C. Kiely ("Kiely") is currently, and has been a director of the

13  Company since 1999.  Because of Kiely's positions with the Company, he knew material, adverse

14  non-public information regarding Cray and the fact that the Company disseminated false and

15  misleading financial information throughout the Relevant Period.  Among other things, Kiely was

16  aware of the fact that Cray lacked internal controls necessary to accurately report the Company's

17  financial results throughout the Relevant Period.  Kiely was aware of this information via his access

18  to internal corporate documents, conversations and connections with other corporate officers and

19  employees, attendance at management and Board meetings and committees thereof and via reports

20  and other information provided to him in connection therewith.  During the Relevant Period, Kiely

21  participated in the issuance of false and/or misleading statements, including the preparation of false

22  and/or misleading press releases and Securities and Exchange Commission ("SEC") filings.  Upon

23  information and belief, Kiely is a citizen of the State of Massachusetts.

24          22.     Defendant Daniel C. Regis ("Regis") is currently, and has been a director of the

25  Company since 2003.  Because of Regis' positions with the Company, he knew material, adverse

26  non-public information regarding Cray and the fact that the Company disseminated false and

27  misleading financial information throughout the Relevant Period.  Among other things, Regis was

28  aware of the fact that Cray lacked internal controls necessary to accurately report the Company's

AMENDED DERIVATIVE COMPLAINT          - 9 -
(Lead Case No. C 05-1016 RSL)

1   financial results throughout the Relevant Period.  Regis was aware of this information via his access

2   to internal corporate documents, conversations and connections with other corporate officers and

3   employees, attendance at management and Board meetings and committees thereof and via reports

4   and other information provided to him in connection therewith.  During the Relevant Period, Regis

5   participated in the issuance of false and/or misleading statements, including the preparation of false

6   and/or misleading press releases and Securities and Exchange Commission ("SEC") filings. During

7   the Relevant Period, while in possession of the undisclosed adverse information set forth herein,

8   Regis sold 31,999 shares of Cray stock for proceeds of $212,185.   Upon information and belief,

9   Regis is a citizen of the State of Washington.

10          23.     Defendant Sally G. Narodick ("Narodick") is currently, and has been a director of

11  the Company since October 2004.  Because of Narodick's positions with the Company, she knew

12  material, adverse non-public information regarding Cray and the fact that the Company disseminated

13  false and misleading financial information throughout the Relevant Period.  Among other things,

14  Narodick was aware of the fact that Cray lacked internal controls necessary to accurately report the

15  Company's financial results throughout the Relevant Period.  Narodick was aware of this

16  information via her access to internal corporate documents, conversations and connections with

17  other corporate officers and employees, attendance at management and Board meetings and

18  committees thereof and via reports and other information provided to him in connection therewith.

19  During the Relevant Period, Narodick participated in the issuance of false and/or misleading

20  statements, including the preparation of false and/or misleading press releases and Securities and

21  Exchange Commission ("SEC") filings.  Upon information and belief, Narodick is a citizen of the

22  State of Washington.

23          24.     Defendant Stephen C. Richards ("Richards") is currently, and has been a director of

24  the Company since October 2004.  Because of Richards' positions with the Company, he knew

25  material, adverse non-public information regarding Cray and the fact that the Company disseminated

26  false and misleading financial information throughout the Relevant Period.  Among other things,

27  Richards was aware of the fact that Cray lacked internal controls necessary to accurately report the

28  Company's financial results throughout the Relevant Period.   Richards was aware of this

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Avenue SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870

1  information via his access to internal corporate documents, conversations and connections with other

2  corporate officers and employees, attendance at management and Board meetings and committees

3  thereof and via reports and other information provided to him in connection therewith.  During the

4  Relevant Period, Richards participated in the issuance of false and/or misleading statements,

5  including the preparation of false and/or misleading press releases and Securities and Exchange

6  Commission ("SEC") filings.  Upon information and belief, Richards is a citizen of the State of

7  California.

8          25.     Defendant Frank L. Lederman ("Lederman") is currently, and has been a director of

9  the Company since May 2004.  Because of Lederman's positions with the Company, he knew

10  material, adverse non-public information regarding Cray and the fact that the Company disseminated

11  false and misleading financial information throughout the Relevant Period.  Among other things,

12  Lederman was aware of the fact that Cray lacked internal controls necessary to accurately report the

13  Company's financial results throughout the Relevant Period.  Lederman was aware of this

14  information via his access to internal corporate documents, conversations and connections with other

15  corporate officers and employees, attendance at management and Board meetings and committees

16  thereof and via reports and other information provided to him in connection therewith.  During the

17  Relevant Period, Lederman participated in the issuance of false and/or misleading statements,

18  including the preparation of false and/or misleading press releases and Securities and Exchange

19  Commission ("SEC") filings.  Upon information and belief, Lederman is a citizen of the State of

20  Arizona.

21          26.     Defendant John B. Jones, Jr. ("Jones") is currently, and has been a director of the

22  Company since December 2004.  Because of Jones' positions with the Company, he knew material,

23  adverse non-public information regarding Cray and the fact that the Company disseminated false

24  and misleading financial information throughout the Relevant Period.  Among other things, Jones

25  was aware of the fact that Cray lacked internal controls necessary to accurately report the

26  Company's financial results throughout the Relevant Period.  Jones was aware of this information

27  via his access to internal corporate documents, conversations and connections with other corporate

28  officers and employees, attendance at management and Board meetings and committees thereof and

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Avenue SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870

via reports and other information provided to him in connection therewith. During the Relevant Period, Jones participated in the issuance of false and/or misleading statements, including the preparation of false and/or misleading press releases and Securities and Exchange Commission ("SEC") filings. Upon information and belief, Jones is a citizen of the State of California.

27.     The defendants identified in ¶¶14-15 and 18-26 are referred to herein as the "Director Defendants." The defendants identified in ¶¶14 and 16-19 are referred to herein as the "Officer Defendants." The defendants identified in ¶¶14-15, 17-20 and 22 are referred to herein as the "Insider Selling Defendants." Collectively, the Director Defendants, the Officer Defendants and the Selling Defendants are referred to herein as the "Individual Defendants."

## V. CRAY'S BOARD, AND BOARD SUBCOMMITTEES

28.     The Company's Annual Proxy Statement for the Company's Annual Meeting of Shareholders was filed on April 14, 2005 (the "2005 Proxy"). Among other things, the 2005 Proxy provides information pertaining to executive compensation, ownership of securities and organizational information pertaining to the Board. During the Company's 2004 fiscal year ("FY 2004"), the full Board met seven times and the Board committees held a total of 23 meetings. Each director attended at least 85% of the meetings of the Board and relevant committees, except that Daniel J. Evans attended 14 of 21 total meetings of the Board and committees on which he sat and, before his resignation from the Board, William A. Owens attended four of six total meetings of the Board and committees on which he sat.   The current standing committees of the Board are: (i) the Audit Committee; (ii) the Compensation Committee; and (iii) the Nominating Committee and Corporate Governance Committee.

29.     With respect to the Audit Committee, the Individual Defendants caused the Company to disclose:

### A.     Audit Committee

The current members of the Audit Committee are defendants Regis (Chair), Richards and Narodick. During fiscal 2004, Daniel J. Evans and defendant Lederman also served on the Audit Committee.   The Audit Committee had 11 meetings during 2004.   According to the 2005 Proxy:

The Audit Committee assists the Board of Directors in fulfilling its responsibility for

oversight of:

• *the quality and integrity of our accounting and financial reporting processes and the audits of our financial statements,*

• the qualifications and independence of the public auditing firm engaged to issue an audit report on our financial statements,

• **the performance of our systems of internal controls, disclosure controls and internal audit functions, and**

• **our procedures for legal and regulatory compliance, risk assessment and business conduct standards.**

(Emphasis added).  Pursuant to the Audit Committee Charter, the Audit Committee is responsible for oversight of all reported financial information and for establishing and maintaining internal controls with regard to financial reporting.  With regard to financial information oversight, the Audit Committee is required, *inter alia*, to:

1.    Review and discuss with management and the independent auditor:

a.    The Company's quarterly and annual financial statements, all internal control reports (or summaries), and other relevant reports or financial information submitted by the Company to any governmental body or the public, including management certifications as required by law, and relevant reports rendered by the auditors (or summaries).

b.    The critical accounting policies and practices used by the Company, all alternative treatments of financial information within generally accepted accounting principles, the ramifications of the use of such alternative disclosures and treatments and the treatments preferred by the independent auditor.

c.    Any significant judgments made in management's preparation of the financial statements and the view of each as to the appropriateness of such judgments.

d.    Earnings press releases, guidance and other information provided to analysts and rating agencies, including "pro forma" and other non-GAAP financial measures.

e.    The effect of regulatory and accounting initiatives, and of any off-balance sheet structures, on the Company's financial statements.

f.    Written communications between the auditor and management including any management representation letter, internal control recommendation letter and schedule of unadjusted differences issued, or proposed to be issued, by the auditor to the Company, and management's response.

2.    Review in advance and approve all filings with the SEC containing (or incorporating by reference) the Company's financial statements, including the Quarterly Reports on Form 10-Q and the Annual Report on Form 10-K and "Management's Discussion and Analysis of Financial Condition and Results of Operations" in such filings.

3.    Oversee the resolution of any disagreements between management and the auditors regarding financial reporting.

AMENDED DERIVATIVE COMPLAINT                 - 13 -
(Lead Case No. C 05-1016 RSL)

4.    Recommend to the Board whether the audited financial statements should be included in the Company's Annual Report on Form 10-K.

With regard to internal controls, the Audit Committee is required, *inter alia*, to:

1.    Review with the auditor and management the integrity of the Company's financial reporting processes (internal and external) and the internal control structure, including disclosure controls.

2.    Consider whether any changes to the internal controls or disclosure controls processes and procedures are appropriate in light of management's assessment and the independent auditor's report.

3.    Review the internal audit scope, audit plans and relevant process, and the results of internal audits, including the auditor's attestation report on management's assessment of internal control over financial reporting.

**B.    Compensation Committee**

30.    Defendants Lederman (Chair), Jones, Kennedy and Kiely were members of the Compensation Committee for FY 2004.  The Compensation Committee met eight times in FY 2004.  According to the 2005 Proxy:

The Compensation Committee assists the Board of Directors in fulfilling its responsibilities for the oversight of:

•  our compensation policies, plans and benefit programs,

•  the compensation of the chief executive officer and other executive officers, and

•  the administration of our equity compensation plans.

**C.    Nominating and Corporate Governance Committee**

31.    Defendants Kiely (Chair), Lederman and Regis were members of the Nominating and Corporate Governance Committee for FY 2004.    The Nominating and Corporate Governance Committee met eight times in FY 2004. According to the 2005 Proxy:

The Corporate Governance Committee has the responsibility to:

•  ***develop and recommend to the Board a set of corporate governance principles,***

•  recommend qualified individuals to the Board for nomination as directors,

•  lead the Board in its annual review of the Board's performance, and

•  recommend directors to the Board for appointment to Board committees.

**VI.    DUTIES OF THE INDIVIDUAL DEFENDANTS**

32.    In addition to the foregoing, by reason of their positions as officers, directors and/or

AMENDED DERIVATIVE COMPLAINT          - 14 -
(Lead Case No. C 05-1016 RSL)

fiduciaries of Cray and because of their ability to control the business and corporate affairs of Cray, the Individual Defendants owed Cray and its shareholders fiduciary obligations of trust, loyalty, good faith and due care, and were and are required to use their utmost ability to control and manage Cray in a fair, just, honest and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Cray and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

33.   Each director and officer of the Company owes to Cray and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.  In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's revenue, margins, operations, performance, management, projections and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

34.   The Individual Defendants, because of their positions of control and authority as directors and/or officers of Cray, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.  Because of their advisory, executive, managerial and directorial positions with Cray, each of the Individual Defendants had access to adverse non-public information about the financial condition, operations, and improper representations of Cray.

35.   At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Cray, and was at all times acting within the course and scope of such agency.

36.   To discharge their duties, the officers and directors of Cray were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of Cray were required to, among other things:

(i) refrain from acting upon material inside corporate information to benefit themselves;

(ii) ensure that the Company complied with its legal obligations and requirements, including

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Avenue SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870

acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(iii) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(iv) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(v) remain informed as to how Cray conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws;

(vi) ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable federal, state and local laws, rules and regulations; and

(vii) ensure that the Company maintained adequate internal controls so that the financial reports and public statements issued by the Company and the Individual Defendants were based upon accurate information.

37.   Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Cray, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.  The conduct of the Individual Defendants who were also officers and/or directors of the Company during the Relevant

1 | Period has been ratified by the remaining Individual Defendants who collectively comprised all of

2 | Cray's Board during the Relevant Period.

3 |     38.    The Individual Defendants breached their duties of loyalty and good faith by

4 | allowing defendants to cause or by themselves causing the Company to misrepresent the adequacy

5 | of its internal controls, together with the Company's financial results and prospects, as detailed

6 | herein *infra*, and by failing to prevent the Individual Defendants from taking such illegal actions.

7 | In addition, as a result of defendants' illegal actions and course of conduct during the Relevant

8 | Period, the Company is now the subject of a NASDAQ investigation and several class action law

9 | suits that allege violations of federal securities laws.  As a result of the foregoing, Cray has

10 | expended and will continue to expend significant sums of money.  Such expenditures include, but

11 | are not limited to:

12 |         (i)    Costs incurred to carry out internal investigations, including legal fees paid

13 | to accountants, auditors and  outside counsel; and

14 |         (ii)    Costs incurred in investigating and defending Cray and certain officers in

15 | NASDAQ investigation and class actions, plus potentially millions of dollars in settlements

16 | to satisfy an adverse judgments.

17 |     39.    Moreover, these actions and failures to act, have irreparably damaged Cray's

18 | corporate image and goodwill.  For at least the foreseeable future, Cray will suffer from what is

19 | known as the "liar's discount," a term applied to the stocks of companies who have been implicated

20 | in illegal behavior and have misled the investing public, such that Cray's ability to raise equity

21 | capital or debt on favorable terms in the future is now impaired.

22 | **VII.**    **CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

23 |     40.    In committing the wrongful acts alleged herein, the Individual Defendants have

24 | pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and

25 | conspired with one another in furtherance of their common plan or design.  In addition to the

26 | wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further

27 | aided and abetted and/or assisted each other in breach of their respective duties.

28 |     41.    During all times relevant hereto, the Individual Defendants collectively and

**LAW OFFICES OF**
**CLIFFORD A. CANTOR, P.C.**
627 208th Avenue SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870

individually initiated a course of conduct that was designed to and did: (i) conceal the fact that the Company was improperly misrepresenting its financial results and prospects, in order to allow defendants to artificially inflate the price of the Company's shares; (ii) maintain the Individual Defendants' executive and directorial positions at Cray and the profits, power and prestige that the Individual Defendants enjoyed as a result of these positions; and (iii) deceive the investing public, including shareholders of Cray, regarding the Individual Defendants' management of Cray's operations, the adequacy of its internal controls, the Company's financial health and stability, and future business prospects throughout the Relevant Period.  In furtherance of this plan, conspiracy and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

42.     The Individual Defendants engaged in a conspiracy, common enterprise and/or common course of conduct commencing by at least July 2003 and continuing thereafter.  Certain of the Individual Defendants subsequently joined in the conspiracy upon accepting a position as an officer and/or director of the Company and by taking the actions alleged herein ratified the actions and conduct committed in furtherance of the conspiracy prior to that time.  During this time the Individual Defendants caused the Company to conceal the true fact that Cray was misrepresenting the expense incurred by the Company in granting lucrative stock-based compensation to officers and directors of the Company, together with the Company's financial results and prospects.  In addition, defendants also made other specific, false statements about Cray's internal controls, financial performance and future business prospects, as alleged herein.

43.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment; to conceal adverse information concerning the Company's operations, financial condition and future business prospects; and to artificially inflate the price of Cray common stock so they could: (i) dispose of over $4.8 million of their personally held stock; and (ii) protect and enhance their executive and directorial positions and the substantial compensation and prestige they obtained as a result thereof.

**LAW OFFICES OF**
**CLIFFORD A. CANTOR, P.C.**
627 208th Avenue SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870

44.     The Individual Defendants accomplished their conspiracy, common enterprise and/or common course of conduct by causing the Company to purposefully, recklessly or negligently misrepresent its financial results.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary and substantial participant in the conspiracy, common enterprise and/or common course of conduct complained of herein.

45.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## VIII.   SUBSTANTIVE ALLEGATIONS

46.     On July 31, 2003, the Individual Defendants caused the Company to issue a press release entitled, "Cray Inc. Announces Second Quarter 2003 Financial Results - Record quarterly revenue of $61.8 million and earnings of $.10 cents per diluted share."  The press release stated in part:

> SEATTLE – July 31, 2003 – Global supercomputer leader Cray Inc. (Nasdaq NM: CRAY) today reported record financial results for the second quarter ended June 30, 3003.  Total revenue for the quarter was $61.8 million compared to $38.6 million in the same quarter last year.  Net income was $7.9 million or $.10 cents per diluted share, up from $1.2 million or $.02 cents per diluted share reported in the second quarter of 2002.  Second quarter results benefited from previously announced revenue of approximately $6 million that was deferred from first quarter 2003.
>
> "The first half of 2003 came in as planned, thanks to the tremendous efforts of the entire Cray team as well as our customers," said Jim Rottsolk, Chairman and CEO of Cray Inc.  "Improved profitability in the second quarter indicates we're getting closer to our target business model and we are beginning to see the leverage in the model as revenue increases.  With the Cray X1 system now in full-production mode, we are focused on product delivery and successfully meeting increasingly challenging customer acceptance tests for the second half of the year," said Rottsolk.
>
> Product margins in the second quarter improved but to higher volumes, lower component costs and improved yields.  Service margins were negatively affected by bid costs associated with Cray's successful DARPA funding award and by severance costs.
>
> ***"We used cash in the second quarter to retire remaining bank debt and to fund inventory and accounts receivable accompanying the growth of our business," Rottsolk said.  "The effect was exaggerated due to the timing of***

AMENDED DERIVATIVE COMPLAINT             - 19 -
(Lead Case No. C 05-1016 RSL)

LAW OFFICES OF
**CLIFFORD A. CANTOR, P.C.**
627 208th Avenue SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870

*acceptances late in the quarter, and due to our decision to assemble large systems for software testing in advance of deliveries.* The balance sheet strengthened during the second quarter, with working capital increasing by over $12 million. We expect strong positive cash flow in the second half of the year," Rottsolk said.

Second Quarter Highlights

• In April, Cray reported the first customer acceptance of a full-production version of the new Cray X1™ supercomputer system. The system was accepted by Network Computing Services, Inc., systems integrator and computing facilities manager for the Army High Performance Computing Research Center.

• In May, Cray reported $16.0 million in orders for Cray X1 equipment and related technology and services from undisclosed customers.

• In June, Cray announced that all 3,125,000 shares of its Series A Convertible Preferred Stock held by NEC Corporation had been converted and sold. With this transaction, the company has no preferred stock outstanding.

*Recently, Cray announced that it would receive $49.9 million in funding over the next three years from the Defense Advanced Research Projects Agency (DARPA) through participation in the second phase of DARPA's High Productivity Computing Systems Program. "Participating in the second phase of this program is a great win for Cray and further validation of our IIPC experience and ability to innovate," said Rottsolk. "The selection process was very competitive and the Cray team deserves high marks for their hard work."*

Guidance

Full year 2003 guidance remains unchanged, with anticipated revenue of at least $220 million and profitability in the higher range of 5 to 10 percent of revenue. Cray remains confident that revenue, profitability and overall financial performance will be stronger in the second half of 2003 compared to the first half.

(Emphasis added).

47.    Defendants' press release of July 31, 2003 was false and misleading, since it provided a false and misleading picture of the "predictability" of Cray's guidance and forecasts, using product inventory and realized revenue measures. Defendants sought to distinguish the need to "fund" inventory and receivables during the quarter, as an exaggeration due to growth. This explanation served to convince investors that, in spite of "growing pains," defendants had sufficient internal controls established to properly determine and report its financial results accurately.

48.    Although investors were being told that "software testing" was the culprit for this one-time exaggeration, Individual Defendants knew and concealed the fact that Cray lacked adequate internal controls and a reporting process to properly report Cray's financial results. Each new customer order for Cray's custom-built systems brought its own peculiar set of challenges,

despite Cray's representations of "commodity" product lines and disclosure of machine sales by model number, in fact each custom order was subject to unique contractual contingencies, containing complex terms that impacted the Company's recognition and determination of revenue (including customer rights of return, multiple elements and contingencies that can have a material impact on the recognition or deferral of revenue) and balance sheet classification of deferred revenue. During the Relevant Period, Cray did not evaluate and document the consideration of such terms, and did not have a process for independent review of the accounting treatment and the associated revenue determinations for such contracts. Thus, defendants' false and misleading statements of one-time explanations and excuses as reason for delays in inventory and revenue recognition effectively concealed the truth about the Company's inadequate internal controls and financial reporting process.

49.    During the pre-market conference call of July 31, 2003 that followed, defendants further concealed the basic problem in using Cray's quarterly revenue measures as a way to predict the success and prospects of the business.    Regarding 2004 guidance, defendant Rottsolk commented:

> As we reported in the press release, we are now starting to see the target business model kick in.  And the level of profitability in the second quarter is indicative of the strong leverage our business model can produce.  You will see further evidence of this in the second half of the year as revenue increases.

> *    *    *

> You will see that our guidance has been changed from $220m, and operating income in the upper range of 5% to 10%.  We are confident we can achieve these results. ***While we are very optimistic about 2004, there is a wide range of possible outcomes at this stage, tied to both government funding and capital spending in commercial sectors. This makes it difficult to comment on the 2004 outlook, and therefore we will not provide 2004 guidance until later in this year.*** That concludes our formal comments and now we would like to address any questions that you might have.  Thank you very much.

(Emphasis added).

50.    Defendant Rottsolk's comments regarding the "leveraging capabilities" of Cray's business model were false and misleading, given the development challenges that accompanied each new customer order, the unique contractual provisions containing complex terms which substantially impacted the recognition of revenue from the contracts.  This was exacerbated by the fact that Cray

**LAW OFFICES OF**
**CLIFFORD A. CANTOR, P.C.**
627 208th Avenue SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870

1   also lacked sufficient processes, staffing and training within its finance and accounting departments

2   to  properly conduct a critical analysis of the components of deferred revenue implicit in each of

3   these contracts.  Rottsolk's comments served to focus attention on the receipt of new contracts as

4   the driving force for increased revenues, rather than factors having a direct bearing on revenue

5   recognition, such as the speed of on-site acceptance testing or improved processes for building

6   machines in accordance with customer requirements and specifications.

7           51.     Moreover, defendant Rottsolk's reasons for not providing 2004 guidance were false

8   and misleading.  Although he cited customer budgetary issues, the inherent unpredictability of

9   Cray's quarterly revenue measures had far more to do with the accuracy of Cray's lack of adequate

10  internal controls that severely restricted accurate revenue guidance rather than the timing of

11  customer contract awards.  Defendants knew that each new customer order presented a new set of

12  hardware and software development challenges, challenges that were at the root of that

13  unpredictability together with unique and complex contractual provisions which had a direct bearing

14  on the ability of the Company to recognize revenue generated from each new order.  Furthermore,

15  Individual Defendants knew that the Company lacked the internal controls, processes, staffing and

16  training in the finance and accounting departments to accurately evaluate, report and forecast

17  properly recognized revenue from these transactions.  Defendants continued with a discussion of

18  their product models and lines:

19          Alan Robinson - Delafield Hambrecht, Inc. - Analyst

20          Just on the-- first quick question on sort of a macro level and then some bookkeeping
            questions.  There's been a lot of noise recently from potential competitors in the
21          MPP markets.   I'm thinking about the dawning company in China and also
            (inaudible) recently.
22
            Can you give us an idea of how you think your Red Storm Technology sets you apart
23          from these people, and whether their recent of these announcements make you any
            more or less confident that the positive Red Storm getting attractions as a
24          commercial product?

25          Jim Rottsolk - Cray Inc. - Chairman and CEO

26          Yeah, let me–Alan this is Jim.  Let me try to tackle that.  I think Red Storm and in
            any success to our commercial product from Red Storm is going to be pretty highly
27          differentiated from the types of products you are reading about.  Most of which are
            fairly straightforward clusters with a fairly loose more bandwidth interconnection.
28          Red Storm, as you know, will have a very high bandwidth; very intelligent

AMENDED DERIVATIVE COMPLAINT          - 22 -
(Lead Case No. C 05-1016 RSL)

1    interconnect system.

2    This also, quite flexible can be to figure the number of ways and as well will have
     at we believe to be superior system software. So we think we are going to have a
3    nicely differentiated product that will be very pleased performance competitors.

4        52.    The Individual Defendants' represented Red Storm as a "commercial product",

5    possessing "superior system hardware" and highly differentiated from other types of commercial

6    products. However, these representations were false and misleading since the "product" was simply

7    a hardware and software component configuration, one that could be substantially altered in

8    accordance with customer requirements and specifications.    Customer requirements and

9    specifications translated into challenges that would manifest themselves both during the building

10   of the machine and during on-site customer acceptance testing. Thus, the Red Storm did not possess

11   locked-down attributes of a typical "commercial product".

12       53.    The Individual Defendants then faced questions about the "increasing complexity"

13   of customer acceptance testing:

14   Jim McGowrie - Analyst

15   Thank you. There's a comment in the release thing. You are facing increasingly
     challenging customer acceptance tests for the second half of the year. Can you just
16   expand on what you mean by that?

17   Jim Rottsolk - Cray Inc. - Chairman and CEO

18   Well, we are obviously feeling very confident the way things worked out in 2Q, we
     made a lot of progress. We didn't want - it's just a cautionary statement, we are
19   going to be building and delivering larger systems in the third quarter and then even
     larger systems in the fourth quarter. And as noted these systems that comes from our
20   site increase in size, we face all the software, everything else that is sealed which
     was just in size. That's just a lot of work and customers are beginning to put these
21   systems, not just to acceptance tests but getting ready for the full production, within
     whatever work they do, and just more demanding, more stringent acceptance tests
22   we picked. I think we are telling more and more confidence, Jim don't get me
     wrong, but just a word of caution.
23
     Jim McGowrie - Analyst
24
     No. I understand. And last quarter you said that Q2 you would face some backend
25   loaded customer acceptance issues. Do you have the same level of issues in Q3 as
     you did in Q2?
26
     Jim Rottsolk - Cray Inc. - Chairman and CEO
27
     It's less in Q3 than Q2 and again less in Q4 than in Q3. We, you know, we have to
28   complete the software to scale these systems to larger sizes, so that's probably the

AMENDED DERIVATIVE COMPLAINT        - 23 -
(Lead Case No. C 05-1016 RSL)

facing item.

54.     Thus, defendant Rottsolk presented the on-site customer acceptance testing issue as one related to scalability, not tied to the unique customer requirements and specifications for each system.   This was false and misleading, since each customer order generated its own set of requirements and specifications, with acceptance tests related to those challenging requirements and not simply the "size" of the system.   Moreover, these additional requirements and specifications resulted in complex contractual terms for which the Company lacked the internal control, processes, and staffing to properly and critically analyze, report or forecast their impact on revenue.

55.     On August 14, 2003, the Individual Defendants caused the Company to file its quarterly report on Form 10Q for 2Q 2003, in which Cray repeated the financial results set forth above.   The quarterly report also stated in relevant part:

> We recognize product revenue from sales of our computer systems upon acceptance by the customer, although in limited circumstances, depending on sales contract terms, revenue may be recognized when title passes upon shipment or may be delayed until funding is certain or other contractual requirements are satisfied. We recognize product revenue from the Red Storm contract using the percentage-of-completion method. We recognize service revenue for the maintenance of our computer systems ratably over the term of each maintenance agreement. Funds from maintenance and product sales contracts that are paid in advance are recorded as deferred revenue. We recognize service revenue from our professional services activities as services are rendered.
>
> * * *
>
> We evaluated the effectiveness of the design and operation of our disclosure controls and procedures, as defined in Rules 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934, as amended, as of the end of the period covered by this report. Our principal executive and financial officers supervised and participated in the evaluation. ***Based on the evaluation, our principal executive and financial officers each concluded that, as of the date of the evaluation, our disclosure controls and procedures were effective in providing reasonable assurance that material information relating to Cray and our consolidated subsidiaries is made known to management, including during the period when we prepare our periodic SEC reports.*** The design of any system of controls is based in part upon certain assumptions about the likelihood of future events, and there can be no assurance that any design will succeed in achieving its stated goals under all potential future conditions, regardless of how remote.

(Emphasis added).

56.     In fact, however, the Company did not have sufficient internal controls to ensure either that revenue was properly recognized or that financial information was accurately reported.

57.     On October 30, 2003, the Individual Defendants caused the Company to issue a press

AMENDED DERIVATIVE COMPLAINT      - 24 -
(Lead Case No. C 05-1016 RSL)

release entitled, "Cray Inc. Reports Third Quarter 2003 Financial Results — Company posts record quarterly revenue of $53.8 million, $1.10 per diluted share."  The press release stated in part:

> SEATTLE – October 30, 2003 – Global supercomputer leader Cray Inc. (Nasdaq NM: CRAY) today reported financial results for the third quarter ended September 30, 2003.

> Third quarter revenue was $63.8 million, up 52 percent from $42.1 million in the same period last year, reflecting strong customer acceptances during the quarter for the company's flagship Cray X1™ supercomputer system. Third quarter net income was $8.5 million or $.10 cents per diluted share, compared to $2.1 million or $.04 cents per diluted share for the same period in 2002.  The company had strong operating cash flow of $24 million, with cash balances increasing o $69 million as of September 30, 2003.

> For the nine months ended September 30, 2003, total revenue increased to $169.7 million, up 46 percent from $115.9 million reported for the first nine months in 2002.  Net income for the nine months was $17.5 million or $.23 cents per diluted share, compared to net income of $4.1 million and $.08 cents per diluted share respectively.

> "Excellent execution helped drive another profitable quarter, highlighted by record quarterly revenue of $63.8 million and strong margins of nearly 45 percent," commented Jim Rottsolk, Chairman and CEO of Cray Inc.  ***"We anticipated a challenging third quarter because we were building and delivering larger Cray XI systems for the first time, and therefore facing more difficult customer acceptances.  Fortunately, we were successful on all fronts.***  Again, Cray employees deserve a great deal of credit for our accomplishments, as do our customers, who worked closely with us throughout the quarter."

> In October, the company announced Cray X1 supercomputer orders from The Boeing Company and the University of Warsaw.  Earlier this week, Cray announced plans to expand the company's addressable market by offering a massively parallel processing (MPP) product based on the "Red Storm" supercomputer Cray is developing for Sandia National Laboratories.  The new, high-bandwidth MPP product, using standard AMD Opteron™ microprocessors and the Linux operating system, is scheduled to begin shipping in 2004.

> "Our positive momentum has continued into the fourth quarter with important Cray X1 orders and exciting new product plans designed to help Cray penetrate new opportunities, both domestically and internationally," Rottsolk said.

> "The University of Warsaw order includes a planned upgrade to the Cray X1E and will be used to enhance weather forecasting, life sciences research and other research projects in Europe.  The Boeing Company procurement was the first commercial sale of a Cray X1 system and will be installed in Boeing's Puget Sound Data Center," he said.

> Third Quarter Highlights

> • Working closely with a number of our partners, we delivered several single-image systems of 128 processors or more, the largest of which is located at Oak Ridge National Laboratory.

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Avenue SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870

• In July, Cray received additional funding of $50 million from DARPA for Phase II of an advanced research program (HPCS) to develop supercomputer technology capable of sustained petaflops performance by the year 1020.

• In August, Cray announced the appointment of Peter J. Ungaro as Vice President of Sales and Marketing. Ungaro was formerly vice present, worldwide deep computing sales at IBM.

• In September, Cray signed a co-funding agreement with the U.S. government under which the U.S. government will contribute $17.5 million toward the development of the successor of the Cray X1 and X1E supercomputer system, code named "Black Widow."

• Also in September, industry analysts, International Data Corporation (IDC) reported that Cray captured first, second and third place in the most powerful class of single computers in their latest supercomputer rankings.

Guidance

***"Based upon our solid results for the third quarter, we anticipate revenue for the full year 2003 will be between $230 million and $235 million. This assumes that systems scheduled for fourth quarter installation receive customer acceptance within the quarter," Rottsolk said. "Operating income should be slightly above the previously established range of five to ten percent of revenue."***

(Emphasis added).

58.     Defendants' press release of October 30, 2003 was false and misleading for the following reasons. First, defendants again sought to explain the increasing delays in completing product acceptance testing, this time for the Cray X1 hardware configuration, as primarily an issue of system size. However, each system was built in accordance with customer requirements and specifications, with each set of requirements and specifications presenting their own unique set of hardware and software challenges. Although defendants explained that Cray was up to the task, these challenges were placing an increased strain on Company resources and timelines. Moreover, these ever increasing individual requirements and specifications resulted in increasingly complex contracts with provisions that impacted the Company's ability to recognize revenue from these contracts. Cray, however, lacked internal controls, processes, and staffing to properly and critically analyze such contract provisions, making both reported financial results as well as financial forecasts inaccurate and unpredictable.

59.     During Individual Defendants' conference call October 30, 2003, defendant Rottsolk provided a "report card" for the Cray X1:

LAW OFFICES OF
**CLIFFORD A. CANTOR, P.C.**
627 208th Avenue SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870

1    Jim Rottsolk - Cray, Inc. - Chairman, President and Chief Executive Officer

2    Thank you, Scott, and good morning, everyone.  Before I talk about the new Red
     Storm product and our plans to bring it to market in 2004, I thought it would be
3    useful to provide a brief report card on the Cray X1.

4    It was about this time last year we were in the middle of launching that product,
     which was Cray's first new supercomputer system.  A lot has happened in 12
5    months.  **To date, there have been over $180 million in orders for the Cray X1.**
     **These include domestic and international orders, governmental and commercial**
6    **orders, orders for research, defense and academia. All of the installed systems are**
     **engaged in tackling the most challenging scientific and engineering problems.**
7
     (Emphasis added).
8
9        60.    Defendant Rottsolk's comments regarding the Cray X1 were false and misleading,

10   since they presented the Cray X1 as a "commercial product," rather than as a hardware and software

11   configuration ordered in accordance with customer requirements and specifications.   Those

12   specifications and requirements would, in turn impact the time to build the system and the nature

13   of the product acceptances tests defendants would have to perform before they could ever realize

14   revenue from sales of the systems.  Moreover, the Company lacked the internal controls, processes

15   and staffing in the finance and accounting departments to properly and critically analyze the

16   complex terms of each of the contracts to assure that revenue was properly being recognized.

17       61.    The Individual Defendants then responded questions regarding the influence of

18   "deferred revenue" on cash flow:

19   Alan Robinson - Delafield Hambrecht, Inc. - Analyst

20   Good morning, Scott, a couple of questions for you.  I noticed the cash provided by
     operations is up nicely there.  Was that most generated by deferred revenue?

21   Scott Poteracki - Cray, Inc. - Chief Financial Officer, VP-Finance

22   We had receivables come down about 5 million. **Deferred revenue was very strong,**
     **up about 13, 14 million, I think.  It was obviously – earnings were strong, which**
23   **was a key contributor.**  It was mostly deferred revenue, receivables along with
     earnings.  In Q4, I look for inventory to really contribute to another strong cash flow
24   quarter.

25   (Emphasis added).

26       62.    Defendant Poteracki's representation of "strong earnings" during the quarter was

27   false and misleading.  The deferred revenues accounting measure Poteracki pointed to make that

28   claim was in fact one more unpredictable twist to Cray's revenue recognition story.  It simply was

AMENDED DERIVATIVE COMPLAINT          - 27 -
(Lead Case No. C 05-1016 RSL)

LAW OFFICES OF
**CLIFFORD A. CANTOR, P.C.**
627 208th Avenue SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870

1   impossible to determine which of Cray's contracts would contribute to positive cash flow and

2   deferred revenue, as opposed to back-ended deals where all acceptance testing would need to be

3   completed before payments would be made.

4   63.   On November 14, 2003, the Individual Defendants caused the Company to file its

5   quarterly report on Form 10Q for 3Q 2003, in which Cray repeated the financial results set forth

6   above.  The quarterly report also repeated the representations with regard to recognition of revenue

7   and internal controls set forth in paragraph 54, preceding.  In fact, however, the Company did not

8   have sufficient internal controls to ensure either that revenue was properly recognized or that

9   financial information was accurately reported.

10   64.   On January 29, 2004, the Individual Defendants caused the Company to issue a press

11   release entitled, "Cray Inc. Announces 2003 Financial Results – Company reports revenue of $237.0

12   million, EPS of $.81 including non-recurring items."  The press release stated in part:

> SEATTLE – January 29, 2004 – Global supercomputer leader Cray Inc. (Nasdaq NM: CRAY) today reported financial results for the fourth quarter and full year 2003 ended December 31, 2003.
>
> Fourth quarter 2003 revenue was a record $67.2 million, up 71 percent from $39.2 million in the same period last year.  Fourth quarter net income was $45.4 million, or $56 per fully diluted share compared to $1.3 million or $.02 per fully diluted share in the fourth quarter 2002.
>
> Non-recurring items for the fourth quarter 2003 included a write-up of a deferred tax asset of $42.2 million and a restructuring charge of $4.0 million related primarily to severance.  Non-recurring items improved earnings by $38.2 million, or $.47 per fully diluted share.
>
> "Fourth quarter revenue, our best yet, capped a great 2003 for Cray and the results were in line with our expectations," commented Jim Rottsolk, Cray Chairman and CEO.  "Notably during the quarter, we obtained all expected acceptances, including the two most powerful systems ever installed by Cray," Rottsolk said.
>
> For the twelve months ended December 31, 2003, Cray reported revenue of $237.0 million compared to $155.1 million last year, an increase of 53 percent.  Including non-recurring items, net income for 2003 was $52.9 million, or $.81 per fully diluted share, up from net income of $5.4 million and fully diluted earnings per share of $.10 per share in the same period last year.
>
> For the full-year 2003, non-recurring items improved earnings by 38.2 million or $.47 per fully diluted share.
>
> "Cray delivered record financial results in 2003 and throughout the year we successfully delivered on our overall strategy," Rottsolk said.  "In addition to growing the company, we accomplished many additional objectives.  We

AMENDED DERIVATIVE COMPLAINT          - 28 -
(Lead Case No. C 05-1016 RSL)

strengthened our capital structure with a successful public offering and the retirement of all outstanding bank debt; gained significant market share in a highly competitive environment; and demonstrated our ability to build and bring to market products customers need," he said.

Recent Highlights

• In October, Cray won an order from the Boeing Company for a Cray X1™ system to support Boeing's research and development efforts. The Boeing order represented the first commercial order for the Cray X1.

• In October, Cray received an order from Warsaw University's Interdisciplinary Center for Mathematical and Computational Modeling (ICM), Warsaw, Poland. The order included an upgrade to the successor system, the Cray X1E™.

• In October, Cray unveiled plans to deliver a new product based on the "Red Storm" 40-TeraOp (40 trillion calculations per second) supercomputer it is developing for Sandia National Laboratories. The Red Storm product is due out in 2004.

• In November, Cray reported that its Cray X1 supercomputer had the most powerful processors, according to the "World's Top 500 Supercomputers," which is published annually by the universities of Tennessee and Mannheim (Germany), and NERSC/Lawrence Berkeley National Laboratory.

• In December, Cray announced another international order for the Cray X1 system.

Outlook

*"The outlook for 2004 and 2005 for Cray is promising and we are confident in our long-term growth prospects as well as our ability to execute," said Rottsolk. "We've set a high bar for ourselves in 2004, planning to grow revenue to about $300 million while achieving operating profit in the range of eight to twelve percent of revenue. Our plan depends primarily on the timely and successful introduction of two new products, the Cray X1E and commercialized Red Storm systems, both of which we plan to launch in the second half of 2004."*

"Our outlook also relies on maintaining momentum with our current customer base, including the U.S. government." Rottsolk added, "While the fiscal 2004 U.S. federal budget process was recently completed, it remains difficult to forecast the outcome of individual budget allocations and the resulting impact on Cray."

(Emphasis added).

65.    During the premarket conference call of January 29, 2004 that followed, confusion about how the Individual Defendants caused the Company to book revenue on contract completions continued:

Brandy Brandon - Eason Vance - Analyst

And then on the percentage the completion, presumably we can see a–see that in kind

LAW OFFICES OF
**CLIFFORD A. CANTOR, P.C.**
627 208th Avenue SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870

1    of deferred revenue or something like that?

2    Scott Poteracki - Cray - CFO

3    I don't quite understand your question.

4    Brandy Brandon - Eason Vance - Analyst

5    Well, as you go ahead and you kind of percentage of completion contract basis, you
     kind of accrue revenues and expenses on it at a presumed profit rate and stuff like
6    that. Is that visible in the balance sheet given the notes in the Qs and Ks, will it be?

7    Scott Poteracki - Cray - CFO

8    Well, I'll make sure it is. There is some receivables that we have accrued–I know
     there's contracts that have not been built–but, a modest amount. So we're pretty
9    much keeping up with our billings, relative to the revenue we've taken in Sandia.
     But it's included in accounts receivable. I'll try to get some disclosure into the KM
10   on the makeup of those receivable.

11        66.    On March 12, 2004, the Individual Defendants caused the Company to file its annual

12   report on Form 10K with the SEC. This annual report repeated the financial results set forth above.

13   In addition, the annual report went on to state that with respect to revenue recognition:

14        We recognize revenue when it is realized or realizable and earned. We consider
          revenue realized or realizable and earned when it has persuasive evidence of an
15        arrangement, the product has been shipped or the services have been provided to the
          customer, the sales price is fixed or determinable and collectability is reasonably
16        assured. In addition to the aforementioned general policy, the following are the
          specific revenue recognition policies for each major category of revenue and for
17        multiple-element arrangements.

18        *Product*. We generally recognize revenue from product sales upon customer
          acceptance and when we have no unfulfilled obligations that affect the customer's
19        final acceptance.

20        ***Revenue from contracts that require us to design, develop, manufacture or
          modify complex information technology systems to a buyer's specifications, and to
21        provide services related to the performance of such contracts, is recognized using
          the percentage of completion method for long-term development projects.
22        Percentage of completion is measured based on the ratio of costs incurred to date
          compared to the total estimated costs. Total estimated costs are based on several
23        factors, including estimated labor hours to complete certain tasks and the estimated
          cost of purchased components at future dates. Estimates may need to be adjusted
24        from quarter to quarter which would impact revenue and margins on a cumulative
          basis.***

25        *Services*. Service revenues for the maintenance of computers are recognized
26        ratably over the term of the maintenance contract. Funds from maintenance contracts
          that are paid in advance are recorded as deferred revenue. High performance
27        computing service revenue is recognized as the services are rendered.

28        ***Multiple-Element Arrangements. We enter into transactions that include***

AMENDED DERIVATIVE COMPLAINT          - 30 -
(Lead Case No. C 05-1016 RSL)

1    *multiple-element arrangements, which may include any combination of services,
     hardware, and/or software. When some elements are delivered prior to others in an
2    arrangement and all of the following criteria are met, revenue for the delivered
     element is recognized upon delivery and acceptance of such item. Otherwise,
3    revenue is deferred until delivery of the last element.*

4         • Vendor-specific objective (VSOE) of fair value of the undelivered element.

5         • The functionality of the delivered elements is not dependent on the undelivered
     elements.

6         • Delivery of the delivered element represents the culmination of the earnings
7    process.
     VSOE is the price we charge to an external customer for the same element when such
8    element is sold separately and/or management's established price list.

9    (Emphasis added).

10        67.    With respect to the Company's internal controls, the annual report stated:

11   We evaluated the effectiveness of the design and operation of our disclosure controls
     and procedures, as defined in Rules 13a-15(e) and 15d-15(e) of the Securities
12   Exchange Act of 1934 (the "Exchange Act") as of the end of the period covered by
     this report. Our principal executive and financial officers supervised and participated
13   in the evaluation. *Based on the evaluation, our principal executive and financial
     officers each concluded that, as of the end of the period covered by this report, our
14   disclosure controls and procedures were effective in providing reasonable assurance
     that information required to be disclosed by us in the reports we file or submit under
15   the Exchange Act is recorded, processed, summarized and reported within the time
     periods specified in the SEC's form and rules.* The design of any system of controls
16   is based in part upon certain assumptions about the likelihood of future events, and
     there can be no assurance that any design will succeed in achieving its stated goals
17   under all potential future conditions, regardless of how remote. *Our principal
     executive and financial officers have concluded that our controls and procedures
18   are, in fact, effective at the "reasonable assurance" level.*

19   (Emphasis added).

20        68.    In fact, however, the Company did not have sufficient internal controls to ensure

21   either that revenue was properly recognized or that financial information was accurately reported.

22   Specifically, the Company lacked the processes, staffing and training in the finance and accounting

23   departments to accurately and critically analyze complex contracts to ascertain whether revenue was

24   properly being recognized, rendering the financial results and forecasts reported by the Individual

25   Defendants false and misleading.

26        69.    On April 2, 2004, the Individual Defendants caused the Company to issue a press

27   release entitled, "Cray Inc. Completes OctigaBay Acquisition."  The press release stated in part:

28        SEATTLE – (Business Wire) – April 2, 2004 – Cray Inc. (Nasdaq NM:

AMENDED DERIVATIVE COMPLAINT          - 31 -
(Lead Case No. C 05-1016 RSL)

CRAY) today announced that it has completed the acquisition of privately held OctigaBay Systems Corporation of Vancouver, British Columbia. This acquisition, coupled with Cray's previously announced decision to commercialize the Sandia Red Storm system, will extend Cray's product portfolio and multiply its addressable market by over four times, according to market analyst firm IDC.

In completing the transaction, Cray exchanged about 12.4 million shares and just under $15 million dollars for all outstanding OctigaBay shares and assumed approximately 740,000 options. The acquisition is expected to be accretive in 2005, excluding the impact of non-cash acquisition-related charges. For 2004, the continuing cost of OctigaBay-related product development efforts and the product launch will be about $2 million per quarter.

OctigaBay has been developing a high performance computing (HPC) system designed around its direct connected processor architecture, an innovative approach to massively parallel processing that directly links together processors, alleviating memory contention and interconnection bottlenecks found in cluster systems. The OctigaBay system, formerly known as the 12K, will be called the Cray XD1 product.

Early shipments of the Cray XD1 direct connect processor product are expected in the second half of 2004, with general availability in early 2005. Pricing, to be announced later this year, is expected to range from under $100,000 to about $2 million.

With the addition of OctigaBay, Cray can provide purpose-built systems at a wide range of price points that allow customers to get more work done at a lower cost than they did with mainstream HPC systems today, said Cray Chairman and CEO Jim Rottsolk.

Previewed by OctigaBay in November 2003, the Cray XD1 high performance computer has an innovative architecture that embeds both a high speed interconnect and application accelerators to remove major bottlenecks and improve performance on real-world applications. Self-monitoring, self-healing and management features give administrators a highly reliable and easy-to-use system.

70.    The press release of April 2, 2004 was false and misleading for the following reasons. First, the press release announced that the OctigaBay purchase would increase defendants' addressable market by over four times, a statement that pointed to Cray's ability to seize up such an opportunity. This was unlikely, given Cray's dependence on the strong efforts of its employees to deal with an ever increasing backlog of system build and on-site acceptance testing of its systems, slowing the Company's execution of its business. Moreover, the Company lacked the internal financial and accounting internal controls, staffing and training to properly conduct Cray's existing business. Therefore, any increase in Cray's addressable market would exacerbate the Company's already flawed finance and accounting processes, staffing and training.

71.    On April 29, 2004, the Individual Defendants caused the Company to issue issued

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Avenue SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870

a press release entitled, "Cray Inc. Reports First Quarter 2004 Financial Results – Company

announces $43 million international procurement win."  The press release stated in part:

> SEATTLE – April 29, 2004 – Global supercomputer leader Cray Inc. (Nasdaq NM: CRAY) today reported financial results for the first quarter ended March 31, 2004.

> The Company reported total revenue of $42.1 million for the first quarter, compared to $44.1 million in the same period last year.  Operations for the period resulted in a loss of $3.8 million, or $.05 per share, compared to net income of $1.2 million, or $.02 per share, in the first quarter of 2003.

> Product gross margin declined to 30.4 percent from 42.1 percent in the first quarter of 2003 due primarily to product mix.  The company shipped fewer-than-anticipated Cray X1™ systems and shipped some lower-margin cluster systems. Additionally, low-margin revenue was generated from continued performance on the Red Storm and Cascade engineering projects.

> Service revenue declined as expected to $13.8 million, from $16.8 million in the first quarter of 2003.  Service margin, at 37.7 percent, was above target.

> "Quarter one results were affected by government procurement delays and a general slow-down in the defense segment," said Jim Rottsolk, CEO of Cray Inc. "While we are making progress on the sales front and orders have begun to pick up, the weakness in revenue experienced in the first quarter will continue through the first half.  ***Until we introduce the Cray X1E™, Red Storm and Cray XD1™ products in the second half, the Cray X1 system remains our major source of revenue.***"

> ***"Once these new products become available, we anticipate significant, accelerating growth.  However, it is unlikely that we will make up for the first half shortfall in time to meet our 2004 plan," said Rottsolk.  "We are focused on building our order pipeline, delivering new products and positioning the company for substantial growth and profitability."***

> "By the end of 2004, we will have the strongest product portfolio in the industry," Rottsolk added.  "With the Cray XD1 system along with our previously announced Red Storm and Cray X1 systems, we can address, the entire HPC market with high-bandwidth, purpose-built solutions."

> We are pleased to announce that Korea's Public Procurement Service has selected Cray to supply the next-generation supercomputer to the Korea Meteorological Administration.  This award, based on the Cray X1 product family, is worth more than $43 million and is subject to contract completion.

> Separately, the Pittsburgh Supercomputing Center (PSC) has advisee Cray that it is placing an advance order for the company's upcoming product based on the Sandia "Red Storm" supercomputer.  This is the first disclosed customer for the new product line, which will be launched later this year.

> Cray previously announced an order for a Cray X1 supercomputer system from Madison Research Corporation for the U.S. Army Space and Missile Defense Command (SMDC).  The company also announced the first Cray X1 system order in the subcontinent of India from the Tata Institute of Fundamental Research.

AMENDED DERIVATIVE COMPLAINT        - 33 -
(Lead Case No. C 05-1016 RSL)

LAW OFFICES OF
**CLIFFORD A. CANTOR, P.C.**
627 208th Avenue SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870

On April 1, Cray completed the acquisition of Vancouver-based OctigaBay Systems Corporation and announced the naming of its high bandwidth product now known as the Cray XD1 system.  According to IDC, this acquisition, together with the Red Storm product, more than quadruples Cray's addressable market.  The first Cray XD1 beta system has already shipped, with other beta systems expected to follow during the second quarter.  Said Rottsolk.  "The addition to the Cray Canada team is very exciting for us.  The XD1 system rounds out our HPC product line and opens the door to market expansion beyond traditional HPC users."

(Emphasis added).

72.    During the pre-market conference call of April 29, 2004 that followed:

Jim Rottsolk - Cray Inc. - Chairman and CEO

*   *   *

To summarize, we believe Cray is at an important inflection point.  We've been gaining market share in the $1 million high-end capabilities segments, and with the addition of the commercialized Red Storm product and the XD1 we will be able to address the entire $5 billion HPC market.  More importantly, we're broadening our reach and increasing customer access to our standard for high-performance computers.  This is obviously a very exciting time for Cray management, employees and customers.  We're making decisions and investments we believe are fundamental to our ongoing success.  Over the next couple of quarters we have a number of engineering and execution hurdles, as we discussed.  We will do our best to keep our shareholders and customers informed.  Beyond these near-term challenges the outlook for Cray is rewarding.

73.    Defendant Rottsolk's characterization of the business as at an "inflection point" was false and misleading, since it belied the truth about Cray's increased difficulties in managing the backlog of contracted orders already in the system:

Chad Bennett - MJSK - Analyst

Fair enough.  Can you provide a little bit of–you indicated Q2 was again going to be weak.  Just trying to gauge–you have 75 million in backlog; half of that is Red Storm, which means you have–I don't know–35 million that potentially–I don't know when it gets recognized.  And you probably need to announce some orders this quarter.  But do you think Q2 can be sequentially up from Q1?

*   *   *

Jim Rottsolk - Cray Inc. - Chairman and CEO

I think backlog is going to growing.  I think as usual I'm trying to encourage people not to focus on quarters.  I know that is hard to do.  It is particularly hard for you analysts, and it is as frustrated for us sometimes as it is, I'm sure, for you.  But the long-term–I couldn't be more optimistic about Cray's business long-term than I think all of us here at Cray are today.  We think the pieces really are falling in place for substantial growth.  But there are going to be quarter-to-quarter fluctuations.  I think it's going be particularly dramatic this year.  ***I think by the time you get–if we can***

*execute on these new product introductions, by the time you get to fourth quarter you're going to see something totally different than the first quarter or two.*

Hopefully, with the addition of more–we are really dependent upon the X1 right now. And as strong as that product is, it's at a very high average sales price in general, and one or two shipments a quarter can make a huge difference. Once we add XD1 to the mix and maybe even some of the smaller Striders as kind of introductory systems as Pete suggested, I think we will be able smooth that revenue flow out a bit, so volatility will decrease over time. Buy right now, it is unfortunately something we have to live with.

(Emphasis added).

74.     Although defendant Rottsolk expressed optimism about Cray's business, delays in the rollout of "new products" seemed to be the overall message for Cray's weak performance. When pressed, however, defendants refused to admit to any delays or the underlying causes of them:

Justin Udelhofen - Needham & Company - Analyst

Quickly on to the Red Storm product, with regards to the delay, is that primarily attributable to hardware or software slowdown? And do you see that affecting, or how do you see that affecting rather, the follow on procurement? Is it the kind of thing that will significantly hinder the follow on sales? Or how does the timing work?

Jim Rottsolk - Cray Inc. - Chairman and CEO

I don't think we actually characterize it in terms of a delay, although it's going to take place a couple of months later than we had earlier hoped. I don't think it has any impact on the ability to increase the size of that system over time or on other systems. It's strictly a timing issue.

75.     On May 10, 2004, the Individual Defendants caused the Company to file its quarterly report on Form 10Q for 1Q 2004, in which Cray repeated the financial results set forth above. The quarterly report also repeated the representations with regard to recognition of revenue set forth in the annual report and the representations with regard to the adequacies of internal controls from the Company's prior quarterly reports. In fact, however, the Company did not have sufficient internal controls, processes, staffing or training in the finance and accounting departments to ensure either that revenue was properly recognized or that financial information was accurately reported.

76.     On July 26, 2004, the Individual Defendants caused the Company to issue a press release entitled, "Cray Inc. Reports Second Quarter 2004 Financial Results – Company Announces Restructuring to Align With Product Strategy; Company will host a conference call today at 5:00 p.m. EST." The press release stated in part:

AMENDED DERIVATIVE COMPLAINT                              - 35 -
(Lead Case No. C 05-1016 RSL)

SEATTLE–(BUSINESS WIRE)–July 26, 2004–Global supercomputer leader Cray Inc. (Nasdaq: CRAY) today reported financial results for the second quarter ended June 30, 2004.

The company reported second quarter revenue of $21.7 million compared to $61.8 million in the same period last year.  GAAP net loss for the quarter was ($54.8) million, or ($0.64) per share, compared to net income of $7.9 million, or $0.10 per diluted share, in the first quarter of 2003.

Non-GAAP(1) net loss was ($11.7) million for the quarter, or ($0.14) per share.  Non-GAAP net loss for the quarter excludes $45.8 million in charges related to the acquisition of OctigaBay, the majority of which relates to the write-off of in-process research and development.

The majority of the $9.5 million in product revenue came from continued progress on the lower margin Cascade and Red Storm engineering projects.  Revenue from the Cray X1(TM), the company's only current product, was negligible for the quarter.  Revenue from service was $12.2 million, with increased margins of 36.0%, as compared to 31.3% in the prior year.

"While we expected the second quarter to be weak, the weakness was compounded by a contract delay for a major order and a continued general slow-down in the defense segment," said Jim Rottsolk, CEO of Cray Inc.

The company recorded a significant increase in backlog, as predicted, of $51 million, to $126 million from $75 million in the previous quarter.  "In addition to this increase in backlog, we announced major wins that will be booked in future periods," said Rottsolk.

Outlook & Restructuring

The company said the following factors will affect the balance of the year:

The next generation vector product, the Cray X1E, will not generate revenue until the first quarter of 2005 due to delays in engineering and fabrication.

While production of the Sandia Red Storm system has begun and the first shipment is expected this quarter, delays in part shipments will impact the number of systems that can be delivered to other customers this year.

Beta shipments of the Cray XD1(TM) product (acquired via the OctigaBay acquisition) have begun; the company expects modest revenue from the new product line to begin this quarter.

Domestic and foreign government contract terms will delay revenue recognition on three significant Cray X1 orders beyond 2004.

"As a result, 2004 revenue will likely be under $200 million.  Given both our desire to return to profitability quickly and the opportunity to accelerate progress on the product strategy we announced at last fall's supercomputer conference, we are immediately reshaping our organization," said Rottsolk.  The company is reducing its cost structure by about 20 percent; as a result, the company will enter 2005 with quarterly operating expenses no greater than $17-$18 million.

Rottsolk further stated, "With our new product set, we are targeting growth

**LAW OFFICES OF**
**CLIFFORD A. CANTOR, P.C.**
627 208th Avenue SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870

in revenue to about $300 million in 2005, not including over $40 million in revenue expected to be deferred.  We expect overall gross margin percentage to be in the low to mid 30's.  With our new cost structure, we are positioned for solid profitability in 2005 and expect further growth in revenue and profit in subsequent years."

The reshaping is being done carefully to enable the company to meet its strategic and financial goals.  "Nearly all required personnel actions will be completed this quarter," added Rottsolk.

HPC Leadership Strategy Is On Track

In the second quarter, Cray significantly advanced its strategy for high performance computing (IIPC) industry leadership introduced at the SC2003 supercomputing conference last November.

"Going into 2005, Cray will have the strongest HPC portfolio in the industry.  With our Cray X1E, Cray XD1 and Red Storm-based product lines, we are expanding beyond leadership in the high-end capability segment and addressing the broader HPC market with high-bandwidth, purpose-built solutions," said Peter Ungaro, Cray Vice President of Sales and Marketing.  "Early interest in the Cray XD1 has exceeded our expectations," added Ungaro.

"As previously announced, we are teaming with Oak Ridge National Laboratory to provide the world's most powerful sustained-performance computer in the 2006-7 time frame.  This initiative will exploit our previously announced development program, code-named 'Rainier,'" said Ungaro.

'Rainier' integrates high bandwidth capabilities from the Cray X1 series, innovative technologies from the Cray XD1 system, and the scalable and modular Red Storm architecture. Ungaro stated, "'Rainier' will provide the best of vector and scalar microprocessors together in a single high-bandwidth system focused around user productivity and ease-of-use, in addition to overall price/performance.  These technological capabilities will both leverage and directly contribute to our research-based 'Cascade' initiative for the DARPA HPCS program, which targets sustained petaflop-level computing in the 2010 timeframe."

"Other HPC vendors have recently announced future plans trying to implement heterogeneous systems that combine scalar and vector capabilities.  We are confident that Cray's experience and leadership give us a strong advantage in getting there first, with the best solution," added Ungaro.

John Seminerio, former CEO of OctigaBay, now President and CEO of Cray Canada remarked that, "The synergies gained by combining OctigaBay with Cray continue to take shape.  We expect to bring the Cray XD1 to market well in advance of our previous schedule and are already leveraging key technologies into the 'Rainier' platform."

Second-Quarter Highlights

During the second quarter, the company also:

Finalized a five-year contract valued at $43 million to supply the next-generation supercomputer, based on the Cray X1 product family, to the Korea Meteorological Administration (KMA).  Other Cray X1 orders were received from GMRI for NASA Ames Research Center, and the Ohio Supercomputer Center

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Avenue SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870

(OSC).

Announced that overall customer-reported scores for the Cray X1 supercomputer system were the best for any high-performance computing (HPC) system on the new HPC Challenge benchmark tests co-sponsored by the DARPA HPCS program, the U.S. Department of Energy and the National Science Foundation.

Received an order from a Canadian organization for the company's upcoming product based on the Sandia Red Storm supercomputer, for installation in late 2004. Cray previously announced that the Pittsburgh Supercomputing Center (PSC) placed an advance order for a Red Storm-based system, to be installed in the second half of this year.

Received orders from the Department of Energy's Pacific Northwest National Laboratory (PNNL) and Ohio Supercomputer Center (OSC) for the CrayXD1 utilizing field programmable gate arrays (FPGA's) for advanced application acceleration.

77.     The press release of July 25, 2004 pointed to the shocking breakdown in Cray's profits and business prospects.  During the conference call of July 25, 2004 that followed, the Individual Defendants explained how these shocking results had triggered a restructuring of the Company's business, including layoff notices to approximately 100 people, a step the Company was prepared to take, despite the fact that the order backlog had now grown an astounding $51 million, to $126 million and the Company still lacked the staffing in the finance and accounting departments to ensure either that revenue was properly recognized or that financial information was accurately reported:

Alan Robinson - Delafield Hambrecht - Analyst

Good afternoon, could you give us some idea of the areas where the restructuring will take place whether in sales and marketing or in R&D and also an idea of any likely restructuring charges that you must be taking in the current quarter, please?

Jim Rottsolk - Cray Incorporated - Chairman and CEO

Alan, this is Jim.  We were providing notice to well over 100 people in conjunction with this restructuring, and that those people are spread across the organization both in terms of geographies and functional areas.  I think, Scott will correct me if I'm wrong, but I think our current estimate on restructuring charges is something under $10m.

*     *     *

Alan Davis - McAdams Wright Ragen - Analyst

Okay, and in terms of the $126m backlog you reported in the release, could you give us an approximate breakdown of the kind of products that comprise that backlog?

AMENDED DERIVATIVE COMPLAINT              - 38 -
(Lead Case No. C 05-1016 RSL)

Peter Ungaro - Cray Incorporated - VP, Sales & Marketing

Alan, this is Peter Ungaro.  We're not breaking down the backlog specifically by products, but many of those are orders that we have announced previously, coming into this call today.

78.     Then, the Individual Defendants finally addressed the issue of parts delays, impacting the development and shipment of systems to customers:

Joe Toms - Hilspen Capital - Analyst

Yes, I just wanted to spend a minute or few, you were talking about the parts delays and stuff like that.  What's the status as it stands today?

Jim Rottsolk - Cray Incorporated - Chairman and CEO

I'm sorry, what the questioner wants is the status of the parts from IBM?

Joe Toms - Hilspen Capital - Analyst

Ungaro, you mentioned that you had got electron system that you had expected push shipments this quarter, but delays in part shipments would impact a number of systems.

Jim Rottsolk - Cray Incorporated - Chairman and CEO

We have had some delays in you know either through fabrication snap-throughs or whatever, both with respect to the restaurant product, and with respect to the X20, introduction to the X20.  And that has had an impact on the timing of new product introductions.

Joe Toms - Hilspen Capital - Analyst

Right.

Peter Ungaro - Cray Incorporated - VP, Sales & Marketing

I think you are pretty much over those hurdles, but we're not–the delays certainly has an impact on the amount of revenue we can generate from those new products this year.

Joe Toms - Hilspen Capital - Analyst

Well I guess I want you to put a follow up on, thinking over those hurdles, what gives you that confidence that you're over those hurdles?  Why you feel that way?

Peter Ungaro - Cray Incorporated - VP, Sales & Marketing

On Red Storm we have now started production.  So we're actually getting parts and our suppliers are sure, as they will have sufficient parts.  But I think we were closed over that hump if not over it by now, the parts should be arriving in volume, very shortly.  And with respect to X20, I think we have a firm committed base now, and everything we need for the initial product introduction.

AMENDED DERIVATIVE COMPLAINT       - 39 -
(Lead Case No. C 05-1016 RSL)

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Avenue SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870

Joe Toms - Hilspen Capital - Analyst

So, in that sense, going forward you view is that, that's nothing to be impediment obviously than was in the present course of last quarter?

Jim Rottsolk - Cray Incorporated - Chairman and CEO

I don't think that's going to be the impediment to 2005.

79.     Thus, the July 25, 2004 announcement of the shocking breakdown in Cray's profits and business prospects caused the price of Cray's stock to plummet $2.02 per share, for a 20.0% loss, closing at $3.03, on record volume of 23.1 million shares, effectively decimating Cray's market capitalization.

80.     The investment community now understood the unpredictability of Cray's recognition of revenue, at least to the extent that delays in the receipt of critical parts for hardware assembly were contributing to delays in Cray's systems development, assembly, shipment and acceptance testing for its customers.  Defendants' explanations, however, continued to conceal that the speed and cost of on-site acceptance testing or improved processes for building machines, in accordance with customer requirements and specifications were unfavorable at Cray and were unlikely to get better anytime soon and the inherent unpredictability of Cray's quarterly guidance was a result of not only the complexity of the requirements and specifications of customer order, but also of the contractual terms implicit in such arrangements which delayed the recognition of revenue from the contracts.  This tandem of factors was exacerbated by the absence of internal controls, processes, staffing and training in the finance and accounting departments required to ensure that revenue was properly recognized and that financial results and forecasts were accurately reported.

81.     On August 9, 2004, the Individual Defendants caused the Company to file its quarterly report on Form 10Q for 2Q 2004, in which Cray repeated the financial results set forth above.  The quarterly report also repeated the representations with regard to recognition of revenue set forth in the annual report, with the addition of an explanation that "Revenue from contracts that are operating leases is recorded as earned over the lease terms."  Likewise, the representations with regard to the adequacies of internal controls were repeated from the Company's prior quarterly reports.  In fact, however, the Company did not have sufficient internal controls, processes, staffing

AMENDED DERIVATIVE COMPLAINT          - 40 -
(Lead Case No. C 05-1016 RSL)

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Avenue SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870

1   or training in the finance and accounting departments to ensure either that revenue was properly

2   recognized or that financial information was accurately reported.

3        82.    On October 25, 2004, the Company revealed that defendant Poteracki would resign,

4   in a press release entitled, "Scott Poteracki, Cray Chief Financial Officer, to Assume CFO Role at

5   MTI Technology Corporation."  The press release stated in part:

6            SEATTLE (BUSINESS WIRE)–Oct. 25, 2004–Global SUPERCOMPUTER
         LEADER Cray Inc.  (Nasdaq: CRAY) today announced that Scott J. Poteracki, its
7        Senior Vice President of Finance and Chief Financial Officer, will resign in order to
         take similar positions with MTI Technology Corporation (Nasdaq SCM: MTIC),
8        located in Tustin, California.  Poteracki's resignation will become effective
         November 9, 2004.
9
             Kenneth W. Johnson, Cray's General Counsel, will assume the position of
10       interim Chief Financial Officer.  Johnson served as Cray's chief financial officer
         from 1997 until December 2001.  Cray has also retained the services of William L.
11       Scott to assist Mr. Johnson in managing the accounting department and completing
         Sarbanes-Oxley compliance matters.  Mr. Scott has over 30 years of financial,
12       general manager and board experience including positions of chief executive officer
         and chief financial officer with a number of public and private companies.  He has
13       recent experience serving as chief financial officer of Heart Technology, Inc., and
         NeoPath, Inc.  Mr. Scott is a certified public accountant.
14
             Additionally, Cray announced commencement of a national search to replace
15       Poteracki, "We will move to replace Scott with a top quality candidate," said James
         E. Rottsolk, Cray's Chief Executive Officer and President.  "Ken and I look forward
16       to working with Bill Scott while that process unfolds."

17           "I have greatly enjoyed my time at Cray, and this is one of the hardest
         decisions I have ever made," said Poteracki.  "Cray plays a special role in high
18       performance computing, and I am enthusiastic about the Company's future.
         However, my family and I have a strong personal desire to return to California, and
19       we are excited about the opportunity at MTI."

20           "In his two years with us, Scott has strengthened the financial team and been
         a solid advisor on matters related to finance and overall strategy," said Rottsolk.
21       "Scott has agreed to stay on board until our third quarter Form 10-Q has been filed.
         We wish him well in his new position."

22       83.    On November 4, 2004, the Individual Defendants caused the Company to issue a
23
    press release entitled, "Cray Inc. Reports Third Quarter 2004 Financial Results; Company Revises
24
    Full-Year 2004 Revenue Outlook."  The press release stated in part:
25
             SEATTLE–(BUSINESS WIRE)–Nov. 4, 2004–Global supercomputer leader
26       Cray Inc. (Nasdaq: CRAY) today reported financial results for the third quarter
         ended September 30, 2004.
27
             The Company reported third quarter revenue of $45.9 million, compared to
28       $63.8 million in the same period last year, up sequentially from $21.7 million in the

second quarter 2004. GAAP net loss for the period, including unusual items, was ($111.0) million, or ($1.27) per share, compared to net income of $8.5 million, or $.10 per diluted share, in the third quarter of 2003.

Unusual items for the third quarter totaled ($92.4) million, or ($1.06) per share. These items consisted of ($69.8) million related to recognition of a valuation allowance against a deferred tax asset, an ($8.0) million write-down of excess inventory, ($7.1) million of expense related to the previously announced restructuring, a ($5.3) million cost adjustment recognized on a fixed-price contract, ($1.3) million related to prepaid service, and the remainder related to supplier arrangement losses. Non-GAAP(1) net loss for the quarter was ($108.5) million, or ($1.24) per share. Non-GAAP net loss excludes $2.5 million in OctigaBay acquisition-related charges.

Gross margins were unusually low, with approximately 60% of product sales in the quarter attributable to engineering contracts, including Red Storm and Cascade. Service revenue during the quarter was $11.1 million, with increased margins of 37.9%, up from 35.1% in third quarter 2003. Excluding the prepaid service charge noted above, operating expense of $23.5 million was up from $20.4 million in the same period last year, and flat sequentially. Operating expense is expected to trend down over the next two quarters.

*Despite the third quarter operating loss, the balance sheet remained strong, with $47.2 million of cash, cash equivalents and short-term investments at the end of the third quarter, up sequentially from $42.3 million in the second quarter; as well, the Company continues to carry no debt.*

*"We have restructured the Company, including the executive team, to focus on execution with the goal of returning Cray to profitability as rapidly as possible–the third quarter revenue improvement is a step in that direction," said Jim Rottsolk, CEO of Cray Inc.* "We are particularly excited about delivering the first quarter of Sandia's Red Storm system and announcing general availability of both the Cray XT3(TM) and Cray XD1(TM) systems. With these two new products, we have considerably expanded our addressable market and overall market opportunity - we have already announced a number of important wins around the world." Additionally, the Company announced that full-year 2004 revenue is now expected to be between $155 and $165 million, relative to the previously indicated 2004 revenue outlook of under $200 million. "While shipments of both the Cray XT3 and Cray X1e systems will start in this quarter, due to a parts availability issue with key components, we will not ship sufficient new systems in time to generate as much revenue as planned," said Rottsolk.

"We are excited about Cray's relative position in the market and the growth opportunity we have going forward. With launches of the Cray XD1 and Cray XT3 systems, we are again building momentum in the market. With the addition of the Cray X1E system, we will enter 2005 with the strongest HPC portfolio in the industry," added Rottsolk.

Recent Highlights

Installed a major expansion of the Cray X1(TM) system at Oak Ridge National Laboratory, creating the largest Cray X1 system in the world.

Completed shipment of the first quarter of the Red Storm system at Sandia National Laboratory.

AMENDED DERIVATIVE COMPLAINT          - 42 -
(Lead Case No. C 05-1016 RSL)

1    Introduced the Cray XT3 product, based on the Red Storm system.
2    Announced advanced orders from Pittsburgh Supercomputing Center, Oak Ridge
     National Laboratory, and other undisclosed customers.

3    Announced Cray XD1 partnerships with a number of key software companies
     targeting the computer aided engineering marketplace. According to Rich Partridge,
4    enterprise systems analyst at D.H. Brown Associates, "The Cray XD1 stands out
     from the competition. It's no surprise that major ISVs are rapidly aligning
5    themselves with Cray to exploit this innovative system for CAE applications."

6    Announced several Cray XD1 customer wins around the world, including
     SAHA Institute for Nuclear Physics in India, Helmut Schmidt University, Pacific
7    Northwest National Laboratory, Ohio Supercomputer Center, Alabama
     Supercomputer Authority, and Oak Ridge National Laboratory.
8
9    Added Sally G. Narodick and Stephen C. Richards to the Cray Board of
     Directors.

10   (Emphasis added.)

11   84.    The Individual Defendants once again shocked investors with yet another quarter of

12   negative growth. Drawing on positive spin, defendant Rottsolk pointed to the intentional

13   restructuring of Cray's executive team and the fact that Cray was debt-free. However, the statement

14   concerning recent changes in the makeup of Cray's executive team rang hollow, as these changes

15   were driven by the sudden departure of Cray's CFO, defendant Poteracki. Finally, the statement that

16   Cray was debt-free came at an odd time, as defendants revealed cost overruns and losses on some

17   of its most visible contracts. During the conference call of November 4, 2004, defendants revealed

18   the truth about losses on the Sandia Contract:

19   Chad Bennett - Miller Johnson Steichen Kinnard - Analyst

20   So you indicated that the Sandia contract–you had a roughly 5 percent cost overrun
     on that. Did we even make money on that deal?
21
22   Jim Rottsolk - Cray Inc. - Chairman, President & CEO

23   When all is said and done this will be about a breakeven contract. Earlier when we
     first started the contract two years ago and estimated our engineering costs, which
24   have been tracking nicely until recently, we had estimated an overall profit on the
     engineering and initial product delivery portion of the contract of around 4 percent.
25   And we have now increased our cost estimate, and that effectively takes the profit
     margin down to zero. So bear in mind, this contract pays for the engineering effort
26   for a whole new product line, and we think it's going to reap handsome rewards in
     the future.

27   Chad Bennet - Miller Johnson Steichen Kinnard - Analyst

28   Can you break down product revenue for me? You said in the press release 60

AMENDED DERIVATIVE COMPLAINT          - 43 -
(Lead Case No. C 05-1016 RSL)

1    percent of it was Red Storm or Cascade-related.  What was the other 40?

2    Jim Rottsolk - Cray Inc. - Chairman, President & CEO

3    The other 40 is primarily X1.  There's a little bit less than $1 million in XD1, about $500,000 in XD1 revenue.  But this (ph) started in the third quarter.

85.    Despite defendants' continued promises regarding a turnaround in Cray's revenue and profits, the press release of November 4, 2004 caused the price of Cray's stock to fall $0.27 per share, for a 7.8% loss, closing at $3.18, on volume of 2.8 million shares, thus further eroding the Company's market capitalization.

86.    On November 9, 2004, the Individual Defendants caused the Company to file its quarterly report on Form 10Q for 3Q 2004, in which Cray repeated the disastrous financial results set forth above.  The quarterly report also repeated the representations with regard to recognition of revenue and internal controls set forth in the prior quarter's 10Q. Contrary to the representations that the Company was properly recognizing revenue and it had adequate internal controls to assure accurate financial reporting, Cray did not have sufficient internal controls, processes, staffing or training in the finance and accounting departments to ensure either that revenue was properly recognized or that financial results or forecasts were accurately reported.

87.    Less than a month after defendant Rottsolk proclaimed that Cray was debt-free, a plan to incur as much as $75 million in debt was revealed.  On November 29, 2004, the Individual Defendants caused the Company to issue a press release entitled, "Cray Inc. Announces Proposed Offering of Convertible Senior Subordinated Notes."  The press release stated in part:

SEATTLE–(BUSINESS WIRE)–Nov. 29, 2004–Cray Inc. (Nasdaq: CRAY) today announced that it intends to offer $60 million of convertible senior subordinated notes due 2024 to qualified institutional buyers pursuant to Rule 144A under the Securities Act of 1933, as amended.  The Company also plans to grant the initial purchaser of the notes a 30-day option to purchase up to an additional $15 million aggregate principal amount of the notes.

The Company intends to use the net proceeds from the offering to support our operations and growth and for other general corporate purposes.

This announcement is neither an offer to sell nor a solicitation of an offer to buy any of the notes or any shares of the Company's common stock and shall not constitute an offer, solicitation or sale in any jurisdiction in which such offer, solicitation, or sale would be unlawful.  The notes and the underlying shares of common stock issuable upon conversion of the notes have not been registered under

AMENDED DERIVATIVE COMPLAINT    - 44 -
(Lead Case No. C 05-1016 RSL)

the Securities Act of 1933 or any applicable state securities laws and may not be offered or sold in the United States absent registration or an applicable exemption from such registration requirements. Any offer of the notes will be made exclusively by means of a private offering memorandum to qualified institutional buyers.

88.     On December 17, 2004, the Individual Defendants caused the Company to issue a press release entitled, "Cray Announces Exercise of Option to Purchase Additional $15 Million of 3.0% Convertible Senior Subordinated Notes."  The press release stated in part:

> SEATTLE–(BUSINESS WIRE)–Dec. 17, 2004–Cray Inc. (Nasdaq: CRAY) today announced that the initial purchaser has exercised its option in full to purchase an additional $15 million of the Company's 3.0% Convertible Senior Subordinated Notes due 2024. This purchase increases the aggregate principal amount of notes to $80 million. The closing of the sale of additional notes is expected to occur on December 21, 2004.
>
> The notes will be convertible into the Company's common stock at an initial conversion rate of 207.2002 shares per $1,000 principal amount of notes (equal to an initial conversion price of approximately $4.83 pe share, representing a conversion premium of approximately 37.5% to the $3.51 closing price of the Company's common stock on November 30, 2004) under certain conditions and subject to adjustment in certain circumstances. The notes will be convertible only upon the occurrence of certain specified events including but not limited to if, during specified periods, the closing price of the Company's common stock exceeds 120% of the then current conversion price. Upon conversion, the Company may deliver cash or a combination of cash and shares of its common stock in lieu of shares of its common stock.
>
> The notes will mature on December 1, 2024, and will not be redeemable by the Company prior to December 1, 2009, except after December 1, 2007, the Company can redeem the notes if the closing price of the common stock exceeds 150% of the conversion price for 20 trading days in the 30-trading day period before a redemption notice. The holders of the notes will be able to require the Company to repurchase some or all of the notes on December 1, 2009, 2014 and 2019, or upon the occurrence of certain fundamental changes.
>
> The Company intends to use the net proceeds from the offering to support its operations and growth and for other general corporate purposes.
>
> This announcement is neither an offer to sell nor a solicitation of an offer to buy any of the notes or any shares of the Company's common stock and shall not constitute an offer, solicitation or sale in any jurisdiction in which such offer, solicitation, or sale would be unlawful. The notes and the underlying shares of common stock issuable upon conversion of the notes have not been registered under the Securities Act or any applicable state securities law and may not be offered or sold in the United States absent registration or an applicable exemption from such registration requirements. Any offer of the notes will be made exclusively by means of a private offering memorandum to qualified institutional buyers.

89.     Defendants' press release of December 17, 2005 was false and misleading, for the following reasons. The press release signaled confidence in Cray's stock, such that private investors

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Avenue SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870

1   were willing to invest in Cray at a valuation equivalent to $4.83 per share.  This supported the

2   Individual Defendants' statements with regard to improved prospects for business performance and

3   profitability, going into the 2005 fiscal year.  Individual Defendants, however, concealed the fact

4   that they had encountered cost overruns, diminished profits and outright losses on customer

5   contracts for Cray's products, and that the Company was devoid of the internal controls, processes,

6   staffing and training required to properly analyze revenues and accurately report financial results

7   and forecasts.

8          90.     On February 3, 2005, the Individual Defendants caused the Company to issue a press

9   release entitled, "Cray Reports 2004 Financial Results; Company Receives Large Order from Oak

10  Ridge National Laboratory."  The press release stated in part:

11              SEATTLE–(BUSINESS WIRE)–Feb. 3, 2005–Global supercomputer leader
12         Cray Inc. (Nasdaq: CRAY) today reported financial results for the quarter and year
           ended December 31, 2004.

13              Revenue for the full-year 2004 was $148.9 million, compared to $237.0
14         million for 2003.  GAAP operating loss for the year was ($144.3) million, compared
           to operating income of $19.1 million for the prior year.  GAAP operating loss for
15         2004 includes $27.0 million of unusual items associated primarily with restructuring,
           write-down of excess inventory, and adjustments recognized on a fixed-price
           contract.  Non-GAAP(1) operating loss, which includes unusual items but excludes
16         OctigaBay acquisition-related charges of $55.6 million, was ($88.8) million for the
           year.

17
                GAAP net loss for the year was ($206.3) million, compared to net income of
18         $63.2 million for the prior year.  Results for both years were significantly affected
           by changes in the treatment of a federal income tax net operating loss carry forward.
19
                Product gross margins for the year were significantly lower than 2003 due
20         primarily to limited Cray X1 system sales, low margin engineering contract revenue,
           adjustments recognized on a fixed-price contract, and charges related to excess
21         inventory and unabsorbed overhead.  As planned, service revenue for the year was
           $49.7 million – compared to $62.0 million in 2003 – while service gross margins
22         increased year-over-year to 38.9%, up from 34.2%

23              The Company reported operating expenses of $93.1 million for the year,
           compared to $75.7 million in the prior year.  Operating expenses were higher than
24         planned, particularly in the second half of the year, due to the cost of developing new
           products, the cost of implementing Sarbanes-Oxley compliance initiatives, and sales
25         and marketing expenses associated with the ramp of three new products.

26              The Company reported revenue for the fourth quarter of $39.2 million.
           GAAP net loss for the period, including unusual items, was ($36.9) million, or ($.42)
27         per share.  Non-GAAP net loss for the period, which also includes unusual items, but
           excludes charges related to the acquisition of OctigaBay, was ($29.7) million, or
28         ($.34) per share.  Unusual items in the quarter consisted of $4.2 million of additional

AMENDED DERIVATIVE COMPLAINT        - 46 -
(Lead Case No. C 05-1016 RSL)

adjustments to a fixed-price contract and $1.0 million of restructuring charges.

In December, the Company announced the successful completion of an $80 million Rule 144A offering of 3% convertible senior subordinated notes – net proceeds were approximately $76.6 million.  The Company ended the year with $87.4 million in cash and short-term investments.

"Given limited Cray X1 system business, coupled with delays in new product introductions, 2004 was clearly a difficult year financially," said Jim Rottsolk, Chairman and CEO of Cray Inc.  "Nevertheless, we achieved a number of important milestones critical to positioning Cray for long-term success.  We introduced three new products, diversifying our product portfolio and significantly increasing our addressable market.  We made major changes in the Company from top to bottom, with four new directors, important changes in senior management and a restructuring of our work force.  We look to the challenges ahead with confidence."

Outlook

"We enter 2005 with the strongest High Performance Computing (IIPC) portfolio in the industry.  We have a real opportunity to grow the business and further demonstrate with customers the value of systems purpose-built for HPC," said Rottsolk.  "We have set very aggressive targets for ourselves in 2005.  While it is clear we will grow product revenue substantially over 2004, with several large opportunities currently in play, it is premature to provide specific guidance at this time.  For example, today we received an order valued at over $30 million to continue building the Department of Energy's National Leadership Computing Facility at Oak Ridge National Laboratory.  We are presently in the midst of a production ramp and are focused on getting our new products into and accepted by the market.  Given the timing of deliveries and acceptances of large systems, we expect 2005 quarterly results to be uneven."

Rottsolk continued, "Our near-term goal in 2005 is to drive top-line growth with our three new products and to execute operationally.  We are working hard to improve product stability, increase margins, and keep operating expenses as low as possible."

"We are confident we will achieve our long-term goal of top-line growth and sustained profitability.  Critical to this strategy is continued progress on key new product development coupled with execution on the operating and sales fronts," added Rottsolk.

Recent Highlights

Shipped the first Cray X1E supercomputer on schedule to ICM Poland in December and announced several Cray X1E system orders from undisclosed customers around the world.

Launched the Cray XT3 supercomputer – early customers include Oak Ridge National Laboratory, Pittsburgh Supercomputer Center and a number of undisclosed customers.

Announced new Cray XT3 system orders from U.S. Army Corps of Engineers and Japan Science and Technology Agency.

Increased success with the Cray XD1 system – recently announced customer

**LAW OFFICES OF**
**CLIFFORD A. CANTOR, P.C.**
627 208th Avenue SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870

wins include FZJ's Central Institute for Applied Mathematics in Germany, the Zuse Institute Berlin (ZIB), and the National Institute of Nuclear Physics (INFN) in Italy.

Cray continued to build its network of channel partners by adding new partners in the European market.

Appointed industry veteran Mamoru Nakano as President of Cray Japan.

Completed $80 million rule 144A offering of 3% convertible senior subordinated notes.

Added John B. Jones, Jr., to the Cray Board of Directors, following other key recent appointments to the Board.

91.    The February 3, 2005 press release continued to surprise and shock the market. The Individual Defendants continued to be completely unable to deliver performance promised from the Company. During the conference call of February 3, 2005 that followed, defendants spoke to ever-increasing order backlogs, burdensome Sarbanes-Oxley internal auditing efforts, the impact of stock options on the Company's financial condition and the poor performance of the Company on customer contracts:

Ken Johnson - Cray Inc. - General Counsel and interim CFO

Moving to backlog, we stood at 107 million at the end of September 2004 and grew modestly to 115 million at December 31st. This amount does not include the orders we announced last week to Japan Science and Technology NC, the multi-order award from the Department of Defense high-performance computer modernization program and the order we received today from Oak Ridge National Laboratory.

Before I turn the call over to Jim, I'd like to touch on two additional matters. We continue to make progress towards Sarbanes-Oxley compliance. We are in the midst of testing and evaluating our internal controls for Section 404 purposes. This is a time-consuming, extensive, and expensive process.

To date, no material weaknesses have been identified. However, both we and our auditors have much work to do before we can reach our final conclusions. We plan on finishing our devaluation by the time we file our Form 10-K. But there is a possibility we may just park on the 45 day grace period granted by the SEC with the 404 report.

Additionally, we are reviewing our stock option program in order to determine potential changes around the new FASB ruling, for expensing the fair value of employee stock. Stock options have been an important component of our overall compensation package. And the new and I will say unfortunate requirements around reporting these non-cash expenses could have a significant impact on operating results.

*    *    *

Alan Robinson - Delafield Hambrecht - Analyst

AMENDED DERIVATIVE COMPLAINT                - 48 -
(Lead Case No. C 05-1016 RSL)

1
2
3

I'd just like to talk a little about the backlog again.  Given the large orders we just had announced recently–within the last couple of weeks–and your reticence towards maintaining guidance for 300 million level, can I assume that there is a good change that some of these jumbo orders announced recently won't book (indiscernible) all in 2005?  Or can you give me some idea of how that will pan out?

4

Peter Ungaro - Cray Inc. - SVP-Sales, Marketing and Services

5
6

No.  We expect that everything that we have announced recently will book in 2005.  We are not yet sure which quarters or which delivery.  So we can't give guidance on that right now.

7

*   *   *

8

Robert Cohen - Western International - Analyst

9
10

When you talk about performance, that you didn't see performance you're talking about performance of orders or performance on the computer?

11

Ken Johnson - Cray Inc. - General Counsel and interim CFO

12

I don't think I mentioned performance, actually.

13

Robert Cohen - Western International - Analyst

14

Well you said you didn't get the performance that you wanted in '04.

15

Ken Johnson - Cray Inc. - General Counsel and interim CFO

16

Than I misspoke.  I mean we didn't get the products out into the marketplace as quickly as we wanted to.

17

Robert Cohen - Western International - Analyst

18
19

So you had delayed orders and you didn't get them in '04, so why wouldn't those transpire in '05?  And why wouldn't your revenues then be much higher than anticipated?

20

Ken Johnson - Cray Inc. - General Counsel and interim CFO

21

We think we're going to have good solid revenues in '05.

22

92.   On March 4, 2005, the Individual Defendants caused the Company to issue a press

23

release entitled, "Cray Files Registration Statement Relating to Its Convertible Senior Subordinated

24

Notes."  The press release stated in part:

25
26
27

SEATTLE–(BUSINESS WIRE)–March 4, 2005–Cray Inc. (Nasdaq: CRAY) today announced that it has filed a registration statement on Form S-3 with the Securities and Exchange Commission to register for resale its 3.0% Convertible Senior Subordinated Notes due 2024 and shares of Cray common stock issuable upon conversion of these notes.

28

Cray previously announced on December 17, 2004, that it had issued and sold

AMENDED DERIVATIVE COMPLAINT
(Lead Case No. C 05-1016 RSL)

- 49 -

in December 2004, in Rule 114A private transactions an aggregate principal amount of $80 million of the notes.  Upon effectiveness of the registration statement, the selling security holders listed in the prospectus contained in the registration statement may use the prospectus to resell from time to time their notes and any shares of Cray common stock issued upon conversion of the notes.  Cray will not receive any proceeds from the resale of the notes or any such shares of Cray common stock.

This announcement is neither an offer to sell nor a solicitation of an offer to buy any of the notes or any shares of Cray common stock and shall not constitute an offer, solicitation or sale in any jurisdiction in which such offer, solicitation, or sale would be unlawful.  While the registration statement relating to the notes and underlying shares of Cray common stock has been filed with the SEC, the registration statement has not yet become effective.  Until the notes and the underlying shares of common stock issuable upon conversation of the notes have been registered under the Securities Act and applicable state securities laws, the notes and underlying common stock may not be offered or sold in the United States except pursuant to an applicable exemption from such registration requirements.

93.    Less than two weeks later, on March 15, 2004, the Individual Defendants caused the

Company to issue a press release entitled, "Cray Inc. Announces Delay in Filing of Annual Report

on Form 10-K."  The press release stated in part:

SEATTLE–(BUSINESS WIRE)–March 15, 2005–Global supercomputer leader Cray Inc. (Nasdaq: CRAY) today announced that it will delay the filing of its Annual Report on Form 10-K for the year ended December 31, 2004.  The Company has not completed its December 31, 2004, financial statements and related footnotes.  This delay has been created in large part by the concurrent review and assessment of internal controls required by Section 404 of the Sarbanes-Oxley Act of 2002.

The Company expects to file an Annual Report on Form 10-K on or before March 31, 2005, except for the Section 404 assessment.  The Company expects to use the 45-day extension period for the Section 404 assessment permitted by the SEC for companies of its size.

The Company reported  preliminary financial results for the fourth quarter and year ended December 31, 2004, on February 3, 2005.  Management believes that the reported preliminary results fairly present the financial condition and operating results of the Company as of and for the year ended December 31, 2004, in all material respects.  Until the audit is completed, however, there can be no assurance that there will not be a material change in the previously reported financial results.

***Although the Company has not completed its formal assessment process under Section 404 of the Sarbanes-Oxley Act, the Company expects that it will identify one or more material weaknesses, including inadequate review of third-party contracts and lack of software application controls and documentation, and that it will conclude that its system of internal controls was not effective.  The Company's auditors have expressed their serious reservations to the Company and its Audit Committee as to whether the Company will be able to complete its assessment and whether the auditors will be able to render an opinion on either the Company's assessment or its internal controls.***

(Emphasis added).

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Avenue SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870

94.    Defendants' press release of March 15, 2005 was a bombshell, coming just two weeks after the filing of the Company's S-3, in connection with the $80 million of convertible notes offered in December 2004, which incorporated by reference the Individual Defendants' prior false statements in the Company's quarterly and annual reports that proclaimed the sufficiencies of Cray's internal controls and financial reporting procedures.  Clearly, the concerns raised by the Company were already evident, as the Company's basic accounting measures of inventory and recognition of revenue were inherently unreliable throughout the Relevant Period, as was the Company's quarterly and annual guidance.  The fact that the Company's software application controls and documentation were ineffective or lacking also came as no surprise, since these deficiencies had a direct bearing on the ability of the Company to build systems as well as ship and perform on-site acceptance testing for its customers.

95.    Following shocking news, on March 17, 2005, the price of Cray's stock plummeted $0.78 per share, for an astonishing 25.9% loss, closing at $2.23, on volume of 14.8 million shares.

96.    On April 15, 2005, the Individual Defendants caused the Company to issue a press release entitled, "Cray Inc. Announces It Will Change Auditors."  The press release stated in part:

> SEATTLE–(BUSINESS WIRE)–APRIL 15, 2005–Global supercomputer leader Cray Inc. (Nasdaq: CRAY) today announced that it has begun a search to replace its current independent registered public accounting firm, Deloitte & Touche, which has decided not to stand for re-election as Cray's auditor for the 2005 fiscal year.
>
> Cray disclosed in a filing with the Securities and Exchange Commission today that this decision was not caused by any disagreement between Cray and Deloitte & Touche on any matter of accounting principles or practices, financial statement disclosure or auditing scope or procedure, and that the reports of Deloitte & Touche on Cray's financial statements for the last two fiscal years contained no adverse opinion or disclaimer of opinion, and were not qualified or modified as to uncertainty, audit scope or accounting principles.
>
> Deloitte & Touche continues to be engaged to provide its attestation report on management's assessment of Cray's internal control over financial reporting for filing in an amendment to Cray's Annual Report on Form 10-K for the year ended December 31, 2004, and to review Cray's interim financial information to be included in Cray's Quarterly Report on Form 10-Q for the first quarter ended March 31, 2005.

97.    On May 9, 2005, the Individual Defendants caused the Company to issue a press release entitled, "Cray Inc. Receives Notice of Potential Delisting from Nasdaq; Company Will

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Avenue SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870

Appeal and Common Stock Listing Continues Pending Appeal Outcome." The press release stated in part:

> ***SEATTLE, May 09, 2005 (BUSINESS WIRE) – Cray Inc. (Nasdaq: CRAY) today announced that on May 6, 2005, it received a notice from the Listing Qualifications Department of The Nasdaq Stock Market stating that due to Cray's failure to include the auditor's opinion on management's assessment of internal control over financial reporting required pursuant to Section 404 of the Sarbanes-Oxley Act of 2002 in its Form 10-K/A filed on May 3, 2005, the Company was not in compliance with the requirements of Marketplace Rule 4310(c)(14).***
>
> As a result a character "E" will be appended to the trading symbol and accordingly the trading symbol for the Company's common stock will be changed from CRAY to CRAYE at the opening of business on May 10, 2005.
>
> The Company will request an appeal hearing with the Nasdaq Listing Qualifications Panel by May 13, 2005, for continued listing on the Nasdaq National Market.  Under Nasdaq Marketplace Rules, Cray common stock will remain listed on the Nasdaq National market pending the outcome of the hearing. If the Company were not to file its appeal by May 13, 2005, then the Company's common stock would be delisted from The Nasdaq Stock Market at the opening of business on May 17, 2005.

(Emphasis added).

98.   On May 9, 2005, the Individual Defendants caused the Company to issue a press release entitled, "Cray Inc. Reports First Quarter 2005 Financial Results; Twelve Month Product Backlog Grows to $127 Million."  The press release stated in part:

> SEATTLE–(BUSINESS WIRE)–May 9, 2005–Global supercomputer leader Cray Inc. (Nasdaq: CRAY) today reported financial results for the first quarter ended March 31, 2005.  Total revenue for the quarter was $37.6 million, compared to $42.1 million in the same period a year ago.  Net loss for the quarter was ($21.0) million, or a loss of ($.24) per share, compared to a net loss of ($3.8) million or loss of ($.05) per share in the first quarter last year.
>
> Revenue for the first quarter did not include several systems that were shipped and installed for which the Company did not recognize revenue due to pending customer acceptances.  The Company expects that the revenue for those systems will be recognized over the second and third quarters.
>
> "We began the year with a weak quarter.  Operationally, we met a number of our milestones including shipments and bookings.  However, financial results were impacted by large manufacturing variances and abnormally high research and development costs.  ***And, on a positive note, our twelve month product backlog grew to $127 million, up $44 million from December 31, 2004," commented Jim Rottsolk, Chairman and CEO.***  "Bookings continue to grow and demonstrate that our three new products, the Cray X1E, XT3 and XD1 systems, are beginning to gain traction in their respective markets," said Rottsolk.
>
> Gross Margin was negatively impacted by approximately $5.0 million of manufacturing variances, which includes a $2.2 million charge related to the

absorption of manufacturing overhead, a $10.0 million non-recurring charge related to termination of a manufacturing agreement with IBM< a $290,000 non-cash charge related to the recognition of an unfunded pension liability in one of our European subsidiaries and $144,000 of inventory write-offs.

In addition, operating expenses were $23.7 million in the first quarter, primarily due to sharply higher than planned net research and development costs related to a deployment of engineering resources during the quarter from funded projects to the Sandia Red Storm program, as well as the timing of funding for certain engineering projects, and higher than normal amortization charges relating to deferred compensation expenses. In addition, general and administrative expenses continued to be impacted by increased auditing fees and ongoing costs related to Sarbanes-Oxley compliance initiatives.

Inventory increased from $71.5 million to $103.2 million as the result of ramp up of all three new Cray products during the quarter. At the end of the quarter, approximately $37.3 million of the inventory value was installed at customer sites awaiting acceptance and revenue recognition.

Cash and short-term investments at the end of the quarter were $43.1 million, down from $87.4 million as of December 31, 2004. At the end of last year, the Company raised capital to fund anticipated costs of inventory ramp and losses early in 2005. The Company expects cash and inventory levels will return to more normal levels by the end of the year as systems are accepted and paid for. In the meantime, the Company is focused on expense controls and working capital efficiencies to maintain adequate levels of cash, and is working to improve flexibility under its banking relationships.

Recent Highlights

Cray promoted Peter Ungaro to the position of President from his previous position as Senior Vice President responsible for worldwide sales, marketing and service. Peter now oversees operations, including engineering, worldwide sales and marketing, manufacturing and service.

Margaret (Peg) Williams was named Senior Vice President and will be responsible for all of Cray engineering. She joins Cray from IBM where she served as Vice President of Database Technology.

The first customer acceptance of the new Cray XT3 system was by the Japan Advanced Institute of Science and Technology, one of Japan's premier academic research centers.

Cray installed a Cray XT3 system at the Swiss National Supercomputing Center, the first such installation in Europe, and continued major installations at Oak Ridge National Laboratory and Pittsburgh Supercomputing Center.

The Army High Performance Computing Research Center acquired and installed a Cray X1E upgrade vector supercomputer that will nearly triple the performance of the previously installed Cray X1. This system was accepted in the second quarter.

Cray announced multiple orders for its Cray XD1 supercomputer, including installations at CINECA in Italy; Air Force's Maui Center; National Institutes of Health; CERFACS in France; Ashton University in England and international

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Avenue SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870

1    consulting and software firm, CD-adapco.

2         Outlook

3         "With a solid product backlog at $127 million over the next 12 months and
all three products in full production, we expect improved results for the next six
4    months, but do not yet have a clear picture of the full year," said Rottsolk.

5         "In the meantime, we will appeal the Nasdaq delisting notice that we
discussed in a separate press release, and continue to work on our selection process
6    to replace Cray's independent auditor and recruit a new chief financial officer," he
said. "We take our Sarbanes-Oxley efforts seriously and will continue our efforts to
7    achieve full compliance."

8    (Emphasis added).

9         99.   Cray failed to include an auditor's opinion on management's assessment of internal

10   control over financial reporting, required pursuant to Section 404 of the Sarbanes-Oxley Act of 2002

11   in its Form 10-K filed on Aril 1, 2005.  Moreover, it continued to report revenue results impacted

12   by faulty internal controls and practices of past quarters.  In response to this shocking news, the

13   price of Cray's stock was dealt a final blow, falling $0.74 per share over the three day period ending

14   on May 12, 2005, for an astonishing 35.6% loss, closing at $1.34, on combined volume of 9.5

15   million shares.  The 10-K did, however, state with regard to the Company's lack of internal controls:

16        A material weakness is a control deficiency, or combination of control deficiencies,
that results in a more than remote likelihood that a material misstatement of our annual
17   or interim financial statements could occur. We have not completed our testing and
evaluation of our internal control over financial reporting. Our evaluation to date has
18   revealed the following material weaknesses:

19        • A lack of effective detective and monitoring controls, coupled with
insufficiently trained accounting personnel and management, were manifested in a
20   number of adjustments to the financial statements for the quarter and year ended
December 31, 2004, that affected various financial statement line items and resulted
21   in differences from our previously announced financial results. The adjustments and
changes arose from improper classification of accounts, incorrect account entry and
22   lack of effective overview of decentralized operations, including review of third-party
vendor contracts, leases and licenses.

23
         • We did not maintain effective review and controls over the determination and
24   reporting of the provision for income taxes, particularly the tax effect due to
subsidiary dividend analysis, the tax effect of a correction of foreign net operating
25   losses and adjustments to deferred taxes. These adjustments were of such magnitude
they were determined to constitute material weaknesses.
26
         As a result of the material weaknesses discussed above, our management's report on
27   internal control over financial reporting, under applicable Commission rules, will
conclude that our internal control over financial reporting was not effective at
28   December 31, 2004, and our independent registered public accounting firm has

AMENDED DERIVATIVE COMPLAINT        - 54 -
(Lead Case No. C 05-1016 RSL)

advised us that their report will reach the same conclusion. Notwithstanding these conclusions, we believe that the consolidated financial statements contained in this Annual Report on Form 10-K fairly present our financial condition and results of operations for the fiscal years covered thereby in all material respects, and we have received an unqualified audit report from our independent auditors on these consolidated financial statements.

The identification of these material weaknesses is based on our findings to date. We will be continuing our assessment of deficiencies noted so far in our testing process, including a number of deficiencies related to our general computer controls and financial application controls, and others that may be identified as we complete our testing. We expect that we and our independent auditors will identify additional material weaknesses between the date of this Annual Report and the date our amended Annual Report on Form 10-K containing Management's Annual Report on Internal Control Over Financial Reporting is filed with the Commission.

Based on our evaluation to date, we do not believe that the material weaknesses identified above materially impacted our financial information for prior periods, and accordingly we currently do not expect that we will be required to restate our financial statements for any prior periods.

In the fourth quarter of 2004, both our chief financial officer and financial reporting manager separately left for other opportunities. We are actively searching for an experienced chief financial officer, and meanwhile are using consultants and our General Counsel to help fill these positions until a new chief financial officer is hired. In the first quarter of 2005 we added a director of internal audit and Sarbanes-Oxley compliance, which with the fourth quarter 2004 addition of an operations controller reduced the demands on our corporate controller. With these changes, we will institute fuller review, additional controls and institute training programs to remediate the material weaknesses described above as well as other deficiencies detected by this process. We do not expect to remediate and test the material weaknesses identified above by the end of our first quarter of fiscal 2005, however, and we will report in our Quarterly Report on Form 10-Q for the first quarter of fiscal 2005, and possibly in subsequent reports filed with the Commission, that material weaknesses in our internal control over financial reporting continue to exist.

Changes in Internal Control over Financial Reporting

The following changes in our internal control over financial reporting occurred in the fourth quarter of 2004 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting:

• Implementation of additional control procedures over various aspects of our operations, including improvements in policies and procedures for account reconciliation, separation of treasury duties, independent review of revenue recognition processes for multiple-element contracts and enhancement of controls over the accounting activities of our foreign subsidiaries by regional controllers in Asia-Pacific and Europe; and

• Hiring of an operations controller.

100.   On May 3, 2005, the Individual Defendants caused the Company to file an amendment to its annual report on Form 10-K/A, which revealed for the first time the complete lack

AMENDED DERIVATIVE COMPLAINT          - 55 -
(Lead Case No. C 05-1016 RSL)

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Avenue SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870

of internal controls that plagued Cray throughout the Relevant Period.  The Individual Defendants for the first time admitted:

> Our management assessed the effectiveness of our internal control over financial reporting as of December 31, 2004, using the criteria established in Internal Control — Integrated Framework issued by the Commission of Sponsoring Organizations of the Treadway Commission ("COSO"), and concluded that we did not maintain effective internal control over financial reporting. In conducting its assessment, management performed an incomplete review of financial applications and general computer controls and tax controls and did not perform a formalized entity-level risk assessment.
>
> For the year ended December 31, 2004, management's assessment of our internal control over financial reporting excluded the internal control over financial reporting at Cray Canada Inc. (formerly known as OctigaBay Systems Corporation), which was acquired on April 1, 2004. We are permitted to exclude subsidiaries that we acquired during 2004 from the 2004 internal control assessment.
>
> In the process of its assessment, our management identified the following material weaknesses in our internal control over financial reporting:
>
> 1.  Control Environment. Our control environment did not sufficiently promote effective internal control over financial reporting throughout our management structure, and this material weakness was a contributing factor in the development of other material weaknesses described below. ***Principal contributing factors included the lack of permanent employees in key financial reporting positions, resistance to change of long-held practices developed in an entrepreneurial and trust culture, the lack of a formal program for training members of our finance and accounting group and a lack of a full evaluation of our financial system applications due to incomplete documentation and testing of key controls. Our control environment also contributed to our inability to evaluate fully our general computer controls, financial system application controls and tax controls, as described more fully below.***
>
> 2.  Risk Assessment. ***We did not perform an entity-level risk assessment to evaluate the implications of relevant risks on financial reporting, including the impact of our diversifying business and non-routine transactions, if any, on our internal control over financial reporting.*** Based on the significance a sufficient entity-level risk assessment has on effective internal control over financial reporting, this represents a design deficiency and constitutes a material weakness.
>
> 3.  Segregation of Duties. We did not segregate duties in several important functions, including:
>
> •  permitting one person the ability to receive inventory, perform cycle counts and process adjustments; and another individual to initiate and authorize the scrapping of obsolete and excess inventory;
>
> •  permitting changes to inventory quantity information within the financial application system without appropriate review;
>
> •  providing users access within our financial application system to areas outside of their responsibilities; and

AMENDED DERIVATIVE COMPLAINT                - 56 -
(Lead Case No. C 05-1016 RSL)

• permitting the creation, modification and updating of customer or vendor data without a secondary level of review or approval.

These deficiencies represent a design deficiency in internal controls which result in more than a remote likelihood that a material error would not have been prevented or detected, and constitute a material weakness.

4. <u>Inadequate Staffing and Training in Finance and Accounting.</u> ***We have had a lack of resources and inadequate training in our finance and accounting functions.*** In the second half of 2004 our corporate controller was assigned primary responsibility for our Sarbanes-Oxley compliance effort and in late 2004 both our chief financial officer and financial reporting manager separately left for other opportunities, stretching our limited resources even further. ***Training for our accounting staff with respect to generally accepted accounting principles ("GAAP") has been ad hoc rather than systematic. As a result of these factors, certain transactions were not recorded initially in accordance with GAAP,*** such as a limited number of third-party vendor contracts, leases and licenses; the capitalization of sales and use taxes on fixed assets and the internal labor component of a financial application system implementation; and appropriate period-end cut-off for "FOB Origin" inventory received shortly after the end of the period. These deficiencies represent a design deficiency in internal controls which result in more than a remote likelihood that a material error would not have been prevented or detected, and constitute a material weakness.

5. <u>Inadequate Oversight of Accounting Transactions.</u> For 2004, ***we had insufficient processes and personnel to provide adequate oversight of financially significant transactions and determinations by our finance and accounting personnel in our offices outside of headquarters,*** including:

• month-end accruals;

• general ledger account reconciliations;

• documentation of management review of account reconciliation;

• ***critical analysis of the components of deferred revenue;***

• the creation and classification of accounts in our accounting system; and

• the classification of costs as rolled up into financial statements.

These deficiencies represent a design deficiency in internal controls and based on misstatements requiring correction to the financial statements and the significance of proper oversight of individuals to the preparation of reliable financial statements, they constitute a material weakness.

6. <u>Inadequate Controls Over Journal Entry Approvals.</u> We did not have appropriate controls around the process for recording and approving journal entries. ***We also noted instances where material journal entries were recorded before subsequently provided supporting documentation was prepared or reviewed by the accounting department. Instances also occurred in which journal entries were not adequately documented and reviewed.*** These deficiencies represent an operating effectiveness deficiency in internal controls which result in more than a remote likelihood that a material error would not have been prevented or detected, and constitute a material weakness.

AMENDED DERIVATIVE COMPLAINT          - 57 -
(Lead Case No. C 05-1016 RSL)

**LAW OFFICES OF**
**CLIFFORD A. CANTOR, P.C.**
627 208th Avenue SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870

7.  Complex Contract Accounting Procedures. ***We did not have a consistent process in place to document the significant terms of all important product sales contracts and our accounting for these contracts. We enter into a small number of high dollar amount contracts for our product sales. These contracts often contain complex terms that impact our recognition and determination of revenue (including customer rights of return, multiple elements and contingencies that can have a material impact on the recognition or deferral of revenue) and balance sheet classification of deferred revenue. In a limited number of cases, we did not evaluate and document the consideration of such terms, and until late 2004 we did not have a process for independent review of the accounting treatment and the associated revenue determinations for such contracts. These deficiencies represent a design deficiency in internal controls and based on misstatements requiring correction to the financial statements and the significance of well-trained individuals to the preparation of reliable financial statements, they constitute a material weakness.***

8.  Tax Controls. Our processes for preparation and review of tax provisions were documented late and complete testing was not possible. We were unable to demonstrate through testing that such internal controls were implemented and operating as expected in 2004. The following deficiency noted in our limited testing of tax controls constitutes a material weakness: a failure to maintain effective review and controls over the determination and reporting of the provision for income taxes, particularly the tax effect due to analysis of subsidiary dividends; the tax effect of a correction of foreign net operating losses; and adjustments to deferred taxes. This deficiency represents a design deficiency and, based on misstatements requiring correction to the financial statements that impacted the income tax provision, constitutes a material weakness.

(Emphasis added).

101.   Throughout the Relevant Period, the Individual Defendants failed to establish internal controls and processes sufficient to ensure that the Company's financial results and forecasts were accurately generated. This was further complicated by the highly complex nature of the transactions and contracts which contained a substantial number of individual requirements and specifications which impacted the revenue recognition from these transactions, yet rather than staff and train the finance and accounting departments to fulfill these functions, the Individual Defendants implemented a restructuring which included Company wide lay-offs.

102.   Thus, throughout the Relevant Period, Individual Defendants knew and concealed the fact that:

(a)   The Company was virtually devoid of internal controls with regard to its financial reporting and forecasting;

(b)   The Company lacked the processes, staffing and training in its finance and accounting departments to properly analyze, report and forecast properly recognizable revenue from

AMENDED DERIVATIVE COMPLAINT          - 58 -
(Lead Case No. C 05-1016 RSL)

1    its unique and complex contracts with customers;

2             (c)    Due to the unique nature of the Company's business and the high degree of

3    complexity with regard to Cray's products, the speed and cost of on-site acceptance testing or

4    improved processes for building machines, in accordance with customer requirements and

5    specifications, had become increasingly unfavorable at Cray and were unlikely to get better anytime

6    soon;

7             (d)    Cray's own auditors and Audit Committee was aware the flawed and

8    ineffective nature of the Company's internal controls;

9             (e)    Delays in realization of inventory and recognition of revenue were a recurring

10   and unpredictable feature of both Cray's business model and its ineffective and flawed financial

11   reporting processes and lack of internal controls;

12            (f)    Delays in the receipt of critical parts for hardware assembly were contributing

13   to delays in the development, assembly, shipment and acceptance testing of the Company's

14   "products";

15            (g)    Cray's "products" were hardware and software component configurations that

16   could be substantially altered in accordance with customer requirements and specifications;

17            (h)    Cray was in no position to capitalize on the four-fold increase in the

18   addressable market resulting from the OctigaBay acquisition;

19            (i)    Each new customer order presented a new set of hardware and software

20   development challenges, complicated by the complexity of the contracts which could not be properly

21   and critically analyzed due to the flawed and ineffective nature of Cray's internal controls;

22            (j)    Cray was losing money or breaking even on certain of its largest customer

23   orders; and

24            (k)    The inherent unpredictability of Cray's quarterly revenue guidance had far

25   more to do with the flawed and ineffective nature of the Company's internal controls than the timing

26   of customer contract awards.

27       103.    In the midst of the revelation of the absence of internal controls that had plagued the

28   Company throughout the Relevant Period, on May 11, 2005, the Director Defendants amended the

AMENDED DERIVATIVE COMPLAINT        - 59 -
(Lead Case No. C 05-1016 RSL)

1   Executive Severance Policy to authorize the Compensation Committee to approve salary

2   continuation for different periods and to add targeted bonus and other compensation to the definition

3   of "Salary" in connection with the hiring or appointment of new officers and senior managers.

4   Furthermore, on the same day, the Director Defendants accelerated of the vesting of all unvested

5   outstanding stock options previously granted to both employees and executive officers under the

6   Company's stock option plans with a per share exercise price of $1.47 or greater. As a result of that

7   acceleration, options to acquire approximately 410,000 shares, with per share exercise prices ranging

8   from $1.47 to $2.35, which otherwise would have vested from time to time over the next four years,

9   became immediately exercisable, including options for 67,720 shares held by executive officers of

10  the Company.

11      104.    On June 1, 2005, the Individual Defendants caused the Company to issue a press

12  release in which they announced that NASDAQ had authorized the Company's stock to return to

13  trading under its original trading symbol "CRAY", effective with the open of business on June 3,

14  2005.  The Company also announced the it had entered into a new $30 million credit agreement with

15  Wells Fargo Foothill, an asset based lender, in an attempt to ameliorate the Company's cash flow

16  problems.  This new line of credit bears interest on a performance-based formula, contains covenants

17  to maintain or achieve certain financial performance standards and is collateralized by all of the

18  Company's assets and those of Cray Federal Inc. and required Cray to pledge all of the stock of its

19  subsidiaries.  Moreover, the fees, interest rates and terms of this credit agreement were far less

20  favorable than those that would have been available to a well managed company with established

21  and fully functioning internal financial controls.

22      105.    On June 27, 2005, the Individual Defendants caused the Company to file an interim

23  report on Form 8-K with the SEC in which Cray announced severe layoffs and cut backs throughout

24  the Company, including the immediate lay off of 90 employees and  a five percent reduction in

25  wages for all U.S. employees.  This was yet another desperate attempt by the Individual Defendants

26  to divert attention from the mismanagement that lead to the absence of internal controls, largely due

27  to the fact that the accounting and finance departments were understaffed and undertrained.

28      106.    Then on July 1, 2005, the Individual Defendants caused the Company to announce

AMENDED DERIVATIVE COMPLAINT          - 60 -
(Lead Case No. C 05-1016 RSL)

1   that they had replaced Deloitte & Touche, who had served as the Company's auditors since 1987,

2   with  Peterson Sullivan.

3       107.   On August 8, 2005, the Individual Defendants caused the Company to issue a press

4   release entitled "Cray Inc. Announces Second Quarter 2005 Financial Results." This press release

5   revealed that Cray suffered a staggering net loss for the second quarter 2005 of $23.8 million or $.27

6   per share. This loss included charges of approximately $7.8 million related to additional anticipated

7   completion costs for the Red Storm project, $2.3 million in obsolete and scrap inventory, $1.8

8   million for amortization of deferred stock compensation expenses and $1.9 million for restructuring

9   expenses.   Moreover, the press release revealed that Cray's problems in achieving customer

10  acceptance of its ongoing difficulties was worsening, since, inventory at customer locations, i.e.,

11  systems that have been delivered but for which acceptance testing is not yet complete grew by over

12  $21 million during the second quarter alone.

13      108.   Also on August 8, 2005, the Company announced that Defendant Ungaro had been

14  promoted from President to CEO, and was elected to the board, replacing Defendant Rottsolk.

15      109.   On August 9, 2005, the Individual Defendants caused the Company to file its

16  quarterly report on Form 10-Q with the SEC.  In this 10-Q, the Individual Defendants admitted that

17  the material deficiencies in internal controls had not yet been remedied, stating:

18      ***There were no material changes in our internal control over financial reporting
        during the most recently completed fiscal quarter*** that have materially affected, or
19      are reasonably likely to materially affect, our internal control over financial reporting
        except that: in the second quarter of 2005 we hired as our chief financial officer
20      Brian C. Henry, who has twenty years of experience as a technology company chief
        financial officer; we strengthened our Sarbanes-Oxley Act compliance team through
21      the addition of a full time director; and ***we are involved in ongoing efforts
        addressing each of the material weaknesses and significant deficiencies identified***
22      ***in our 2004 review as well as reviewing all of our procedures and key controls***
        ***relating to financial reporting in scope for 2005. Although we have implemented***
23      ***changes in a number of our procedures and key controls, we had not commenced***
        ***testing of these key controls as of June 30, 2005.*** We are not planning on reporting
24      whether there had been full remediation of the material weaknesses described in our
        Annual Report on Form 10-K/A for 2004 until our 2005 report on internal controls
25      is complete.

26  (Emphasis added).

27      110.   During the Relevant Period, Cray common stock traded as high as $13.49 per share.

28  Following the revelations of the Individual Defendants' wrongful conduct and absolute failure to

AMENDED DERIVATIVE COMPLAINT          - 61 -
(Lead Case No. C 05-1016 RSL)

**LAW OFFICES OF**
**CLIFFORD A. CANTOR, P.C.**
627 208th Avenue SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870

1    establish adequate internal controls within the Company, by October 11, 2005, the price of Cray

2    common stock closed at $0.98, a 93% collapse in the trading price, or a loss of *more than $1 billion*

3    *in market capitalization*.

### X.    FALSE FINANCIAL STATEMENTS

5        111.    Cray's internal controls and financial statements issued during the Relevant Period

6    and the statements about them were false and misleading, as such financial information was not

7    prepared in conformity with GAAP, or was the financial information a fair presentation of the

8    Company's operations due to the Company's improper accounting in violation of GAAP and SEC

9    rules.

10        112.    GAAP are those principles recognized by the accounting profession as the

11    conventions, rules and procedures necessary to define accepted accounting practice at a particular

12    time.  Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) sates that financial statements filed with th SEC

13    which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate.

14    Regulation S-X requires that interim financial statements must also comply with GAAP, with the

15    exception that interim financial statements need not include disclosure which would be duplicative

16    of disclosures accompanying annual financial statements.  17 C.F.R. § 210.10-01(a).

17        113.    Due to these accounting improprieties, the Individual Defendants caused the

18    Company to present its financial results and statements in a manner while violated GAAP, including

19    the following fundamental accounting principles:

20            (a)    The principle that financial reporting should provide information that is useful

21    to present and potential investors and creditors and other users in making rational investment, credit

22    and similar decisions was violated (FASB Statement of Concepts No. 1, ¶ 34);

23            (b)    The principle that financial reporting should provide information about the

24    economic resources of an enterprise, the claims to those resources, and effects of transactions, events

25    and circumstances that change resources and claims to those resources was violated (FASB

26    Statement of Concepts No. 1, ¶ 40);

27            (c)    The principle that financial reporting should provide information about how

28    management of an enterprise has discharged its stewardship responsibility to owners (stockholders)

AMENDED DERIVATIVE COMPLAINT                    - 62 -
(Lead Case No. C 05-1016 RSL)

1  for the use of enterprise resources entrusted to it was violated.  To the extent that management offers

2  securities of the enterprise to the public, it voluntarily accepts wider responsibilities for

3  accountability to prospective investors and to the public in general (FASB Statement of Concepts

4  No. 1, ¶ 50);

5        (d)    The principle that financial reporting should provide information about an

6  enterprise's financial performance during a period was violated.  Investors and creditors often use

7  information about the past to help in assessing the prospects of an enterprise.  Thus, although

8  investment and credit decisions reflect investors' expectations about future enterprise performance,

9  those expectations are commonly based at least partly on evaluations of past enterprise performance

10  (FASB Statement of Concepts No. 1, ¶ 42);

11        (e)    The principle that financial reporting should be reliable in that it represents

12  what it purports to represent was violated.  That information should be reliable as well as relevant

13  is a notion that is central to accounting (FASB Statement of Concepts No. 2, ¶¶ 58-59);

14        (f)    The principle of completeness, which means that nothing is left out of the

15  information that may be necessary to insure that it validly represents underlying events and

16  conditions was violated (FASB Statement of Concepts No. 2, ¶ 79);

17        (g)    The principle that conservatism be used as a prudent reaction to uncertainty

18  to try to ensure that uncertainties and risks inherent in business situations are adequately considered

19  was violated.  The best way to avoid injury to investors is to try to ensure that what is reported

20  represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶ 95, 97).

21        114.    Further, the undisclosed adverse information concealed by defendants during the

22  Relevant Period is the type of information which, because of SEC regulations, regulations of the

23  national stock exchanges and customary business practice, is expected by investors and securities

24  analysts to be disclosed and is known by corporate officials and their legal and financial advisors

25  to be the type of information which is expected to be and must be disclosed.

## IX.   INSIDER SALES DURING THE RELEVANT PERIOD

27        115.    Defendants sold shares of Cray stock during the Relevant Period, in accordance with

28  the following Schedule:

AMENDED DERIVATIVE COMPLAINT          - 63 -
(Lead Case No. C 05-1016 RSL)

| DATE | INSIDER | SHARES | AVERAGE PURCHASE PRICE | PROCEEDS |
|---|---|---|---|---|
| 26-Aug-03 | Johnson, Kenneth | 6,500 | $11.3 | $74,000 |
| 26-Aug-03 | Johnson, Kenneth | 26,000 | $11.8 | $307,320 |
| 2-Sep-03 | Johnson, Kenneth | 6,500 | $12.6 | $82,095 |
| 6-Oct-03 | Johnson, Kenneth | 6,500 | $13.3 | $86,000 |
| 3-Nov-03 | Johnson, Kenneth | 6,500 | $12.5 | $81,315 |
| 1-Dec-03 | Johnson, Kenneth | 19,500 | $10.1 | $197,925 |
| 2-Dec-03 | Johnson, Kenneth | 6,500 | $10.0 | $65,065 |
| 5-Jan-04 | Johnson, Kenneth | 6,500 | $10.1 | $65,910 |
| 12-May-04 | Johnson, Kenneth | 6,312 | $6.9 | $43,994 |
| | **TOTAL** | **84,962** | | **$1,003,624** |
| 27-Aug-03 | Kiefer, David | 71,500 | $12.1 | $865,150 |
| 27-Aug-03 | Kiefer, David | 30,000 | $11.8 | $353,000 |
| 28-Aug-03 | Kiefer, David | 11,500 | $12.4 | $143,000 |
| 8-Sep-03 | Kiefer, David | 10,000 | $13.3 | $133,000 |
| 13-Oct-03 | Kiefer, David | 10,000 | $13.3 | $133,000 |
| 10-Nov-03 | Kiefer, David | 10,000 | $12.2 | $122,000 |
| 9-Jan-04 | Kiefer, David | 30,000 | $11.2 | $337,800 |
| 12-Jan-04 | Kiefer, David | 10,000 | $11.3 | $113,000 |
| | **TOTAL** | **183,000** | | **$2,199,950** |
| 3-Nov-03 | Poteracki, Scott | 37,679 | $12.5 | $473,000 |
| | **TOTAL** | **37,679** | | **$473,000** |
| 14-Aug-03 | Rottsolk, James | 15,000 | $11.8 | $178,000 |
| 8-Sep-03 | Rottsolk, James | 15,000 | $13.1 | $197,000 |
| 13-Oct-03 | Rottsolk, James | 15,000 | $13.2 | $199,000 |
| 10-Nov-03 | Rottsolk, James | 15,000 | $12.2 | $183,000 |
| 12-Jan-04 | Rottsolk, James | 15,000 | $11.2 | $169,000 |
| 12-May-04 | Rottsolk, James | 4,980 | $6.9 | $34,710 |
| | **TOTAL** | **79,980** | | **$960,710** |
| 26-Aug-03 | Kennedy, Kenneth | 900 | $11.5 | $10,404 |
| | **TOTAL** | **900** | | **$10,404** |
| 4-Nov-03 | Regis, Daniel C | 9,000 | $12.5 | $112,140 |
| 16-Dec-04 | Regis, Daniel C | 22,999 | $4.3 | $100,045 |
| | **TOTAL** | **31,999** | | **$212,185** |
| | **GRAND TOTAL** | **$418,520** | | **$4,859,873** |

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

116.     Plaintiffs brings  this action derivatively in the right and for the benefit of Cray to redress injuries suffered, and to be suffered, by Cray as a direct result of the breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.  Cray is named as a nominal

**LAW OFFICES OF**
**CLIFFORD A. CANTOR, P.C.**
627 208th Avenue SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870

1  defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this

2  Court that it would not otherwise have.

3      117.    Plaintiffs will adequately and fairly represent the interests of Cray in enforcing and

4  prosecuting its rights.

5      118.    Plaintiffs are and were owners of Cray common stock during all times relevant to the

6  Individual Defendants' wrongful course of conduct alleged herein, and remains a Cray shareholder.

7      119.    At the time this action was initiated, the Cray Board consisted of the following nine

8  individuals: defendants Rottsolk, Smith, Jones, Kennedy, Kiely, Lederman, Narodick, Regis and

9  Richards (the "Demand Directors").  Plaintiffs did not make a pre-suit demand on the Demand

10 Directors to institute this action because such a demand would be a futile, wasteful and useless act,

11 particularly for the following reasons:

12      (a)    As a result of their access to and review of internal corporate documents;

13 conversations and connections with other corporate officers, employees and directors; and

14 attendance at management and Board meetings, each of the defendants knew the adverse non-public

15 information regarding the improper accounting.  While in possession of this material adverse

16 non-public information regarding the Company, the following current members of the Cray board

17 participated in the illegal insider selling:

18      (i)     During the Relevant Period, Rottsolk sold 79,980 shares of Cray common

19              stock, garnering total proceeds of $960,710;

20      (ii)    During the Relevant Period,  Smith sold 49,548 shares for $539,052;

21      (iii)   During the Relevant Period Kennedy sold 900 shares for $10,404; and

22      (iv)    During the Relevant Period Regis sold 31,999 shares for $212,185.

23 These defendants face a substantial likelihood of liability as the result of same.

24      (b)    The Compensation Committee of the Board the Compensation Committee determines

25 salaries and bonuses and considers employment agreements for elected officers of the Company, and

26 prepares reports on these matters; considers, reviews and grants options under the Company's

27 compensation plans and administers the plans; and considers matters of director compensation,

28 benefits and other forms of remuneration. Throughout the Relevant Period, the Compensation

AMENDED DERIVATIVE COMPLAINT          - 65 -
(Lead Case No. C 05-1016 RSL)

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Avenue SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870

1   Committee has approved and recommended repeated increases in the compensation and award of

2   stock options pursuant to the Company's stock option plans to each of the Director Defendants. The

3   Compensation Committee is comprised of defendants  Lederman (Chair), Jones, Kennedy and

4   Kiely.  As the members of the Compensation Committee singularly control the other defendants'

5   awards, the remaining members of the Board will not institute this action against defendants

6   Lederman, Jones, Kennedy and  Kiely. To do so would jeopardize each defendant's personal

7   financial compensation.  Thus, demand on the remaining Director Defendants is futile;

8        (c)   The principal professional occupation of defendant Rottsolk is his employment with

9   Cray, pursuant to which he received and continues to receive substantial monetary compensations

10  and other benefits.  Specifically, for FY:04, FY:03 and FY:02, respectively, Cray paid defendant

11  Rottsolk total compensation of $350,000; $601,313; and $729,750 and granted him options to

12  purchase a total of 815,872 shares of Cray common stock. Accordingly, defendant Rottsolk lacks

13  independence from defendants, Lederman, Jones, Kennedy and  Kiely, defendants who are not

14  disinterested and/or independent and who exert influence over defendant Klayco's compensation

15  by virtue of their positions on the Compensation Committee.  This lack of independence renders

16  defendant Rottsolk incapable of impartially considering a demand to commence and vigorously

17  prosecute this action;

18       (d)   The principal professional occupation of defendant Smith is his employment with Cray,

19  pursuant to which he received and continues to receive substantial monetary compensations and

20  other benefits.  Specifically, for FY:04, FY:03 and FY:02, respetively, Cray paid defendant Smith

21  base salary and bonuses of $250,000; $347,000; and $416,304 and granted him options to purchase

22  a total of 363,962 shares of Cray common stock. Accordingly, defendant Smith lacks independence

23  from defendants, Lederman, Jones, Kennedy and Kiely, defendants who are not disinterested and/or

24  independent and who exert influence over defendant Klayco's compensation by virtue of their

25  positions on the Compensation Committee.  This lack of independence renders defendant Smith

26  incapable of impartially considering a demand to commence and vigorously prosecute this action;

27       (e)   According to Cray's Amended Proxy Statement filed with the SEC on or about March

28  4, 2005, defendants Regis (Chair), Richards, Narodick and Lederman were, during the Relevant

Period, members of the Audit Committee. The Audit Committee is responsible for overseeing the Company's accounting, financial reporting and audit processes as well as establishing and monitoring the Company's internal control with respect to financial reporting. As set forth above, throughout the Relevant Period, the Company was virtually devoid of internal controls, processes and procedures in every area of the finance and accounting departments  Nonetheless, the Audit Committee recommended that the Board include the improper financial statements and publish the improper and misleading press releases throughout the Relevant Period. By such actions, defendants breached their duties by causing or allowing the improper financials and press releases described above and face a substantial likelihood of liability for same. As a result of these defendants' breach of their duties, any demand upon them is futile;

(f)     The entire Cray Board and senior management participated in the wrongs complained of herein.  Pursuant to their specific duties as Board members, each was charged with the management of the Company and to conduct its business affairs.  Each of the Director Defendants breached the fiduciary duties that they owed to Cray and its shareholders in that they abdicated their oversight responsibilities to the Company by, among other things, failing to implement adequate internal controls and procedures and failed to prevent and correct the improper financials.  Thus, the Cray board cannot exercise independent objective judgment in deciding whether to bring this action or whether to vigorously prosecute this action because its members are interested personally in the outcome as it is their actions that have subjected Cray to millions of dollars in liability for possible violations of applicable securities laws;

(g)     The Individual Defendants, because of their inter-related familiar, business, professional and personal relationships, have developed debilitating conflicts of interest that prevent the Board members of the Company from taking the necessary and proper action on behalf of the Company as requested herein.  In addition to the conflicts that exist as a result of their participation in the improper public statements and insider selling, as detailed herein *supra*, the majority of the Board, including the defendants listed below, are subject to the following prejudicial entanglements:

(i)     Defendant Kennedy is the John and Ann Doerr Professor of Computational Engineering at Rice University and also is currently Director of the Center for High

Performance Software at Rice University.  Mr. Kiely is a past member of the Advisory Council for the School of Engineering at Rice University. Because of their long-standing and entangling business and professional relationships at Rice University,  defendants Kennedy and Kiely will not take the action requested by Plaintiffs herein against one another or the remainder of the Individual Defendants.

(h)    Each of the Director Defendants knew of and/or directly benefitted from the wrongdoing complained of herein;

(i)   The Director Defendants, as more fully detailed herein, participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from Cray's stockholders or recklessly and/or negligently disregarded the wrongs complained of herein, and are therefore not disinterested parties;

(j)   In order to bring this suit, all of the directors of Cray would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand;

(k)    The acts complained of constitute violations of the fiduciary duties owed by Cray's officers and directors and these acts are incapable of ratification;

(l)   Each of the defendant directors of Cray authorized and/or permitted the false statements disseminated directly to the public or made directly to securities analysts and which were made available and distributed to shareholders, authorized and/or permitted the issuance of various of the false and misleading statements and are principal beneficiaries of the wrongdoing alleged herein, and thus could not fairly and fully prosecute such a suit even if such suit was instituted by them;

(m)   Any suit by the current directors of Cray to remedy these wrongs would likely expose the Individual Defendants and Cray to further violations of the securities laws that would result in civil actions being filed against one or more of the Individual Defendants, thus, they are hopelessly conflicted in making any supposedly independent determination whether to sue themselves;

(n)    Cray has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants and current Board have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt

**LAW OFFICES OF**
**CLIFFORD A. CANTOR, P.C.**
627 208th Avenue SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870

1  to recover for Cray any part of the damages Cray suffered and will suffer thereby;

2       (o)   If the current directors were to bring this derivative action against themselves, they

3  would thereby expose their own misconduct, which underlies allegations against them contained in

4  class action complaints for violations of securities law, which admissions would impair their defense

5  of the class actions and greatly increase the probability of their personal liability in the class actions,

6  in an amount likely to be in excess of any insurance coverage available to the Individual Defendants.

7  In essence, they would be forced to take positions contrary to the defenses they will likely assert in

8  the securities class actions.  This they will not do.  Thus, demand is futile; and

9       (p)   If Cray's current and past officers and directors are protected against personal liability

10  for their acts of mismanagement, abuse of control and breach of fiduciary duty alleged in this

11  Complaint by directors' and officers' liability insurance, they caused the Company to purchase that

12  insurance for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of

13  Cray.  However, due to certain changes in the language of directors' and officers' liability insurance

14  policies in the past few years, the directors' and officers' liability insurance policies covering the

15  defendants in this case contain provisions that eliminate coverage for any action brought directly by

16  Cray against these defendants, known as, *inter alia*, the "insured versus insured exclusion."  As a

17  result, if these directors were to sue themselves or certain of the officers of Cray, there would be no

18  directors' and officers' insurance protection and thus, this is a further reason why they will not bring

19  such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such

20  insurance coverage exists and will provide a basis for the Company to effectuate recovery.  If there

21  is no directors' and officers' liability insurance at all then the current directors will not cause Cray

22  to sue them, since they will face a large uninsured liability.

23  **COUNT I**

24  **Against the Insider Selling Defendants for Breach of Fiduciary<br>Duties and Misappropriation of Information**

25       120.   Plaintiffs incorporate by reference and reallege each and every allegation set forth

26  above, as though fully set forth herein.

27       121.   At the time of the stock sales set forth herein, the Insider Selling Defendants knew

28

---

AMENDED DERIVATIVE COMPLAINT          - 69 -
(Lead Case No. C 05-1016 RSL)

**LAW OFFICES OF**
**CLIFFORD A. CANTOR, P.C.**
627 208th Avenue SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870

1  the information described above, and sold Cray common stock on the basis of such information.

2  122.   The information described above was proprietary non-public information concerning

3  the Company's accounting and financial statements, together with its financial condition and future

4  business prospects. It was a proprietary asset belonging to the Company, which the Insider Selling

5  Defendants used for their own benefit when they sold Cray common stock.

6  123.   At the time of their stock sales, the Insider Selling Defendants knew that the

7  Company's financial statements, results and prospects were not as stated. The Insider Selling

8  Defendants' sales of Cray common stock while in possession and control of this material adverse

9  non-public information was a breach of their fiduciary duties of loyalty and good faith.

10  124.   Since the use of the Company's proprietary information for their own gain constitutes

11  a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the

12  imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

13  **COUNT II**

14  **Against All Defendants for Breach of Fiduciary Duty**

15  125.   Plaintiffs incorporate by reference and reallege each and every allegation contained

16  above, as though fully set forth herein.

17  126.   The Individual Defendants owed and owe Cray fiduciary obligations. By reason of

18  their fiduciary relationships, the Officer Defendants and Director Defendants owed and owe Cray

19  the highest obligation of good faith, fair dealing, loyalty and due care.

20  127.   The Individual Defendants, and each of them, violated and breached their fiduciary

21  duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

22  128.   Each of the Individual Defendants had actual or constructive knowledge that they had

23  caused the Company to improperly misrepresent its financial statements, prospects and results and

24  failed to correct the Company's public statements, as well as its publicly reported financial results

25  and guidance. These actions could not have been a good faith exercise of prudent business judgment

26  to protect and promote the Company's corporate interests.

27  129.   As a direct and proximate result of the Individual Defendants' failure to perform their

28  fiduciary obligations, Cray has sustained significant damages. As a result of the misconduct alleged

**LAW OFFICES OF**
**CLIFFORD A. CANTOR, P.C.**
627 208th Avenue SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870

herein, the Individual Defendants are liable to the Company.

130.   Plaintiffs on behalf of Cray have no adequate remedy at law.

## COUNT III

### Against All Defendants for Abuse of Control

131.   Plaintiffs  incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

132.   The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Cray, for which they are legally responsible.

133.   As a direct and proximate result of the Individual Defendants' abuse of control, Cray has sustained significant damages.

134.   As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

135.   Plaintiffs on behalf of Cray have no adequate remedy at law.

## COUNT IV

### Against All Defendants for Gross Mismanagement

136.   Plaintiffs  incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

137.   By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Cray in a manner consistent with the operations of a publicly held corporation.

138.   As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Cray has sustained significant damages in excess of hundreds of millions of dollars.

139.   As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

140.   Plaintiffs on behalf of Cray have no adequate remedy at law.

## COUNT V

AMENDED DERIVATIVE COMPLAINT          - 71 -
(Lead Case No. C 05-1016 RSL)

**Against All Defendants for Waste of Corporate Assets**

141.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

142.    As a result of the improper public statements, financial results and prospects as alleged herein, and by failing to properly consider the interests of the Company and its public shareholders by failing to conduct proper supervision, defendants have caused Cray to waste valuable corporate assets by paying incentive based bonuses to certain of its executive officers and incur potentially millions of dollars of legal liability and/or legal costs to defend defendants' unlawful actions.

143.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

144.    Plaintiffs on behalf of Cray have no adequate remedy at law.

## COUNT VI

**Against All Defendants for Unjust Enrichment**

145.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

146.    By their wrongful acts and omissions, defendants were unjustly enriched at the expense of and to the detriment of Cray.

147.    Plaintiffs, as a shareholders and representatives of Cray, seek restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demands judgment as follows:

A.    Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment; Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory

**LAW OFFICES OF**
**CLIFFORD A. CANTOR, P.C.**
627 208th Avenue SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 • Fax: (425) 868-7870

provisions sued hereunder, including attaching, impounding, imposing a constructive trust on or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that Plaintiffs on behalf of Cray have an effective remedy;

B.      Awarding to Cray restitution from the defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the defendants; Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

C.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

DATED: Oct. 13, 2005                    LAW OFFICES OF CLIFFORD A. CANTOR, P.C.

                                        /s    Clifford A. Cantor
                                        WSBA # 17893
                                        627 208th Ave. SE
                                        Sammamish, WA 98074
                                        Telephone:  (425) 868-7813
                                        Facsimile:  (425) 868-7870
                                        Liaison Counsel

                                        Nadeem Faruqi
                                        FARUQI & FARUQI, LLP
                                        320 East 39th Street
                                        New York, NY 10016
                                        Telephone: (212) 983-9330
                                        Facsimile: (212) 983-9331
                                        Co-Lead Counsel

                                        William B. Federman
                                        W. Todd Ver Weire
                                        Stuart Emmons
                                        FEDERMAN & SHERWOOD
                                        120 N. Robinson, Suite 2720
                                        Oklahoma City, OK 73102
                                        Telephone: (405) 235-1560
                                        Facsimile: (405) 239-2112
                                        Co-Lead Counsel

                                        Attorneys for Plaintiffs

## **VERIFICATION**

I, VASANT D. BUTALA declare that I have reviewed the Amended Shareholder Derivative Complaint ("Complaint") prepared on behalf of Cray, Inc., and I authorize its filing. I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true. I further declare that I am a current holder, and have been a holder, of Cray, Inc. common stock during the time period in which the wrongful conduct alleged and complained of in the Complaint was occurring.

Oct. 12, 2005          Vasant D. Butala

Date