1
2
3
4
5
6
7
8
9
10
11
12
13

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

IN RE CRAY INC. DERIVATIVE
LITIGATION

No.  C05-1016Z

ORDER

This document relates to:
ALL ACTIONS

This matter comes before the Court on motions to dismiss by nominal Defendant Cray

Incorporated ("Cray") pursuant to FED. R. CIV. P. 12(b)(6) for failure to comply with the pre-

litigation demand requirement in RCW 23B.07.400, docket no. 18, and by the Individual

Defendants[1] for failure to properly plead fraud pursuant to FED. R. CIV. P. 9(b) and failure to

state claims upon which relief can be granted pursuant to FED. R. CIV. P. 12(b)(6), docket no.

16.[2]  Having reviewed the motions to dismiss, Plaintiffs' opposition briefs, docket nos. 22

and 23, the reply briefs, docket nos. 25 and 27, and all supporting declarations and exhibits,

and having heard argument on March 28, 2006, the Court now enters the following Order.

---

[1] The "Individual Defendants" are James E. Rottsolk, Peter J. Ungaro, David R. Kieffer,
Scott J. Poteracki, Kenneth W. Johnson, Burton J. Smith, Kenneth W. Kennedy, Jr., Stephen
C. Kiely, Daniel C. Regis, Sally G. Narodick, Frank L. Lederman, John B. Jones, Jr., and
Stephen C. Richards.

[2] In their motion to dismiss, the Individual Defendants join in Cray's motion to dismiss for
failure to comply with the demand requirement.  Docket no. 18, at 1.

ORDER  -1-

## BACKGROUND

This shareholder derivative action brings claims for breach of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets, and unjust enrichment.  Verified Amended Derivative Complaint ("VADC"), docket no. 9, ¶ 1.  Plaintiffs allege that these violations occurred from July 31, 2003, to the filing of the VADC on October 13, 2005 ("Relevant Period").  Id. ¶ 1.  Plaintiffs are shareholders of Cray who owned, and continue to own, shares of Cray's common stock.  Id. ¶¶ 11-12.

As alleged by Plaintiffs, "Cray is engaged in the design, development, marketing and support of high-performance computer systems, commonly known as supercomputers."  Id. ¶ 2.  Cray is incorporated and maintains its principal place of business in Washington State.  Id. ¶ 13.  Generally, Plaintiffs allege that Cray's officers and directors "knowingly misrepresented both the dynamics of Cray's business model and the Company's internal controls with regard to its financial reporting process."  Id. ¶ 3.  More specifically, Plaintiffs allege that "[o]n March 16, 2005, Cray revealed that, commensurate with its Sarbanes-Oxley activities, it expected to document material weaknesses in its system of internal controls and also expected to report that these controls were ineffective."  Id. ¶ 5.  As a result, Plaintiffs allege that on March 17, 2005, Cray's stock lost 25.9% of its value.  Id.  Finally, Plaintiffs allege that on May 9, 2005, Cray publicly revealed that it failed to include an auditor's opinion on management's assessment of internal control over financial reporting, and Cray reported revenue results that were adversely impacted by faulty internal controls and practices causing Cray's stock to drop another 35.6% by May 12, 2005.  Id.  ¶ 6.

Cray has a nine member Board of Directors.  The Individual Defendants serving on the Board of Directors include Rottsolk, Smith, Kennedy, Kiely, Regis, Narodick, Richards, Lederman, and Jones.  Plaintiffs bring claims against each member of Cray's Board for conduct during the Relevant Period.  VADC ¶ 1.  Plaintiffs also bring claims against Ungaro,

1  Kiefer, Poteracki, and Johnson in their capacity as officers of Cray.  VADC ¶¶ 16-19.  Facts

2  relevant to the Individual Defendants are as follows:

3  Rottsolk

4       Rottsolk is the Chairman and CEO of Cray and has been a member of the Board of

5  Directors since Cray was founded in 1987.  Rottsolk also served as Cray's President from

6  March 2002 until March 7, 2005.  Plaintiffs allege that Rottsolk knew of Cray's adverse non-

7  public information from internal documents and conversations with others and participated in

8  the issuance of false or misleading statements.  During the Relevant Period, Rottsolk sold

9  79,980 shares of Cray stock for proceeds of $960,710.  Id. ¶¶ 14, 119(a).

10 Smith

11      Smith is a member of the Board of Directors and an employee of Cray.  Id. ¶¶ 14,

12 119(d).  Plaintiffs allege that Smith knew of Cray's adverse non-public information from

13 internal documents and conversations with others and participated in the issuance of false or

14 misleading statements.  During the Relevant Period, Smith sold 49,548 shares of Cray stock

15 for proceeds of $539,052.  Id. ¶ 15.

16 Kennedy

17      Kennedy is a member of Cray's Board of Directors.  Plaintiffs allege that Kennedy

18 knew of Cray's adverse non-public information from internal documents and conversations

19 with others and participated in the issuance of false or misleading statements.  During the

20 Relevant Period, Kennedy sold 900 shares of Cray stock for proceeds of $10,404.  Id. ¶ 20.

21 Kiely

22      Kiely is a member of Cray's Board of Directors.  Plaintiffs allege that Kiely knew of

23 Cray's adverse non-public information from internal documents and conversations with

24 others and participated in the issuance of false or misleading statements.  Id. ¶ 21.

25

26

1  <u>Regis</u>

2       Regis is a member of Cray's Board of Directors.  Plaintiffs allege that Regis knew of

3  Cray's adverse non-public information from internal documents and conversations with

4  others and participated in the issuance of false or misleading statements.  During the

5  Relevant Period, Regis sold 31,999 shares of Cray stock for proceeds of $212,185.  <u>Id.</u> ¶¶ 22,

6  115.

7  <u>Narodick</u>

8       Narodick is a member of Cray's Board of Directors.  Plaintiffs allege that Narodick

9  knew of Cray's adverse non-public information from internal documents and conversations

10  with others and participated in the issuance of false or misleading statements.  <u>Id.</u> ¶ 23.

11  <u>Richards</u>

12       Richards is a member of Cray's Board of Directors.  Plaintiffs allege that Richards

13  knew of Cray's adverse non-public information from internal documents and conversations

14  with others and participated in the issuance of false or misleading statements.  <u>Id.</u> ¶ 24.

15  <u>Lederman</u>

16       Lederman is a member of Cray's Board of Directors.  Plaintiffs allege that Lederman

17  knew of Cray's adverse non-public information from internal documents and conversations

18  with others and participated in the issuance of false or misleading statements.  <u>Id.</u> ¶ 25.

19  <u>Jones</u>

20       Jones is a member of Cray's Board of Directors.  Plaintiffs allege that Jones knew of

21  Cray's adverse non-public information from internal documents and conversations with

22  others and participated in the issuance of false or misleading statements.  <u>Id.</u> ¶ 26.

23  <u>Ungaro</u>

24       Ungaro was President of Cray during the Relevant Period.  Plaintiffs allege that

25  Ungaro knew of Cray's adverse non-public information from internal documents and

26

1   conversations with others and participated in the issuance of false or misleading statements.

2   Id. ¶ 16.

3   Kiefer

4         Kiefer was Sr. Vice President of Cray at times during the Relevant Period.  Plaintiffs

5   allege that Kiefer knew of Cray's adverse non-public information from internal documents

6   and conversations with others and participated in the issuance of false or misleading

7   statements.  Id. ¶ 17.

8   Poteracki

9         Poteracki was Sr. Vice President of Finance and Chief Financial Officer of Cray at

10  times during the Relevant Period.  Plaintiffs allege that Poteracki knew of Cray's adverse

11  non-public information from internal documents and conversations with others and

12  participated in the issuance of false or misleading statements.  Id. ¶ 18.

13  Johnson

14        Johnson was General Counsel, Secretary, and CFO of Cray at times during the

15  Relevant Period.  Plaintiffs allege that Johnson knew of Cray's adverse non-public

16  information from internal documents and conversations with others and participated in the

17  issuance of false or misleading statements.  Id. ¶ 19.

18  **DISCUSSION**

19  **I.**    **Cray's Motion to Dismiss for Failure to Comply with the Demand Requirement**

20      **A.**    **Legal Standards**

21          **1.**    **Motion to Dismiss**

22        As with all motions to dismiss, allegations of material fact are taken as true and

23  construed in the light most favorable to the nonmoving party.  Smith v. Jackson, 84 F.3d

24  1213, 1217 (9th Cir. 1996).  However, conclusory allegations of law and unwarranted

25  inferences are insufficient to defeat a motion to dismiss.  Associated Gen. Contractors v.

26  Metro. Water Dist. of So. Cal., 159 F.3d 1178, 1181 (9th Cir. 1998).

1

## 2.    Governing Law for Shareholder Demand Requirement

2      Shareholder derivative actions must comply with FED. R. CIV. P. 23.1, which states in

3  relevant part as follows: "The complaint shall also allege with particularity the efforts, if any,

4  made by the plaintiff to obtain the action the plaintiff desires from the directors or

5  comparable authority . . . and the reasons for the plaintiff's failure to obtain the action or for

6  not making the effort."  Rule 23.1 is related to the substantive requirement that plaintiffs in

7  shareholder derivative suits must first demand that the corporation take the action that the

8  plaintiffs seek to enforce through the suit.  See Kamen v. Kemper Fin. Servs., 500 U.S. 90,

9  96 (1991) (Rule 23.1 "clearly contemplates both the demand requirement and the possibility

10  that demand may be excused, [but] it does not create a demand requirement of any particular

11  dimension.").

12      Because the substantive demand requirement is established by state law, courts must

13  apply the law of the forum state—in this case, Washington State.  See Erie R.R. Co. v.

14  Thompkins, 304 U.S. 64, 78 (1938).  Washington State sets forth its own procedural demand

15  requirement for shareholder derivative actions in RCW 23B.07.400(2), which provides as

16  follows:

17          A complaint in a proceeding brought in the right of a corporation must be
           verified and *allege with particularity the demand made, if any, to obtain action*
18         *by the board of directors and either that the demand was refused or ignored or*
           *why a demand was not made.*  Whether or not a demand for action was made, if
19         the corporation commences an investigation of the charges made in the demand
           or complaint, the court may stay any proceeding until the investigation is
20         completed.

21  (Emphasis added).

22      The parties in this case agree that Washington State courts have not interpreted or

23  applied this *procedural* demand requirement, nor have they specifically adopted an

24  underlying *substantive* demand requirement.  As a result, both parties rely heavily on case

25  law from other jurisdictions, including the relatively well-developed body of law from

26

ORDER   -6-

Delaware.[3]  The "substantive" demand requirement for Delaware is found in Delaware's common law.  "[T]he right of a stockholder to prosecute a derivative suit is limited to situations where the stockholder has demanded that the directors pursue the corporate claim and they have wrongfully refused to do so or where demand is excused because the directors are incapable of making an impartial decision regarding such litigation."  Rales v. Blasband, 634 A.2d 927, 932 (Del. 1993) (noting the connection between this substantive requirement and the procedural requirement in Chancery Court Rule 23.1).  The underlying purpose of this requirement is based on the fundamental principle that the "directors of a corporation and not its shareholders manage the business and affairs of the corporation" and the "decision to bring a law suit or to refrain from litigating a claim on behalf of a corporation is a decision concerning the management of the corporation."  Levine v. Smith, 591 A.2d 194, 200 (Del. 1991), overruled on other grounds by Brehm v. Eisner, 746 A.2d 244, 253 n.13 (Del. 2000).

Although relying heavily on Delaware law in their analysis, Plaintiffs suggest that the Court should not necessarily rely on such law but instead look to the plain language of RCW 23B.07.400(2) and a two-page unpublished case from the Middle District of Tennessee discussing Tennessee's procedural demand requirement statute, which is identical to the Washington State statute.  See In re Direct General Corp. Sec. Litig., 2005 WL 1895638 (M.D. Tenn. August 3, 2005).  The Direct General Court's analysis of the demand requirement was extremely limited, finding "that the allegations of the Verified Complaint are sufficient to excuse the demand otherwise required under Tennessee law" and that the

---

[3] Delaware has adopted a procedural demand requirement, which is found in Delaware Chancery Court Rule 23.1, as follows:

> The complaint shall also allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and the reasons for the plaintiff's failure to obtain the action or for not making the effort.

1  plaintiffs had "shown that the decision-makers' interests and independence herein are

2  sufficiently compromised by the actual allegations against them to excuse demand." Id. at

3  *1.  The single Tennessee state law case relied upon by Direct General cites extensively to

4  Delaware demand requirement and business judgment rule cases.  See Lewis v. Boyd, 838

5  S.W.2d 215, 222 (Tenn. App. 1992), (citing Aronson v. Lewis, 473 A.2d 805, 814 (Del.

6  1984) and Levine, 591 A.2d at 212, regarding interestedness and independence).  Thus,

7  Direct General does not provide support for Plaintiffs' contention that Washington State

8  courts would deviate from the long-held corporate law standards of Delaware, nor does it

9  provide any analysis that is useful in disposing of this motion to dismiss.

10      Rather than simply rely on Direct General as Plaintiffs suggest, this Court must

11  attempt to "predict how the highest court of the state would decide the case if presented with

12  the case today."  See Boland v. Engle, 113 F.3d 706, 710 (7th Cir. 1997).  The Boland Court

13  noted that this analysis may involve the consideration of relevant authority of other

14  jurisdictions that have addressed the issue.  Id. at 711-12 (noting that "Delaware corporate

15  law is undoubtedly persuasive authority" but concluding that it is not necessarily dispositive).

16  Ultimately, the Boland Court found the trend towards narrowing the exceptions to the

17  demand requirement persuasive and held that Boland's failure to make a demand was not

18  excused.  Id. at 713-14.  In this Case, RCW 23B.07.400(2) strongly implies the existence of a

19  substantive demand requirement in Washington State as does the underlying policy rational

20  (i.e., business decisions are within the province of the Board of Directors and a shareholder

21  demand is a business decision).  Accordingly, the Court concludes that the Washington State

22  Supreme Court would likely adopt the substantive demand requirement and apply a similar,

23  if not the same, exception for futility as that employed in Delaware.

24

25

26

ORDER   -8-

1     **B.**     **Shareholder Demand Requirement and the Futility Exception**

2     As described by the Supreme Court of Delaware, "the right of a stockholder to

3 prosecute a derivative suit is limited to situations where the stockholder has demanded that

4 the directors pursue the corporate claim and they have wrongfully refused to do so or where

5 demand is excused because the directors are incapable of making an impartial decision

6 regarding such litigation." Rales v. Blasband, 634 A.2d at 932. Plaintiffs acknowledge that

7 no demand was submitted to Cray's Board of Directors in this case. VADC ¶ 119.

8 Accordingly, dismissal is required unless Plaintiffs' failure to comply with the demand

9 requirement was excused under the so-called "futility" exception. See Rales, 634 A.2d at

10 933-34.

11     Where, as in this case, the plaintiffs in a derivative suit do not challenge any specific

12 decision of the board, courts must "examine whether the board that would be addressing the

13 demand can impartially consider its merits without being influenced by improper

14 considerations." Id. at 934.[4] Courts must look to the complaint and determine "whether or

15 not the *particularized factual allegations* of a derivative stockholder complaint create a

16 *reasonable doubt* that, as of the time the complaint is filed, the board of directors could have

17 properly exercised its *independent and disinterested* business judgment in responding to a

18 demand." Id. (emphasis added). As one court described it, "the entire review is factual in

19 nature." In re Cedant Corp. Derivative Litig., 189 F.R.D. 117, 128 (D. N.J. 1999) (citing

20 Aronson, 473 A.2d at 814). The inquiry requires courts to look to the totality of the

21 circumstances in assessing whether a complaint creates a "reasonable doubt" concerning the

22 board's independence or disinterestedness:

23

24 _____

25 [4] In cases where the plaintiff challenges a specific transaction, the demand requirement may be excused where the plaintiff can show that the transaction was not a product of a valid

26 exercise of the defendants' business judgment. See Aronson, 473 A.2d at 814. Here, Plaintiffs do not suggest that this prong of Aronson is applicable.

ORDER   -9-

> Terms like reasonable doubt, for example, help guide judgment but, are not scientific.  In making the required judgment no single factor—such as receipt of directorial compensation; family or social relationships; approval of the transaction attacked; or other relationships with the corporation (e.g., attorney or banker)—may itself be dispositive in any particular case.  Rather the question is whether the accumulation of all factors creates the reasonable doubt to which <u>Aronson</u> refers.

<u>Harris v. Carter</u>, 582 A.2d 222, 229 (Del. Ch. Ct. 1990).  "[T]he concept of reasonable doubt is akin to the concept that the stockholder has a 'reasonable belief' that the board lacks independence."  <u>Grimes v. Donald</u>, 673 A.2d 1207, 1217 n.17 (Del. 1996), <u>overruled on other grounds by</u> <u>Brehm v. Eisner</u>, 746 A.2d 244, 253 n.13 (Del. 2000).

Based on these standards, Plaintiffs' failure to make a demand is excused for futility only if a majority (five) of the members of Cray's Board of Directors, as constituted at the time of filing the VADC, were either "interested" or "lacked independence."  Although the Plaintiffs allege 16 separate reasons why a majority of the members of Cray's Board were either interested or lacked independence (meaning a demand on Cray would have been a "futile, wasteful and useless act"), Plaintiffs discuss only four of these allegations in their opposition to Defendants' demand requirement motion.  <u>See</u> VADC ¶ 119(a), (c)-(e); Pls.' Opp., at 11-15.  The Court limits its analysis of Plaintiffs' futility allegations to only those that Plaintiffs support with argument.[5]

---

[5] Even a cursory review of the remaining allegations reveals that they are generic and conclusory under the "interested" and "independent" standards discussed below.  <u>See</u> ¶¶ 119(b) (allegation that current directors are not independent of compensation committee), (f) (allegation that directors breached fiduciary duties), (g) (generic allegation of inter-related familiar, business, professional and personal relationships), (h) (generic allegation of knowledge of and/or benefits from wrongdoing), (i) (generic allegation of participation in and/or approval of wrongdoing), (j) (generic allegation that directors would be forced to sue themselves), (k) (repeated allegation of fiduciary duty violations), (l) (generic allegation that Board authorized and/or permitted false statements), (m) (allegation that suit by current directors would "likely expose" directors and officers to further violations of securities laws), (n) (allegation that Cray will be exposed to further losses), (o) (allegation that allowing derivative suit to move forward would expose directors to liability in the class action suits), (p) (allegation that directors may face uninsured liability).

1    **1.    Interested Board Members**

2    The <u>Rales</u> Court succinctly described the "interest" considerations as follows: "A

3    director is considered interested where he or she will receive a personal financial benefit that

4    is not equally shared by the stockholders.  Directorial interest also exists where a corporate

5    decision will have a materially detrimental impact on a director, but not on the corporation

6    and the stockholders."  634 A.2d at 936.  However, "the mere threat of personal liability for

7    approving a questioned transaction, standing alone, is insufficient to challenge . . . [the]

8    disinterestedness of directors."  <u>In re Sagent Tech., Inc., Derivative Litig.</u>, 278 F. Supp. 2d

9    1079, 1089 (N.D. Cal. 2003) (quoting <u>Aronson</u>).  In other words, "[a] plaintiff may not

10    bootstrap allegations of futility by pleading merely that the directors participated in the

11    challenged transaction or that they would be reluctant to sue themselves."  <u>Id.</u> (citations

12    omitted).

13    In <u>Sagent</u>, plaintiffs alleged that a demand was futile because three of the six board

14    members were either interested or lacked independence.  278 F. Supp. 2d 1079, 1088 (N.D.

15    Cal. 2003).  One member, Zicker, was allegedly interested because he sold common stock for

16    more than $1.3 million in proceeds.  <u>Id.</u> 1088-89.  Plaintiffs alleged that Zicker did so while

17    "in possession of material, adverse nonpublic information."  <u>Id.</u>  The <u>Sagent</u> Court concluded

18    that this generic allegation was insufficient to demonstrate "a substantial likelihood" that

19    Zicker would be liable for insider trading.  <u>Id.</u> at 1089.  Additionally, the plaintiffs in <u>Sagent</u>

20    alleged that the members of Sagent's Audit Committee "failed to establish and maintain

21    adequate internal accounting controls and to ensure that the company's financial statements

22    were based on accurate information."  <u>Id.</u> at 1084-85.  However, they apparently did not

23    allege that this failure rendered the audit committee interested.

24    At the time Plaintiffs filed this derivative suit, the members of Cray's Board of

25    Directors included Rottsolk, Smith, Jones, Kennedy, Kiely, Lederman, Narodick, Regis, and

26    Richards.  Plaintiffs' opposition brief relies on only two allegations to demonstrate

ORDER   -11-

1  interestedness: (1) Regis, Richards, Narodick, and Lederman are interested because they are

2  members of Cray's Audit Committee ("Audit Committee Directors") (VADC ¶ 119(e)); and

3  (2) Rottsolk, Smith, Kennedy, and Regis are interested because they sold Cray stock during

4  the Relevant Period ("Selling Directors") (VADC ¶ 119(a)).[6]  Pls.' Opp., docket no. 22, at

5  12-15.  Because Plaintiffs must demonstrate that a total of five members were interested or

6  lacked independence, the demand requirement is only excused if they establish that one

7  group or the other is interested *and* there is at least one additional director who was either

8  interested or who lacked independence (for a total of five).  The Court turns now to an

9  examination of the allegedly interested directors.

10  ### a.      Audit Committee Directors

11  According to Cray's 2005 Proxy, Cray's Audit Committee "assists the Board of

12  Directors in fulfilling its responsibility for oversight of" the following: "[1] the quality and

13  integrity of [Cray's] accounting and financial reporting processes and the audits of [Cray's]

14  financial statements; [2] the qualifications and independence of the public auditing firm

15  engaged to issue an audit report on [Cray's] financial statements; [3] the performance of

16  [Cray's] systems of internal controls, disclosure controls and internal audit functions, and [4]

17  [Cray's] procedures for legal and regulatory compliance, risk assessment and business

18  conduct standards."  VADC ¶ 29(A).  Plaintiffs allege that these duties required the Audit

19  Committee to review and discuss financial reporting and accounting policies with

20  management and auditors, review and approve SEC filings in advance, oversee

21  disagreements between management and auditors, and recommend whether financial

22  statements should be included in the 10-K Reports.  Id.

23

24

25

26  [6] Plaintiffs allege that Johnson and Poteracki sold stock during the Relevant Period.  VADC ¶ 115.  However, those Defendants were not directors when this action commenced.

ORDER   -12-

1    In their opposition brief, Plaintiffs argue that three cases support their contention that

2  Cray's Audit Committee Directors are interested under the <u>Rales</u> test.[7]  <u>Cedant</u>, 189 F.R.D.

3  117; <u>In re Lernout & Hauspie Sec. Litig.</u>, 286 B.R. 33 (D. Mass. 2002); <u>In re Oxford Health</u>

4  <u>Plans, Inc. Sec. Litig.</u>, 192 F.R.D. 111 (S.D.N.Y. 2000).  First, Plaintiffs state that the <u>Cedant</u>

5  Court "found demand to be futile in part because it was the Audit Committee's responsibility

6  to catch and correct the accounting irregularities."  Resp. Br. at 13.  This interpretation of

7  <u>Cedant</u> is mistaken.  Plaintiffs cite the "Background" section of the <u>Cedant</u> Court's Order,

8  which noted that the Audit Committee was "specifically informed" that its income was

9  overstated prior to the date Cedant publicly announced that information and, while in

10  possession of this information, several members of the Audit Committee sold a total of 1.8

11  million shares of Cedant stock in the months before the announcement.  189 F.R.D. at 125;

12  Pls.' Opp., at 13 n.14.  However, the "Demand" section of the <u>Cedant</u> Court's analysis is

13  devoid of any suggestion that the Audit Committee members were interested merely because

14  they were on the Audit Committee.  <u>Id.</u> at 128-29 (citing instead the benefits directors

15  received from transactions, the sale of millions of shares of stock by directors while in

16  possession of adverse information, and the "significant personal liability" directors faced

17  from a pending class action suit).  In this case, the VADC alleges only that the Audit

18  Committee "recommended that the Board include the improper financial statements and

19  publish the improper and misleading press releases throughout the Relevant Period" and that

20  such actions breached the Audit Committee's fiduciary duties.  VADC ¶ 119(e).  <u>Cedant</u>

21  provides no helpful analysis as to these demand futility allegations.

22

23

24  [7] At argument, Plaintiffs' counsel stated that they also relied on <u>In re Caremark Int'l, Inc.,</u>
     <u>Derivative Litig.</u>, 698 A.2d 959 (1996), to support the argument that the Audit Committee

25  is "interested."  <u>Caremark</u> was discussed in Plaintiffs' brief with regard to the exculpatory
     provisions in Cray's bylaws and was not discussed in the "Audit Committee" section of

26  Plaintiffs' brief.  <u>See</u> Pls.' Opp., at 12-13, 15-16.  In any event, <u>Caremark</u> is also discussed
     below.

1    Second, <u>Lernout</u> is inapposite as it provides no analysis of the demand requirement

2    and addressed only a motion to dismiss for failure to allege facts sufficient to state claims for

3    breach of fiduciary duties.  <u>Lernout</u> did not apply the "interestedness" standard established in

4    <u>Rales</u> and, in fact, involved class action claims under Section 10(b) of the Securities

5    Exchange Act rather than a derivative action.  286 B.R. at 37-38.

6    Finally, the <u>Oxford</u> Court offered a lengthy recitation of the demand futility standards

7    and proceeded to conclude demand was excused without any discussion of which specific

8    directors were interested or lacked independence.  192 F.R.D. at 115-18 (concluding that it

9    "appears unnecessary . . . to address the issue of the independence or disinterestedness of the

10   Directors individually").  Instead, the <u>Oxford</u> Court looked generally to the insider trading

11   allegations.  <u>Id.</u> at 117-18.  Contrary to Plaintiffs' suggestion, <u>Oxford</u> is devoid of any

12   discussion regarding the interestedness of the Audit Committee but merely states generally,

13   and without citation, that knowledge of another's improper insider trading is enough to

14   demonstrate interestedness.  <u>Oxford</u> does not support Plaintiffs' contention that the Audit

15   Committee Directors are interested by virtue of their place on the Audit Committee.

16   Plaintiffs' additional reliance on <u>Caremark</u> is also misplaced.  <u>Caremark</u> did not

17   address demand futility, but only stated the liability standard for certain breaches of the duty

18   of care.  698 A.2d at 970 (director's obligation includes a duty to attempt in *good faith* to

19   assure that a corporate information and reporting system exists and failure to do so may, in

20   theory, render a director liable for losses caused by non-compliance).  The <u>Caremark</u> Court

21   held that "only a sustained or systematic failure of the board to exercise oversight—such as

22   an utter failure to attempt to assure a reasonable information and reporting system

23   exists—will establish the lack of good faith that is a necessary condition to liability."  <u>Id.</u> at

24   971.  The Court described such a claim as "possibly the most difficult theory in corporation

25   law upon which a plaintiff might hope to win a judgment" and noted that, even if the harm to

26   the corporation was caused by a violation of the criminal law, it is not necessarily enough to

create a breach of fiduciary duty.  Id. at 967, 972.  To demonstrate that the Audit Committee

is interested as the result of a possible Caremark claim, Plaintiffs must provide

"particularized factual allegations" that the members face a "materially detrimental impact"

if the claim were to proceed.  See Rales, 634 A.2d at 934, 936.  The "mere threat" of liability

under a Caremark claim is not enough.  Sagent, 278 F. Supp. 2d at 1089.  Although the

VADC alleges broadly that Cray was "virtually devoid of internal controls, processes and

procedures in every area of the finance and accounting departments," Plaintiffs have not

provided "particularized factual allegations" suggesting that (assuming this characterization

is true for purposes of the motion) it was the result of a "sustained or systematic failure" by

the Audit Committee.  See VADC 119(e).

In sum, Plaintiffs' "demand futility" cases do not stand for the proposition that a

committee assigned the general oversight responsibility of the activities underlying a

derivative complaint (e.g., establishing accounting controls and guarding against

irregularities) is per se "interested."  Nor have Plaintiffs adequately alleged facts that suggest

a substantial likelihood of liability under a Caremark duty of care claim.  Plaintiffs must

allege facts that state "with particularity" the manner in which a given director is interested.

See RCW 23B.07.400(2).  The mere threat of personal liability alone is insufficient.  Sagent,

278 F. Supp. 2d at 1089.  Plaintiffs' generic allegation regarding the Audit Committee

Directors fails to demonstrate that those Directors are interested.

**b.    Insider Sales**

The VADC alleges that the Selling Directors include Rottsolk, Smith, Regis, and

Kennedy.  VADC ¶ 119(a).  In its motion to dismiss, Cray contends that (1) Kennedy was an

outside director presumed to have no information about day-to-day company affairs, and (2)

Kennedy's one sale occurred in August 2003, which, while in the Relevant Period, was

before the FY 2004 issues Plaintiffs rely upon.  In response, Plaintiffs apparently abandon

the allegation that Kennedy is interested as a result of his single stock sale during the

1    Relevant Period.  See Pls.' Opp., at 14 (no discussion of Kennedy).  Accordingly, the Selling

2    Directors, for purposes of this analysis, include only Rottsolk, Smith, and Regis.

3         The VADC alleges that the Selling Directors were privy to the adverse, non-public

4    information regarding Cray's accounting systems when they sold shares of Cray stock during

5    the Relevant Period.  VADC ¶ 119(a).  The Selling Directors engaged in at least nine

6    separate sales during the Relevant Period.  Id. ¶ 115 (Sales Schedule).[8]

7         In support of their argument that the Selling Directors were interested, Plaintiffs rely

8    on a single unpublished opinion from the Delaware Chancery Court.  See Zimmerman v.

9    Braddock (Zimmerman II), 2005 Del. Ch. Lexis 135 (Del. Ch. 2005).  In Zimmerman II,

10   nominal defendant Priceline licensed its technology to a separate privately-held company,

11   WebHouse, in return for royalties.  Id. at *8.  In the derivative action, the plaintiff alleged

12   that Priceline's management knew that WebHouse was losing $5 million a week and having

13   technical problems causing the website to crash.  Id. at *9.  In spite of these problems,

14   Priceline's management continued to publicly tout the prospects of the technology and its

15   relationship with WebHouse.  Id. at *10.  During this period, three of Priceline's directors

16   sold approximately $248 million worth of Priceline's stock in just 45 days.  Id. at *11 n.21.

17   In determining whether these three directors were interested for purposes of the demand

18   futility analysis, the Delaware Chancery Court reasoned as follows:

19   A reasonable inference from the Plaintiff's allegations is that the Selling Defendants had
     knowledge – directly and by imputation – of Priceline and WebHouse's problems.  In
20   addition, it is a reasonable inference that the public was not aware of Priceline's true
     predicament because its problems – even if they had been partially disclosed – were likely
21   overshadowed by the public hyperbole of Priceline's executives.

22   . . .

23   When the sheer size of the trades (collectively, approximately $248 million dollars) is
     combined with the Plaintiff's well-pled allegations of insider trading culpability, the Selling
24   Defendants, for motion to dismiss purposes, can be viewed as facing substantial personal

25   _____

26   [8] Plaintiffs' schedule of stock sales omits Individual Defendant Smith.  Id. at ¶ 115.  Plaintiffs
     allege that Smith sold 49,548 shares for a total of $539,052 but do not provide the number of
     trades or dates of each trade.  Id. at ¶ 119(a)(ii).

1    liability even though the materiality of the trades (or the consequences of an action
     challenging them) to the Selling Defendants has not been specifically pled.
2    . . .

3    The question with regard to demand futility is whether the trading directors could impartially
     consider a shareholder's demand upon the corporation to pursue a claim against them based
4    on their trades.  In light of the allegations in the Second Amended Complaint and the value
     of the Selling Defendants' trades, it is a reasonable inference that the Selling Defendants
5    would be personally and significantly concerned about, and opposed to, any such demand
     and, thus, interested in whether the Priceline Board would pursue a claim based on their
6    trades.

7    Id. at *32-35.  Also, in Zimmerman I, 2002 Del. Ch. LEXIS 145, *8 n.64, the selling

8    defendants did not even contest the fact that they were interested as a result of the $248

9    million in stock sales, which was likely a consideration for the Zimmerman II Court.  Id. at

10   *29.

11        In this case, Plaintiffs contend that the Selling Directors were privy to inside

12   information concerning "the complete absence of the Company's internal controls and the

13   difficulties Cray was encountering producing and qualifying its new products" as a result of

14   their positions as CEO (Rottsolk), employee (Smith), and Chairman of Cray's Audit

15   Committee (Regis).  Pls.' Opp., at 14.  Plaintiffs cite no other allegations in the VADC that

16   state what specific information Rottsolk, Smith, and Regis knew, or when they would have

17   become aware, of such information in relation to each stock sale.

18        Cray argues that Plaintiffs' insider trading claims do not demonstrate "interestedness"

19   because (1) Regis was (like Kennedy) an outside director, (2) Plaintiffs' allegations are

20   conclusory and insufficient under the case law, and (3) the sales by Rottsolk and Smith were

21   made pursuant to Rule 10b5-1 plans, which provides an affirmative defense.  First, Cray

22   notes that Regis was an outside director during the entire Relevant Period and that the law

23   presumes that outside directors are not responsible for false or misleading information under

24   the "group published information" rule.  See In re GlenFed, Inc., Sec. Litig., 60 F.3d 591,

25   593 (9th Cir. 1995).  In GlenFed, the Ninth Circuit held that "[m]erely because the complaint

26   identifies a corporation's outside directors, various committee assignments, and generic

ORDER  -17-

1   responsibilities for every committee" does not mean such outside directors are responsible

2   for information published on behalf of the group.  Id.  Plaintiffs do not directly respond to

3   this argument and appear to rely only on the fact that Regis was the Chairman of Cray's

4   Audit Committee.

5       Second, Cray contends that at least two cases applying Delaware law, Sagent and

6   Guttman v. Huang, 823 A.2d 492 (Del. Ch. Ct. 2003), have held that similar insider trading

7   claims were insufficient to demonstrate interestedness.  In Sagent, the plaintiffs alleged that

8   Zicker "sold 80,000 shares of Sagent common stock while in the possession of material,

9   adverse, non-public information," reaping a $1.3 million profit.  278 F. Supp. 2d at 1088.

10  The Sagent Court concluded that the director was not interested because the complaint

11  contained no allegation that the director was in possession of any particular material adverse

12  information when he sold Sagent stock.  Id. at 1089.  Similarly, in Guttman, the complaint

13  alleged that "each of the defendants who sold during the contested period was in possession

14  of material, non-public information and traded to his personal advantage using that

15  information."  823 A.2d at 496.  The complaint also stated that "[e]ach of the defendants was

16  in a position to know of the improper accounting practices engaged in by NVIDIA" and

17  "[e]ach of the defendants engaged in trades shortly after NVIDIA released a financial

18  statement that was later restated."  Id. at 496-97.  The Guttman Court concluded that these

19  allegations were "wholly conclusory" and did not include "well-pled, particularized

20  allegations of fact detailing the precise roles that these directors played at the company, the

21  information that would have come to their attention in those roles, and any indication as to

22  why they would have perceived the accounting irregularities."  Id. at 503.

23      Finally, Cray contends that the trades by Rottsolk and Smith are subject to an

24  affirmative defense because those trades were effectuated under 10b5-1 plans that

25  automatically dictated the amount and timing of the sales.  For example, Rottsolk's

26  scheduled sales included 15,000 shares each in August, September, October, and November

ORDER   -18-

2003, and January 2004.  VADC ¶ 115.  In response, Plaintiffs argue that a ruling on this affirmative defense would only be appropriate in a summary judgment motion after the case has been developed factually through discovery.  Plaintiffs are correct that the Court may not consider affirmative defenses at this juncture, particularly where Defendants have not yet filed an Answer to the VADC.

While the interestedness determination for insider sales is not entirely clear, the cases support Cray's contention that the Plaintiffs' allegations are insufficient.  Both <u>Sagent</u> and <u>Guttman</u> analyzed nearly-identical allegations regarding insider sales and found those allegations conclusory and insufficient to demonstrate interestedness.  In contrast, the more recent unpublished opinion in <u>Zimmerman II</u> held that similar allegations were sufficient to demonstrate interestedness.  However, the <u>Zimmerman II</u> Court gave significant weight to the "sheer size of the trades (collectively, approximately $248 million dollars)," all of which occurred in 45 days.  2005 Del. Ch. Lexis 135 at *11, 33-35.  That volume of trading is absent from this case, where the Selling Defendants sold a total of 161,527 shares of Cray stock for approximately $1.71 million in proceeds over a 16-month period.  <u>See</u> VADC ¶¶ 115, 119(a) (sales occurred from August 2003 to December 2004).  As a result, the weight of authority analogous to this case supports Defendants' argument and the Court concludes that the Selling Directors were not interested.[9]

### 2.    Independence of Board Members

The <u>Rales</u> Court described the "independence" considerations as follows:

> [I]ndependence means that a director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences.  To establish a lack of independence, [plaintiff] must show that the directors are beholden to the [interested directors] or so under their influence that their discretion would be sterilized.

_____

[9] The Court also notes that, for the reasons discussed in Part II.B below, common law insider trading claims are not available in Washington State.  Because the Selling Directors are not subject to personal liability for derivative insider trading claims, the sufficiency of the "interestedness" futility allegation is further diminished.

634 A.2d at 936 (quotations and citations omitted).  In <u>Texlon Corp. v. Myerson</u>, the

Delaware Supreme Court elaborated on this standard, stating as follows:

> A controlled director is one who is dominated by another party, whether
> through close personal or familial relationship or through force of will.  A
> director may also be deemed "controlled" if he or she is beholden to the
> allegedly controlling entity, as when the entity has the direct or indirect
> unilateral power to decide whether the director continues to receive a benefit
> upon which the director is so dependent or is of such subjective material
> importance that its threatened loss might create a reason to question whether
> the director is able to consider the corporate merits of the challenged
> transaction objectively.

802 A.2d 257, 264 (Del. 2002).

In a single paragraph of argument, Plaintiffs contend that two members of Cray's

Board, Rottsolk and Smith, are not independent.  Pls.' Opp., at 11-12 (arguing Rottsolk and

Smith are not independent because they rely on substantial income from Cray as employees).

Plaintiffs are correct.  In <u>Rales</u>, the Court found that two members of the board (Sherman, the

CEO, and Ehrlich, the President of a related company) lacked independence from two

controlling directors where they received large salaries from the companies and, therefore, it

could be inferred that they were beholden.  634 A.2d at 937.[10]  Additionally, Defendants do

not respond to Plaintiffs' argument that Rottsolk and Smith lack independence and, at

argument, Defendants' counsel all but conceded that the Delaware cases hold as such.

Therefore, the Court presumes that the argument has merit and concludes that Rottsolk and

Smith are "interested" for purposes of this motion.

### 3.    Plaintiffs have not Established that Demand was Futile

Under the demand futility analysis, Plaintiffs must demonstrate through the

allegations contained in the VADC that a majority (five) of the members of Cray's Board of

---

[10] <u>But see</u> <u>Sagent</u>, 278 F. Supp. 2d at 1089 (board members do not lack independence based
solely on their positions and the monetary compensation they received in connection with
their duties as employee and consultant for the company).  However, the <u>Sagent</u> Court relied
only on a pre-<u>Rales</u> case from Delaware for this proposition and, therefore, does not provide
a helpful analysis.  <u>See</u> <u>id.</u> (citing <u>Grobow v. Perot</u>, 539 A.2d 180, 188 (Del. 1988)).

1  Directors are either interested or lack independence.  <u>Rales</u>, 634 A.2d at 933-34.  Plaintiffs

2  have failed to make such a showing.  The relevant case law does not hold that a director is

3  interested merely by virtue of sitting on an Audit Committee while the corporation faces

4  accounting and audit irregularities.  Similarly, the weight of authority suggests that Rottsolk,

5  Smith, and Regis are not interested as a result of having sold shares of Cray stock during the

6  Relevant Period.  Both <u>Sagent</u> and <u>Guttman</u> specifically held that insider sales such as those

7  at issue here were insufficient, and the lone, unpublished case cited by Plaintiffs is

8  distinguishable to the extent that the proceeds in this case ($1.71 million) are vastly

9  disproportionate to <u>Zimmerman</u>, where the Court noted the "sheer size of the trades" ($248

10  million).   Finally, the only directors who lack independence are Rottsolk and Smith.[11]

11  Accordingly, the Court GRANTS Defendants' motion to dismiss for failure to comply with

12  the pre-litigation demand requirement.

13  **II.    <u>Individual Defendants' Motion to Dismiss</u>**[12]

14         In addition to joining Cray's motion to dismiss for failure to comply with the demand

15  requirement, the Individual Defendants move separately to dismiss the VADC for failure to

16  comply with the pleading requirements in Rule 9(b), and failure to state claims upon which

17  relief can be granted under Rule 12(b)(6).  First, the Individual Defendants contend that the

18  VADC alleges a "unified course of fraudulent conduct," requiring Plaintiffs to state those

19  fraud allegations with particularity.  Second, the Individual Defendants argue that Plaintiffs'

20  two claims relating to insider trading may not be brought in a derivative action.  <u>See</u> VADC

21  ¶¶ 120-24 (Count I: Breach of Fiduciary Duty for Misappropriate Information), 145-47

22

23  [11] The Court notes that even if the Selling Directors were interested, Plaintiffs fail to

24  demonstrate that a majority of Cray's Board is impartial because Rottsolk and Smith are in
both groups.

25

26  [12] The motion to dismiss for failure to adequately plead demand futility is also GRANTED as
to the Individual Defendants, who incorporate that argument by reference into their motion to
dismiss.  The Court will also consider the Individual Defendants' separate motion to dismiss.

1   (Count VI: Unjust Enrichment).  Third, the Individual Defendants contend that Plaintiffs'

2   claims for breach of fiduciary duties, abuse of control, gross mismanagement, and waste

3   (Counts II, III, IV, and V, respectively) must be dismissed because Plaintiffs fail to allege

4   any cognizable claim for damages.  Finally, the Individual Defendants contend that

5   Plaintiffs' claim for corporate waste must also be dismissed for failure to allege facts

6   sufficient to state a claim.

7   **A.    Failure to Plead Fraud Under Federal Rule of Civil Procedure 9(b)**

8        Under FED. R. CIV. P. 9(b), "[i]n all averments of fraud or mistake, the circumstances

9   constituting fraud or mistake shall be stated with particularity."  In general, Rule 9(b)

10  requires fraud allegations to include "the who, what, when, where, and how of the

11  misconduct charged."  Vess v. CIBA-Geigy Corp., USA, 317 F.3d 1097, 1106 (9th Cir.

12  2003) (quotations omitted).  The Ninth Circuit has distinguished between cases in which

13  fraud allegations form the entire basis for a claim and cases in which there is both fraudulent

14  and non-fraudulent conduct underlying a claim:

15       In some cases, the plaintiff may allege a unified course of fraudulent conduct
         and rely entirely on that course of conduct as the basis of a claim.  In that
16       event, the claim is said to be "grounded in fraud" or to "sound in fraud," and
         the pleading of that claim as a whole must satisfy the particularity requirement
17       of Rule 9(b).
         . . .
18
         In other cases, however, a plaintiff may choose not to allege a unified course of
19       fraudulent conduct in support of a claim, but rather to allege some fraudulent
         and some non-fraudulent conduct.  In such cases, only the allegations of fraud
20       are subject to Rule 9(b)'s heightened pleading requirement.

21  Id. at 1103-04 (citations omitted).

22       Here, the parties' dispute centers on whether any or all of Plaintiffs' claims are

23  "grounded in fraud" such that they are entirely subject to Rule 9(b) or whether the fraud

24  allegations may be addressed separately.  The Individual Defendants argue that each claim is

25  grounded in fraud because Plaintiffs incorporate by reference allegations of

26  misrepresentation and concealment.  See VADC ¶¶ 3, 4, 7, 41-42 (alleging knowing

ORDER   -22-

1    misrepresentations, concealment of facts, misleading of analysts, and conspiracy).  The

2    Individual Defendants contend that these allegations are conclusory and fail to allege what

3    was false or misleading about the statements, which directors and officers knew they were

4    misleading, and when they knew it.

5        In response, Plaintiffs first argue that a number of their claims do not rely on

6    allegations of fraud.  In particular, Plaintiffs refer to their claims for (1) breach of the

7    fiduciary duties of good faith and due care, (2) gross mismanagement, and (3) waste.  These

8    claims are based in part upon allegations that the Individual Defendants failed to fulfill a duty

9    to implement effective internal controls over Cray's financial reporting.  See VADC ¶¶ 125-

10   130 (breach of fiduciary duty of care and good faith), 136-140 (gross mismanagement), 141-

11   144 (waste).  This argument has merit.  Plaintiffs allege that the Individual Defendants

12   "abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently

13   managing the assets and business of Cray" and failed "to conduct proper supervision."  Id. ¶¶

14   137, 142.  These allegations and the claims they support do not rely on or involve fraud.

15   Under the distinction described in Vess, the breach of duty of care, mismanagement, and

16   waste claims are not subject to Rule 9(b) and do not fail in their entirety as the Individual

17   Defendants contend.

18       Second, Plaintiffs argue that those claims dependant on averments of fraud may also

19   stand because the VADC satisfies the "particularity" requirement of Rule 9(b).  This

20   argument is not well taken.  In support of their position that they sufficiently alleged the

21   "who, what, where, when, and how" of the fraud allegations, Plaintiffs simply cite to

22   paragraphs 55, 63, 66-67, 75, 81, 93, 99, and 100 of the VADC, without further explanation.

23   However, these allegations are largely conclusory and redundant.  Paragraphs 55, 63, 66-67,

24   75, and 81 simply offer repeated citations to Cray's 10Q quarterly public disclosures, which

25   each state (with some minor variation) in relevant part as follows:

26           Based on the evaluation, our principal executive and financial officers each
             concluded that, as of the date of the evaluation, our disclosure controls and

ORDER   -23-

procedures were effective in providing reasonable assurance that material information relating to Cray and our consolidated subsidiaries is made known to management, including during the period when we prepare our periodic SEC reports.

Id. at ¶ 55.  The VADC alleges only that, in fact, Cray "did not have sufficient internal controls to ensure either that revenue was properly recognized or that financial information was accurately reported."  Id. at ¶ 56.  Plaintiffs do not explain why or when Cray's CEO and CFO stopped concluding that Cray's procedures were effective, nor do they state how or when the other Individual Defendants would have learned of this information.  Similarly, paragraphs 93, 99, and 100 merely cite Cray's disclosure that it expected to, and ultimately did, identify material weaknesses in its internal controls and accounting procedures.  The VADC fails to explain how these disclosures, which are apparently pled to demonstrate that the earlier statements were false, establish that the Individual Defendants knew the earlier statements were false when made.

Finally, Plaintiffs argue that much of the evidence related to the fraud allegations is in the hands of the Individual Defendants, essentially seeking to excuse the generality of the VADC until they can obtain such evidence through discovery.  See U.S. Ex. Rel. Lee v. SmithKline Beecham, Inc., 245 F.3d 1048, 1052 (9th Cir. 2001) ("Rule 9(b) may be relaxed to permit discovery in a limited class of corporate fraud cases where the evidence of fraud is within a defendant's exclusive possession."), overruled on other ground by Hollinger v. Titan Capital Corp., 914 F.2d 1564, 1575 (9th Cir. 1990).  However, the cases allowing for a relaxed application of Rule 9(b) continue to require significant particularity in the pleading.  See, e.g., Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1440 (9th Cir. 1987) (fraud allegations are "very precise" and specify "the exact dollar amount of each alleged overstatement, and the manner in which such representations were false and misleading"); Fed. Sav. and Loan Ins. Corp. v. Musacchio, 695 F. Supp. 1053, 1058-59 (N.D. Cal. 1988) ("In virtually every instance in which fraud is alleged the plaintiffs have set forth the time, place and manner of the allegedly fraudulent acts.").  No such precision or specificity is

ORDER   -24-

present in the VADC.  Thus, the Court also GRANTS the Individual Defendants' motion to dismiss the fraud allegations for failure to comply with Rule 9(b) and dismisses those claims without prejudice.[13]

### B.   Insider Trading Claims (Counts I and VI) Under Federal Rule of Civil Procedure 12(b)(6)

A motion to dismiss for failure to state a claim under FED. R. CIV. P. 12(b)(6) may be granted only where it appears beyond a reasonable doubt that the plaintiff can prove no set of facts that would entitle the plaintiff to relief.  Conley v. Gibson, 355 U.S. 41, 45-46 (1957).  Allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party.  Smith v. Jackson, 84 F.3d 1213, 1217 (9th Cir. 1996).  However, conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss.  Associated Gen. Contractors v. Metro. Water Dist. of So. Cal., 159 F.3d 1178, 1181 (9th Cir. 1998).

The Individual Defendants raise four arguments in support of their motion to dismiss the insider trading claims (Counts I and VI) for failure to state a claim: (1) not all of the Individual Defendants sold stock during the relevant period and those that did not should be dismissed as to the insider trading claims; (2) several of the Selling Defendants sold pursuant to 10b5-1 plans, which provides an affirmative defense; (3) several of the Selling Defendants *purchased* and continued to hold shares during the Relevant Period; and (4) there is no common law derivative cause of action for insider trading because Cray sustained no damages.  Defs.' Mot. at 6-9.

The Individual Defendants' first three arguments are not well developed and are without merit in the context of a 12(b)(6) motion to dismiss.  First, the VADC refers to the

---

[13] The claims based in fraud include Count I (breach of fiduciary duty of loyalty and good faith for insider selling), Count II (breach of fiduciary duty of loyalty and good faith for improperly misrepresenting Cray's financial statements), part of Count V (waste caused by improper public statements, financial results and prospectus), and Count VI (unjust enrichment for insider selling on the basis of misrepresented financial information).

1    "Insider Selling Defendants" in Count I and the "defendants" in Count VI.  See VADC ¶¶

2    120-124, 145-147.  Plaintiffs specify which Individual Defendants sold Cray stock during the

3    Relevant Period.  Id. ¶ 115.[14]  Thus, under the minimal notice pleading requirement of Rule

4    8(a), the VADC adequately identifies the Individual Defendants at issue in Counts I and VI.

5    Second, the 10b5-1 argument is, as the Individual Defendants acknowledge, an affirmative

6    defense.  The Individual Defendants have filed no Answer to the VADC and, therefore,

7    alleged no affirmative defenses.  The Court will not dismiss the insider sales claims on the

8    basis of a yet-to-be-pled affirmative defense, particularly where the Individual Defendants

9    bear the burden of proof.  See T. HAZEN, THE LAW OF SECURITIES REGULATION § 12.17 (5th

10   ed. 2002) (noting that courts require the defendant to demonstrate that stock sales were made

11   pursuant to a 10b5-1 plan).  Third, the Individual Defendants do not support their argument

12   that Smith, Johnson, Rottsolk and Poteraki should be dismissed because they purchased and

13   held additional shares during the Relevant Period.  The Individual Defendants cite no

14   authority for the proposition that a defendant's purchase of stock during a period of allegedly

15   unlawful insider sales entitles them to dismissal.

16          The more closely contested issue is whether a common law derivative claim for

17   insider selling even exists.  The Individual Defendants cite two cases holding that such

18   claims are not available and a leading corporate law treatise stating that a majority of courts

19   are in agreement.  See Freeman v. Decio, 584 F.2d 186, 192-95 (7th Cir. 1978) (claim

20   dismissed because (1) no damages to corporation and (2) defendants would be subject to

21   double liability given availability of Rule 10b(5) claims); Frankel v. Slotkin, 795 F. Supp. 76,

22   79-80 (E.D.N.Y. 1992) (claim dismissed for lack of actual damage to the corporation); 3A

23   WILLIAM M. FLETCHER, FLETCHER CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS §

24   1174 (perm. ed. 2002) ("[M]ost courts considering the issue have rejected a common law

25

26   [14] Plaintiffs have, however, mistakenly omitted Defendant Smith from this schedule, but they
     name Smith as a Selling Defendant in paragraphs 15 and 119(a).

corporate cause of action against directors and officers for insider trading").  The Individual

Defendants also note that Washington State generally requires a showing of damages for

breach of fiduciary duty and unjust enrichment claims.  See Interlake Porsche Audi, Inc. v.

Bucholz, 45 Wn. App. 502, 509 (1986) (showing of proximate causation of loss sustained by

corporation required); Bailie Communications, Ltd. v. Trend Bus. Sys., Inc., 61 Wn. App.

151, 159 (1991) (unjust enrichment claim requires showing defendants enriched themselves

at the expense of the corporation).

In response, Plaintiffs rely heavily on Brophy v. Cities Services Company, 70 A.2d 5,

8 (Del. Ch. 1949), which held that "[i]n equity, when the breach of a confidential relation by

an employee is relied on and an accounting for any resulting profits is sought, loss to the

corporation need not be charged in the complaint."  See also Diamond v. Oreamuno, 301

N.Y.S.2d 78, 83 (1969) (relying on Brophy in holding that there may be an insider trading

claim); Walton v. Morgan Stanley & Co., Inc., 623 F.2d 796, 798 (2d Cir. 1980) (stating that

Delaware courts have "consistently followed" Brophy's holding that a breach of fiduciary

duty is actionable absent an injury without analyzing Brophy's continued viability after the

implementation of 10b(5) liability).  In Brophy, the plaintiff alleged that the insider

defendant had knowledge of the corporation's plan to buy back its own stock on certain

prearranged dates. 70 A.2d at 6.  The plaintiff further alleged that the defendant breached a

duty of trust to the corporation by purchasing shares of the corporation's stock for himself

just before the buy-back and then selling the shares after the buy-back for a profit.  Id.

Plaintiffs' reliance on Brophy is misplaced.  In Freeman, the Seventh Circuit examined the

continued viability of Brophy in 1978 and reasoned that allowing derivative common law

claims for insider trading would create the problem of double liability because a statutory

remedy was available under Rule 10b(5).  584 F.2d at 195-96.  The Freeman Court also

distinguished Brophy on the grounds that, at least implicitly, the Brophy Court recognized

1   that the corporation did suffer potential harm in becoming a competitor in the market for its

2   own stock with the insider defendant who purchased shares contemporaneously.  Id. at 194.

3        Plaintiffs also cite an inapposite section of Fletcher's treatise on corporations, which is

4   inconsistent with the section relating specifically to the insider trading cases cited above.  See

5   Pls.' Opp., at 14 (citing FLETCHER, CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS at

6   § 888).  Finally, Plaintiffs cite the Zimmerman II Court's conclusion that the plaintiff had

7   adequately pled an insider trading claim where defendants sold approximately $248 million

8   in Priceline stock with the knowledge that Priceline's business relationship with WebHouse

9   was not succeeding.  2005 Del Ch. Lexis 135 at *8 n.84 (2005) (unpublished).

10       The Individual Defendants' argument with regard to the unavailability of insider

11  trading derivative claims has merit.  The Court finds persuasive the Seventh Circuit's

12  reasoning that Brophy is no longer relevant in this context because it was decided well before

13  private causes of action were available to individual shareholders under Rule 10b(5).  There

14  is also no dispute that Washington State case law acknowledges the general requirement that

15  damages are an essential element of derivative claims for breach of fiduciary duties and

16  unjust enrichment.  Thus, although it is an open question, the Court also concludes that the

17  Washington State courts would decline to adopt a common law derivative claim for insider

18  trading where there is no allegation of damage to the nominal defendant corporation.

19       The Court GRANTS the Individual Defendants' motion to dismiss Counts I (breach of

20  fiduciary duties by insider selling defendants) and VI (unjust enrichment) of the VADC for

21  this reason as well.

22       **C.    Failure to Adequately Plead Damages (Counts II-V)**

23       The Individual Defendants contend that Counts II (breach of fiduciary duties), III

24  (abuse of control), IV (gross mismanagement) and V (corporate waste) must be dismissed

25  because the VADC fails to allege any recoverable damages.  Counts II through IV simply

26  state that Cray has "sustained significant damages."  VADC ¶¶ 129, 133, 138.  Count V

1   alleges that the Individual Defendants caused Cray to waste corporate assets by "paying

2   incentive based bonuses to certain of its executive officers and incur [sic] potentially millions

3   of dollars of legal liability and/or legal costs to defend defendants' unlawful actions." Id. ¶

4   142.  Plaintiffs' opposition brief suggests that these claims are based on allegations that Cray

5   sustained damages in the form of (1) costs incurred to carry out internal investigations of,

6   and defend against, potential legal liability from the pending class action lawsuit, and (2)

7   harm to Cray's corporate image and good will that impairs Cray's ability to raise equity

8   capital or debt. Id. ¶¶ 38-39, 104.  The Individual Defendants maintain that these damage

9   allegations are speculative and unrecoverable.

10   **1.      Costs of Investigating and Defending Class Action**

11       The Individual Defendants rely on several cases holding that legal costs and potential

12   legal liability arising out of a separate class action suit are not recoverable damages in a

13   derivative action. See Defs.' Mot., at 10.  For example, in In re Symbol Technologies

14   Securities Litigation, the complaint alleged as damages that the corporation might be "caused

15   to pay amounts with regard to the claims asserted in the Class Action, or [] caused to pay any

16   legal fees and incidental expenses in connection with defending such claims." 762 F. Supp.

17   510, 516 (E.D.N.Y. 1991).  The District Court in Symbol deemed such damages

18   unrecoverable because they were contingent on the outcome of a class action suit in which no

19   judgment had been entered or settlement reached. Id.  The Individual Defendants provide

20   four other unpublished district court cases applying the same reasoning. See Dollens v.

21   Zionts, 2002 WL 1632261 *9 (N.D. Ill. 2002); In re United Telecomms., Inc., Sec.

22   Litigation, 1993 WL 100202 *3 (D. Kan. 1993); Daisy Sys. Corp. v. Fiengold, 1988 WL

23   166235 *4 (N.D. Cal. 1988); Falkenberg v. Baldwin, 1977 WL 1025 *4 (S.D.N.Y. 1977).

24       In response, Plaintiffs cite only a single unpublished case attached as a slip opinion to

25   their Response brief. See Mehlenbacher v. Jitaru, Case No. 04-cv-1118-Orl-22KRS (M.D.

26   Fl. June 6, 2005).  In Mehlenbacher, the plaintiff brought an indemnity and contribution

1   claim alleging damages for legal costs incurred by "the SEC investigation, the securities

2   fraud class actions, and the internal investigations of the Company."  Slip Op. at 10.  The

3   class action had been voluntarily dismissed without payment of settlement.  Id. at 9.  Without

4   discussion or citation to analogous cases, the District Court in Mehlenbacher simply

5   concluded that "Count II may not be a model of pleading, but it does pass muster under the

6   liberal Fed. R. Civ. P. 8(a) standard."  Id. at 10.  Mehlenbacher is not instructive due to its

7   lack of analysis or support.  In contrast, Symbol Technologies, Dollens, United

8   Telecommunications, Daisy Systems, and Falkenberg each held that derivative claims are

9   foreclosed when they merely allege damages based on the potential costs of investigating,

10  defending, or satisfying a judgment or settlement for what might be unlawful conduct.  The

11  Court concludes that Plaintiffs' damage allegations based on potential costs of the class

12  action suits are insufficient to state a claim for relief.

13              **2.      Loss of Goodwill and Increased Financing Costs**

14          The Individual Defendants argue that Plaintiffs cannot recover damages based on

15  allegations of lost goodwill and a "liar's discount" that will potentially increase the costs of

16  obtaining financing.  VADC ¶¶ 39, 104, 142.  Again, the Individual Defendants rely on

17  Symbol Technologies and similar cases which dismissed claims for such damages.  762 F.

18  Supp. at 517 (allegation that defendants undermined the company's credibility in the

19  marketplace was "boilerplate" and insufficient to withstand motion to dismiss).  See also

20  United Telecomms., 1993 WL 100202 at *2; Dollens, 2002 WL 1632261 at *9.

21          In response, Plaintiffs cite only the unpublished Cement-Lock v. Gas Technology

22  Institute, 2005 WL 2420374 at *13 (N.D. Ill. 2002), in which the plaintiff alleged the

23  following damages:

24          (1) misappropriation of millions of dollars in grant money, which prevented the
            development of the Technology and results in the future loss of profits from the
25          licensing of the Technology; (2) *harm to Cement-Lock Group's business
            reputation*; (3) lost business opportunities to market the Technology to other
26          individuals, corporations, or governmental entities, including Taiwan, Hong
            Kong, and China; and (4) devaluation of Cement-Lock Group's intellectual

1   property by wasted years in the lifespan of certain patents and confusion and
2   infringement on the Technology's service mark and trademark.

3   (Emphasis added).  With reference to all of these allegations, the <u>Cement-Lock</u> Court stated

4   only: "Such damages are neither speculative nor remote.  Under the common law, concrete

5   injury to business reputation will satisfy the injury element of standing."  <u>Id.</u>

6          While there is some inconsistency in the case law (i.e., <u>Symbol Technologies</u>, <u>United</u>

7   <u>Telecommunications</u>, and <u>Dollens</u> versus <u>Cement-Lock</u>), the weight of authority suggests

8   that lost goodwill and business reputation damage allegations must be more than speculative

9   and conclusory.  Moreover, <u>Cement-Lock</u> is in agreement to a degree, requiring "concrete"

10  injury to a corporation's business reputation.  Here, Plaintiffs bring only a single allegation

11  that specifies any present damage to Cray.  VADC ¶ 104 (alleging that "the fees, interest

12  rates and terms" of a June 1, 2005, credit agreement "were far less favorable than those that

13  would have been available to a well managed company with established and fully

14  functioning internal financial controls").  This allegation is conclusory, failing to identify the

15  fees, interest rate or terms, or to provide any explanation as to how the credit agreement was

16  unfavorable.  Accordingly, the Court concludes that Counts II through V fail to identify

17  recoverable damages for loss of goodwill or business reputation and GRANTS the Individual

18  Defendants' motion to dismiss without prejudice for this reason as well.

19          **D.      Failure to Allege Waste of Corporate Assets (Count V)**

20          Finally, the Individual Defendants contend that Plaintiffs' claim for waste of corporate

21  assets (Count V) should also be dismissed for failure to state a claim under Rule 12(b)(6).

22  Corporate waste is defined as "an exchange of corporate assets for consideration so

23  disproportionately small as to lie beyond the range at which any reasonable person might be

24  willing to trade."  <u>Lewis v. Vogelstein</u>, 699 A.2d 327, 336 (Del. Ch. 1997).  In this case,

25  Plaintiffs allege that the Individual Defendants caused Cray to engage in corporate waste "by

26  paying incentive based bonuses to certain of its executive officers and incur [sic] potentially

1   millions of dollars of legal liability and/or legal costs to defend defendants' unlawful

2   actions."  VADC ¶ 142.  The Individual Defendants argue that this claim must fail because

3   (1) there is no allegation the bonuses were made without consideration or constituted a gift,

4   and (2) there is no allegation that the costs associated with defending the pending legal

5   actions are egregious or irrational.  See Lewis, 699 A.2d at 336 (no corporate waste where

6   any substantial consideration was received by the corporation); White v. Panic, 783 A.2d

7   543, 554 n.36 (Del. 2001) (corporate waste claim requires plaintiff to show (and by

8   implication allege) that the board's decision was egregious and irrational).  Plaintiffs provide

9   no opposition to this argument.  Because the corporate waste allegation is unsupported and

10  there is no opposition from the Plaintiffs, the Court GRANTS the Individual Defendants'

11  motion to dismiss Count V without prejudice.

12  ## CONCLUSION

13       For the reasons stated above, the Court rules as follows:

14       The joint motion by Cray and the Individual Defendants to dismiss for failure to

15  comply with the pre-litigation demand requirement, docket no. 18, is GRANTED and the

16  VADC is DISMISSED WITHOUT PREJUDICE.

17       The Individual Defendants' motion to dismiss for failure to comply with Rule 9(b),

18  docket no. 16, is GRANTED IN PART and DENIED IN PART.  The motion is GRANTED

19  as to specific allegations of fraud and misrepresentation and those claims are DISMISSED

20  WITHOUT PREJUDICE.  The motion is DENIED as to the request to dismiss Counts I

21  through VI in their entirety.

22       The Individual Defendants' motion to dismiss Counts I and VI for failure to state

23  breach of fiduciary duty and unjust enrichment claims on the basis of insider selling, docket

24  no. 16, is GRANTED.  Counts I and VI are DISMISSED WITH PREJUDICE.

25       The Individual Defendants' motion to dismiss Counts II through V, docket no. 16, is

26  GRANTED.  Counts II through V are DISMISSED WITHOUT PREJUDICE.

1   IT IS SO ORDERED.

2   DATED this 27th day of April, 2006.

3

4                                           s/ Thomas S. Zilly
                                           _____
                                           THOMAS S. ZILLY
5                                           United States District Judge

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

ORDER   -33-